**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 12-cv-02197-PAB

A.R., by her next friend, PATRICIA A. PACETTI,

   Plaintiff,

     v.

THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah Corporation sole a/k/a the MORMON CHURCH

and DAVID SCOTT FRANK,

   Defendants.

**DEFENDANT CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS'** *DAUBERT* **MOTION TO EXCLUDE PAUL ISENSTADT AS AN EXPERT WITNESS**

Defendant Corporation of the President of The Church of Jesus Christ of Latter-day Saints ("the Church" or "LDS Church"), moves to exclude Paul Isenstadt as an expert witness.

Pursuant to Local Rule D.C.COLO.LCivR 7.1.A, counsel for the Church made an effort to confer with Plaintiff's counsel to resolve this dispute by writing to Plaintiff's lawyer requesting that he withdraw Isenstadt's designation as an expert witnesses. Plaintiff's counsel declined the request and stated that he opposes this Motion.

**BACKGROUND**

In the fall of 2009, at age 15, Plaintiff "A.R." met Bryan Frank at school. *See* Plaintiff's Deposition ("A.R. Depo.") at 67:8-9, relevant portions attached as **Exhibit 1**. A.R. wanted to be Bryan's girlfriend. *Id*. at 90:15–91:7. Bryan lived with his divorced father, David Scott Frank ("DSF"). *Id*. at 86:5–87:9. DSF and Bryan were members of the Colorado Springs 8th Ward of the LDS Church. Bryan told A.R. about the Mormon Church. *Id*. at 87:12—88:11.

Bryan invited A.R. to attend Sunday church services. *Id*. at 93:6-9. She came to Sunday services on January 3, 2010, where she met DSF for the first time, though they had texted each

other before. *Id*. at 93:9-12; 133:21–134:6; 135:2-6. She returned on subsequent Sundays, but she cannot remember how many times – as few as three or as many as twenty. *Id*. at 96:9-13. A.R. attended a Sunday School class taught by DSF. *Id*. at 109:1-6.

A.R. and DSF began to communicate frequently outside of church. *Id*. at 136:5-24. They texted and called each other "thousands and thousands" of times. *Id*. at 140:11-16. These calls and texts occurred mostly between 9 p.m. and 3 a.m. *Id*. at 140:19-22.

One night in late March or April 2010 at about 1 a.m., A.R. called DSF and invited him over to her house when his shift ended. *See* Police Report, attached as **Exhibit 2**. A.R. told him where to park to avoid being seen. *Id*. They met in DSF's car on the road in front of A.R.'s house and kissed. A.R. Depo. at 149:9–150:25. They continued to exchange late night phone calls and text messages. *Id*. at 154:3-9. They met a second time late at night in DSF's car in front of A.R's house and engaged in intercourse. *Id*. at 155:24–156:24.

The two continued to exchange late night phone calls and text messages. *Id*. at 159:1-7. They met for a third time (Friday, June 25, 2010) late at night in DSF's car in front of A.R.'s house and again engaged in intercourse. *Id*. at 160:7–161:9; *see also* Exh. 2.

In July 2010, A.R. learned through Facebook that DSF was engaged to another woman. Exh. 2. When she realized DSF didn't love her, she told her mom about the relationship. A.R. Depo. 164:22-25. Her mom called the police. *Id*. at 165:6-7. DSF was arrested and pleaded guilty to sex with a 15-year-old with more than a 10-year age difference, a class 1 misdemeanor.[1]

No sexual contact occurred between A.R. and DSF during Sunday worship services. *Id*. at 107:22–108:2. No sexual contact occurred between A.R. and DSF during the Sunday School

---

[1] *See* Colo. Rev. Stat. § 18-3-402(1)(e) ("Any actor who knowingly inflicts sexual intrusion or sexual penetration on a victim commits sexual assault if: (e) At the time of the commission of the act, the victim is at least fifteen years of age … and the actor is at least ten years older than the victim and is not the spouse of the victim.").

2

class A.R. attended. *Id*. at 121:23–122:22; 123:16-19. There were between five and twelve other teenagers in this class. *Id*. at 120:22–121:13.

A.R. has sued the LDS Church for negligent hiring, negligent supervision, and breach of fiduciary duty. Comp. ¶¶ 32, 37-38, 40, 44, 46-48. A.R. proffers the testimony of Paul Isenstadt as an expert witness. Isenstadt's testimony should be excluded for the reasons that follow.

## ARGUMENT

### I.    RULE 702 IMPOSES A GATEKEEPER FUNCTION ON THE COURT.

Expert testimony must meet the criteria of Rule 702 of the Federal Rules of Evidence. *See generally Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999).

#### A.    The trial court must examine whether the expert is qualified to offer opinions relevant to the particular issues in the case.

Plaintiff must show that Isenstadt is "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Isenstadt's curriculum vitae alone demonstrates his complete lack of expertise. *See infra*. Assuming he has sufficient expertise, which he does not, for the purposes offered, "[t]he trial court ha[s] to decide whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Kumho Tire Co., Ltd.*, 526 U.S. at 156. If an expert relies primarily on experience to establish his expertise, he "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Adv. Comm. Notes; *see also Ho v. Michelin N. Am., Inc.*, 2013 WL 1277023 at *3 (10th Cir. Mar. 29, 2013) (affirming exclusion of

an expert's testimony because he "did not explain how [his] experience rendered his particular opinions in this case reliable.").

### B.     The trial court must examine whether the expert's opinions are reliable.

"If the expert is sufficiently qualified, then the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology." *United States v. Avitia-Guillen*, 680 F.3d 1253, 1256 (10th Cir. 2012), *cert. denied*, 133 S. Ct. 466 (2012) (internal citations, quotation marks omitted). A district court must assess "the reasoning and methodology underlying the expert's opinion" and whether it has "a grounding in the methods and procedures of science based on actual knowledge, not subjective belief or unsupported speculation." *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006) (internal citations, quotation marks omitted).

### C.     The trial court must examine whether the expert will assist the trier of fact and whether the probative value of the opinion outweighs any prejudice.

Even reliable testimony is inadmissible if it will not "assist the trier of fact to understand the evidence or to determine a fact in issue," *Daubert*, 509 U.S. at 590, or if its probative value is substantially outweighed by other factors, including unfair prejudice. Fed. R. Evid. 401 and 403.

## II.    ISENSTADT IS NOT QUALIFIED TO OFFER OPINIONS RELEVANT TO THIS CASE, HIS OPINIONS ARE UNRELIABLE, AND THEY WILL NOT ASSIST THE TRIER OF FACT.

Isenstadt is apparently offered by Plaintiff to establish that a standard of care exists when a member of the Church is called to be a Sunday School teacher and that the alleged standard of care was somehow breached by the Church in this case. An analysis of Isenstadt's qualifications in relation to the opinions he offers and the facts and relevant issues in this case shows that Isenstadt should be excluded. Isenstadt's vita is attached as **Exhibit 3**. His report is attached as **Exhibit 4**. Isenstadt's vita and report demonstrate that he has not conducted any studies based

4

on standards of care for selecting and retaining teachers, has not published any peer-reviewed articles on these subjects, and is devoid of specialized knowledge of any such standards. He does appear to have some competency in evaluating and treating sex offenders and assessing the risk of recidivism. However, DSF was not a sex offender before his conviction for having sex with A.R., nor had he ever been arrested on suspicion of being a sex offender. Thus, Isenstadt's competence in such matters is irrelevant to this case.

A.R.'s claims against the Church are for negligent hiring and negligent retention. Nothing in Isenstadt's vita or report suggests that he has any expertise in the standard of care for churches: he lists no education, scientific studies, research activities, or published peer-reviewed literature on this subject, and he has no expertise in the types of policies churches use to prevent sexual misconduct. A.R.'s claim against DSF is for battery. No expert testimony is needed to assess this claim.

Expertise in one area does not qualify one to testify about other matters. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 967-70 (10th Cir. 2001) (that being a board-certified orthopedic surgeon "is not sufficient to permit a physician to testify concerning any orthopedic-related issue"). Isenstadt's experience in correctional settings with convicted offenders does not correlate to this case. Further, most of Isenstadt's opinions are not "expert" opinions at all, but merely observations which are within a lay jury's ability. The opinions that can be identified are accompanied by no reasoning or description of methodology. And several of his opinions are contrary to the undisputed facts and therefore are unreliable and will not assist the trier of fact.

Below we discuss the opinions and conclusions offered by Isenstadt, whether Isenstadt is qualified to offer the opinions, and whether his opinions meet the requirements of Rule 702:

> ***In the case of [DSF], we have an individual assuming a Position of Trust in teaching a class of adolescent students.*** Exh. 4 at 3.

Isenstadt has spent his career working in corrections; he has no experience, much less expertise, regarding Sunday School teachers in the LDS Church. He opines that DSF's position as a Sunday School teacher was a "Position of Trust" and was "certainly a critical position representing the church," *id*. at 3, 7, but he offers no reasoning or explanation for these assumptions. As Dr. Park Dietz's rebuttal report states: "Mr. Isenstadt has not defined what he means by a 'position of trust' and has not set forward any facts to show that a temporary Sunday School teacher who spends just 40-50 minutes a week with a group of students in a classroom setting is in a 'position of trust.'" *See* Dietz Rebuttal Rep. at 1, attached as **Exhibit 5**.

> ***The role of background checks in working in this capacity has become increasingly mandatory in all settings in which an individual may be acting in a Position of Trust. In my capacity as an Operations Director at ComCor, Inc. background checks were done on all employees to include maintenance and food service and administrative employees who had minimal or no contact with the offender population.*** Exh. 4 at 3.

Isenstadt suggests that the same standard of care should apply to a Sunday School teacher who spends 40-50 minutes a week with a group of students as applies to workers in a correctional facility (like ComCor, Inc.) with known sex offenders. He lays no foundation and offers no reasoning except his experience in a correctional facility. Expert opinion based on experience, "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Adv. Comm. Notes. As Dr. Dietz explains in his rebuttal report:

> Mr. Isenstadt's experience as Operations Director at a community corrections center that provides residential and nonresidential services to

6

> offenders is not comparable to the operation of a church, as the presence of offenders in a correctional program poses security risks related to alcohol and drugs, weapons, and other contraband and security risks related to violence, sex offenses, and escape that are expected of offender populations and unexpected for those participating in Sunday School. A church should not be judged by [the] same standards as a correctional program.

Exh. 5 at 2. Isenstadt offers no description of what kind of background check should have been conducted or what would have been discovered. *See United States v. Simpson*, 7 F.3d 186, 188-89 (10th Cir. 1993) ("[in]adequately exploring the criteria upon which the opinion is based, the jury is provided with no independent means by which it can reach its own conclusion or give proper weight to the expert testimony."). Isenstadt's testimony does not meet the requirements of Rule 702.

> ***In the case of [DSF], we have an individual whose history of abuse, to include menacing and Domestic Violence, has been identified in the court system since 1998. One would believe that in the determination of having [DSF] teach a class of students alone, certainly church personnel should have reviewed his history and background; although it is noted that the Two Deep Policy is not applicable in small Wards, such as this Ward. There must be alternatives put in place to mitigate the fact that there was not a teacher or aide in the class. One of these factors was that there should, if at all possible, be a window in the class, which would allow for observation. One would note that if a window was not available, some accommodation should be made. Although currently windows exist in the doors of the classrooms, at the time [DSF] was teaching, there were key holes allowing a member of the Primary Presidency to monitor a member to monitor the classrooms as noted in Bishop Miller's Deposition. Another accommodation was that an overseer, in the role of the principal, would have some oversight as to monitoring the class.*** Exh. 4 at 3-4.

Isenstadt's opinions regarding the two-deep policy, windows in classroom doors, and an overseer to monitor the class are irrelevant and will not assist the trier of fact for this simple reason: *It is undisputed that none of the alleged sexual misconduct occurred in the classroom.* None of these measures would have prevented DSF and A.R. from having sex in DSF's car in front of A.R.'s house. Additionally, nothing in Isenstadt's history of working with offenders in corrections suggests he has the expertise to opine on such matters. And Isenstadt's assertion

that "[o]ne would believe" that the Church should have reviewed DSF's background is not an expert opinion and is not based on reasoning, methodology or even experience.

Additionally, Isenstadt makes assumptions that are contrary to the facts and that render this portion of his opinion unreliable. *See United States v. Charley*, 189 F.3d 1251, 1270 (10th Cir. 1999) (erroneous assumptions render expert testimony unreliable). Isenstadt contents DSF has a "history of abuse." Exh. 3 at 3. But, Isenstadt does not cite to any of the documents in the record in support of this characterization. DSF was arrested in 2000 for "menacing," but the charges were dropped. Exh. 5 at 2. And under Colorado law, this arrest would not have shown up on a criminal background check, even if the Church had conducted one. Exh. 5 at 3, n.2. As for charges of "domestic violence," as Dr. Dietz explains referring to the arrest records, allegations against DSF that he called his children a few minutes too early or a few minutes too late in violation of a restraining order were classified as "domestic violence" even though there was no violence involved. Exh. 5 at 2. Isenstadt's statement about DSF's "history of abuse" is erroneous.

The "Two Deep Policy" does not apply to Sunday School classes in any ward in the Church, large or small, because, in the Church's experience, youth Sunday School classes are a safe setting. Exh. 5 at 4. The "Primary Presidency" does not oversee Sunday School classes, the Sunday School presidency does. And Isenstadt ignores the undisputed testimony that there is an "overseer" that monitored the class. As DSF explained in his answers to interrogatories: "Members of the Eighth Ward Sunday School presidency regularly oversaw and regularly visited the class." *See* DSF's Responses to Req. for Admissions No. 3, attached as **Exhibit 6**.

> ***A specific concern this evaluator has regarding this particular case relates to the manner in which the defendant, [DSF], groomed the victim in this case. We***

8

> *know that with sexual offending, most offenses do not occur in which individuals commit a stranger sexual assault…. [T]he large majority of sexual offenses involve individuals who engage in a cycle of behavior over a period of time. Individuals who commit sexual abuse tend to often identify individuals who may be struggling with personal issues and manifest some level of vulnerability. This was certainly the case in regard to [DSF], who soon after [A.R.] entered his classroom, began to engage in a texting interaction with her. It was obvious from the beginning that he was aware of her vulnerability. As a person in a Position of Trust, [DSF] should have immediately addressed his concerns [about] receiving texts from [A.R.], with the Primary Presidency at the church who could then decide if this matter should be referred to the Bishop…. My concern is that [DSF] began to have some thoughts and feelings immediately toward the victim, which resulted in a cycle in which he ultimately engaged in the sexual molestation. I have worked with many individuals who I have identified with similar cycles with [sic], although one should note that in the case of [DSF], the cycle was relatively short from the time of initial contact to his first act of molestation.* Exh. 4 at 4-5.

Isenstadt may have expertise about the manner in which sexual offenders choose and "groom" their victims, but that expertise is not relevant to this case. It is undisputed that DSF engaged in unlawful, non-violent sex with A.R. *See Cook*, 580 F. Supp. 2d at 1167 (excluding expert testimony "given the lack of dispute regarding [the issue] … and the capability of a lay jury to understand [the issue] … without expert assistance"). And the facts of this case do not require expert testimony about grooming. It is within the jury's capability to understand that DSF met, texted, and then had sex with A.R., and A.R.'s vulnerability to such a relationship.

In *United States v. Raymond*, 700 F. Supp. 2d 142 (D. Me. 2010), the court excluded the expert testimony of Kenneth Lanning proffered against a defendant indicted on two counts of transporting a minor across state lines for the purpose of engaging in illegal sexual activity. Lanning offered testimony on the "behavioral patterns and the 'grooming or seduction process' that molesters use to gain access to victims and, second, about certain characteristics of 'compliant child victims,'" *id*, but he did not explain how his experience related to or allowed him to draw his conclusions. His report referred to "thousands of cases" he had worked on over

9

"many years." *Id*. at 147. "Statements like these," the trial court concluded, "permit no meaningful evaluation of Lanning's facts or data or the reliability of Lanning's opinions …. [because] Lanning's categorization of behavioral characteristics of child molesters and child victims is the 'subjective, conclusory approach' that cannot be 'reasonably assessed for reliability' under Rule 702." *Id*. at 147, 149 (quoting Fed. R. Evid. 702 Adv. Comm. Notes).

Isenstadt likewise refers to "work[ing] with many individuals who I have identified with similar [grooming] cycles." Exh. 4 at 5. But he offers no explanation as to how this experience is relevant to this case, how he applied his experience to the facts of this case, or how his experience leads to his conclusions. Nor does he explain how the general conclusions he has drawn from his experience can be specifically applied to this case. *See Cook*, 580 F. Supp. 2d at 1164-65 (despite expert appraiser's "years of experience in the area and discussions with real estate agents, homeowners and appraisers over the years," her testimony was inadmissible where she did not "explain how her experience in the area allowed her to reach her conclusions.").

The court in *Raymond* also concluded that Lanning's generalizations about the usual characteristics of child molesters would not help the trier of fact. 700 F. Supp. 2d at 150. Jurors would be asked to take generalizations from an expert and make "common sense" deductions, "but a jury may make the quick and unjustified jump from his expert testimony about behavioral patterns to guilt in a particular case that shows similar patterns … [so that] 'by appearing to put the expert's stamp of approval on the government's theory, such testimony might unduly influence the jury's own assessment of the inference that is being urged.'" *Id*. (quoting *United States v. Montas*, 41 F.3d 775, 784 (1st Cir. 1994) (internal brackets omitted)).

Here, it is not clear what conclusion A.R. hopes the jury will draw from Isenstadt's "grooming cycle" testimony because Isenstadt does not state any conclusions. One possible conclusion, however, is that DSF did not merely give in to temptation, but that he intended over a period of time to engage in the illegal sexual conduct with A.R. and carefully "groomed" her for this possibility. Thus, Isenstadt's testimony may ask the jury to read DSF's mind based on generalized patterns of behavior. Such a conclusion would be especially troubling in this case where, as Isenstadt admits, the alleged grooming cycle was "relatively short" (Exh. 5 at 5), it was the victim who pursued the relationship, and where DSF had never done anything like this before. DSF is not the common pedophile that Isenstadt tries to paint – someone who carefully picks out vulnerable victims and cautiously grooms them over time until he can molest them and coerce their silence. The evidence suggests that DSF was a weak man who gave in to a temptation that presented itself to him. Isenstadt's testimony asks the jury to take generalized testimony about the common patterns of pedophiles and apply them to DSF without any evidentiary link. This "grooming cycle" testimony is also prejudicial to the Church because it may also suggest that the Church should have recognized what was occurring and should have done something to stop it. If DSF fits the common pattern of a pedophile, a jury may think, a large organization like the Church should have foreseen the possibility that he might take advantage of a victim like A.R.

Isenstadt does not explain how his testimony is relevant; he merely makes generalizations about the "grooming cycle" and then concludes that this cycle was "relatively short" here. He does not explain his methodology or give conclusions that would be helpful to the jury.

The *Raymond* court also concluded that opinions about "grooming" were "actually common sense observations that … can be simply argue[d] in closing," *id*. at 150, stating that

> as for "grooming," Lanning explains that he has in mind a totally familiar concept: "I … prefer the term *seduction* because it is better known an more understandable. These offenders seduce children much the same way adults seduce one another. This technique is no great mystery. Between two adults or two teenagers it is usually called dating. Years ago it was called courting." This is not specialized knowledge needed to assist the jury to determine a fact at issue…. I conclude that even an "untrained laymen," the ordinary jury member, is qualified to "determine intelligently and to the best possible degree" whether a person has seduced a child, without enlightenment from Lanning.

*Id*. at 151 (internal citations omitted). The same is true here: a jury does not need Isenstadt's help to decide whether DSF groomed A.R. for a relationship, or merely gave in to a temptation.

Isenstadt's assertions that DSF "began to have some thoughts and feelings immediately toward the victim" or that "[i]t was obvious from the beginning that [DSF] was aware of [Plaintiff's] vulnerability" are pure speculation, since Isenstadt has never met DSF and offers no explanation. Exh. 5 at 5. *See United States v. Schneider*, 2010 WL 3734055 at *5 (E.D. Pa. Sept. 22, 2010) (where the expert "ha[d] never met [perpetrator] and ha[d] not examined him or read notes of psychological treatment or diagnoses given by another psychological expert," expert's "testimony about the general relationship that may exist between child sexual abusers and their victims [wa]s speculative as to [the perpetrator's] relationship to [the victim]").

Isenstadt's opinion that DSF should have notified the Primary Presidency will not assist the trier of fact. (We assume he means the Sunday School presidency since the Primary presidency had nothing to do with DSF's role.) Of course it would have been preferable if DSF had notified someone, but expert testimony is not required for such an obvious conclusion.

> ***As a person in a Position of Trust and a teacher who had access to extensive materials produced by the Church of Latter-Day Saints [sic], it is difficult to understand that [DSF] would allow this type of relationship to continue….***

12

> *Identified sex offenders ([DSF] is a Registered Sex Offender) tend to be very engaging and ingratiating in "setting up" their victims.  The cycle in this particular case was very short ….   [DSF], both as a parent and a teacher, certainly understood the vulnerability of adolescents, specifically adolescent females the age of [A.R.].*  Exh. 4. at 5.

The Church agrees that DSF knew better and that it is difficult to understand why he allowed this to happen. Even DSF admits this. Exh. 6 at 8. But this does not qualify as expert testimony and will not assist the trier of fact. If DSF as a "parent and teacher" could understand A.R.'s vulnerability, so can the jury without the assistance of expert testimony.  Further, Isenstadt's opinions regarding the "grooming" process and how perpetrators "set[] up" their victims is irrelevant and will not assist the trier of fact. Sadly, the facts of this case fit within common human experience.  It does not take an expert to explain how DSF and A.R. met, became close, and engaged in sex. Finally, DSF was *not* a registered sex offender prior to his conviction for having sex with A.R.

> *The STATIC-99R is the most recent version of a widely used and research risk screening instrument developed on a large sample of convicted sex offenders…. On the STATIC-99R, [DSF] appears to have a score of two (2) which indicates a Low-Moderate risk score.*  Exh. 4. at 6.

The Church does not dispute Isenstadt's experience regarding issues of recidivism. But this opinion is irrelevant because DSF was not a convicted sex offender at the time of his relationship with A.R., and the STATIC-99R rating is based on his conviction for having sex with A.R., the very basis for liability in this case. It will not assist the trier of fact to have expert testimony regarding whether DSF is a risk to reoffend. As Dr. Dietz explains:

> The STATIC-99R, while a well-accepted actuarial instrument, has no relevance whatsoever to the events being litigated in this case.  Indeed, the STATIC-99R could not have been properly applied to [DSF] prior to [A.R.]'s disclosure of their sexual relationship because no one but [DSF] and [A.R.] knew that he had ever committed any sex offense.  Only after his conviction in the criminal case did he become a convicted sex offender for whom one might use this instrument to predict future risk. Exh. 3 at 4.

13

> ***Also of major concern is that the Church of Latter-Day Saints did not identify the importance of reporting this offending behavior.*** Exh. 4 at 7.

Isenstadt's "concern" about the Church's alleged failure to report does not qualify as expert testimony, nor is Isenstadt qualified to opine on reporting laws and obligations. Isenstadt ignores the uncontradicted testimony that the Church learned about the misconduct *after* her mother had already notified the police and the criminal investigation had already commenced. *See* Dep. of Patricia Pacetti 95:7-96:1, relevant portions attached as **Exhibit 7**; Dep. of Todd Miller 70:20-25, 76:9-17, relevant portions attached as **Exhibit 8**. *Elcock v. Kmart Corp.*, 233 F.3d 734, 755 n.12 (3d Cir. 2000) (discussing the exclusion of expert opinions when "not grounded in the facts of a case"). Further, a report would not have prevented the abuse, and A.R. does not assert a cause of action or increased damages based on any failure to report.

> ***[T]his evaluator was concerned that an individual in this type of position … would not have been interviewed or reviewed regarding his background and his interest in teaching. In Bishop Miller's deposition, he references Stake President Lewis and references how an individual who is receiving a calling to teach must be approved by the congregation. One has serious questions as to why his record was not annotated for Spousal Abuse. Although it is noted that he was never questioned, his tattoos alone, given church teaching, should have generated some concern. One would think that an individual becoming a teacher would have had some level of on-site mentoring during the time he was teaching.*** Exh. 4 at 7.

Isenstadt's "concern" about whether DSF was interviewed based on his "interest" in teaching Sunday School does not constitute expert testimony, and Isenstadt is not qualified to opine on the standard of care for "calling" teachers. In addition, DSF was *approached* about teaching, and he *was* interviewed by the Church, so Isenstadt's premises are factually incorrect. Exh. 6 at 4. Likewise, Isenstadt's "questions" about why DSF's record was not annotated for Spousal Abuse does not constitute expert testimony and will not assist the trier of fact.

The suggestion that the Church should have foreseen his sexual misconduct with A.R. because of "church teachings" about tattoos does not constitute expert testimony, is not within Isenstadt's expertise, and is irrelevant and unreliable. Isenstadt does not say what "church teachings" he is referring to.

Finally, Isenstadt's assertion that there should have been "some level of on-site mentoring during the time he was teaching" is again contrary to the facts. There was on-site mentoring. As DSF explained in his answers to interrogatories: "Members of the Eighth Ward Sunday School presidency regularly oversaw and regularly visited the class." (Exh. 6 at 3.) Additionally, there is nothing in Isenstadt's education or background that suggests he is an expert regarding the standard of care for mentoring teachers.

## CONCLUSION

Given that the current scheduling order for expert witness discovery must be concluded by May 30, 2013, we reserve the right to supplement this Motion based on any new information that is elicited during Isenstadt's deposition, presently noticed for May 22, 2013. However, for the reasons stated above, Isenstadt is not qualified to offer expert opinions relevant to this matter and that the opinions he has offered are not reliable. The Court should therefore exclude Isenstadt as an expert and strike his expert report.

ROTHGERBER JOHNSON & LYONS LLP

*s/ Charles Goldberg*
Charles Goldberg
L. Martin Nussbaum
cgoldberg@rothgerber.com
mnussbaum@rothgerber.com
*Attorneys for Defendant The Corporation of the President of the Church of Jesus Christ of Latter-day Saints*

## CERTIFICATE OF SERVICE

      I hereby certify that on this 15th day of May, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following addresses:

Michael R. Waters, Esq.
David L. Geislinger, Esq.
JONES, WATERS, GEISLINGER & SEYMOUR, LLC
707 South Tejon, Ste. 200
Colorado Springs, CO  80903

David S. Chipman, Esq.
CHIPMAN GLASSER LLC
Tower 1, Suite 7500
2000 South Colorado Boulevard
Denver, CO 80222

                                                        *s/ Charles Goldberg*
                                                        Charles Goldberg