Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 12-CV-02197-PAB

--------------------------------------------------------------

Plaintiff(s):

A.R., by her next friend, PATRICIA A. PACETTI

Defendant(s):

THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS
CHRIST OF LATTER-DAY SAINTS, a Utah Corporation sole
a/k/a the MORMON CHURCH and DAVID SCOTT FRANK

--------------------------------------------------------------

Scheduling Attorney for the Defendant Church of Jesus Christ
of Latter-Day Saints:

MR. L. MARTIN NUSSBAUM, ESQ.

Rothgerber, Johnson & Lyons, LLP

90 South Cascade Avenue, Suite 1100

Colorado Springs, CO  80903

(719) 386-3000

Atty. Reg. No. 15370

MR. JUSTIN STARR, ESQ.

Kirton McConkie

1800 Eagle Gate Tower

60 East South Temple

Salt Lake City, UT  84111

(801) 328-3600

**Appearances continued on page 2**

--------------------------------

DEPOSITION OF ASHLEY RUSSIK

January 21, 2013

# EXHIBIT 1

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

Page 67

```
 1    counseling; is that right?

 2         A.   Yes.

 3              MR. NUSSBAUM:   May I have Zimmer page 245,

 4    please.

 5    BY MR. NUSSBAUM:

 6         Q.   Who is Dr. Zimmer?

 7         A.   He is my family physician.

 8         Q.   When did you meet Brian Frank?

 9         A.   It was in 2009.  December of 2009.

10         Q.   And before Christmas?

11         A.   Yes.

12         Q.   But shortly before Christmas?

13         A.   Yes.

14         Q.   Can you date it any more precisely than that?

15         A.   No.

16         Q.   And do you recall being suicidal in that period

17    of time?

18         A.   I don't recall.

19         Q.   It is possible, but you don't recall?

20         A.   Yes.

21              (Deposition Exhibit 7 was marked.)

22         Q.   This is a note from Dr. Zimmer's file.  And he

23    was your family doc?

24         A.   Yes.

25         Q.   Is that right?
```

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

Page 86

1    about.

2         Q.   And did you then begin communicating with him

3    after class as well?

4         A.   Yes.

5         Q.   And how did you do that?

6         A.   Through Scott Frank's -- or David Scott Frank's

7    phone.

8         Q.   So, Brian had a phone that his dad owned?

9         A.   Uh-huh.

10        Q.   Is that yes?

11        A.   Yes.

12        Q.   And you would speak with him on the phone?

13        A.   Yes.

14        Q.   And you would also text with him on the phone?

15        A.   Yes.

16        Q.   I have never texted, so you will have to help me

17   here.  Do you dial the same number when you text as when you

18   call someone?

19        A.   Yes.

20        Q.   So, those telephone numbers you gave me earlier

21   would also be the number for texting?

22        A.   Yes.

23        Q.   And would you speak to him on the phone like in

24   the evening and on the weekends?

25        A.   Yes.

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

A R., by her next friend, Patricia A. Pacetti v. The Church of Jesus Christ of Latter Day Saints          Ashley Russ          January 21, 2013

Page 87

1      Q.   A lot?

2      A.   Frequently.

3      Q.   And how often did you talk to Brian?

4      A.   I don't remember.

5      Q.   Would it be maybe a couple hours a day?

6      A.   Yes.

7      Q.   And you would also text him during that period of

8   time?

9      A.   Yes.

10      Q.   What would you talk about?  That is a lot of time

11   talking.

12      A.   Sometimes we would talk about religion, and that

13   is when he introduced me to the LDS religion, and all of

14   that.  And we would talk about that.  We would talk about

15   our interests, honestly.

16      Q.   And you have an interest in a lot of things,

17   don't you?

18      A.   Yes.

19      Q.   And you were kind of interested in different

20   religions?

21      A.   Yes.

22      Q.   And you didn't know much about the Mormon Church?

23      A.   No, I didn't.

24      Q.   Is that right?

25      A.   Yes.

A.R., by her next friend, Patricia A. Pacetti v. The Church of Jesus Christ of Latter Day Saints   Ashley Russek                    January 21, 2013

Page 88

1        Q.    This was a curiosity to you?

2        A.    Yes.

3        Q.    Did you think, oh, I want to join that church, or

4    did you think more let's -- I am curious, let's just learn

5    about it?

6        A.    Was more curious and just wanted to learn.

7        Q.    And when you were in Sunday school and go to

8    services in the months ahead, were you still kind of curious

9    as an intellectual sense, or were you thinking, "Maybe I

10   will join"?

11       A.    A mixture of both.

12       Q.    So, what you were exposed to at the church you

13   found some things attractive about it?

14       A.    Yes.

15       Q.    And what were those?

16       A.    It was just different from all the churches that

17   I have ever been to.  Because most of the churches that you

18   have been to are a little less -- they are -- I am trying to

19   think of a word how to describe it.  They are -- the

20   churches that I have usually been to are more formal -- or

21   casual.

22       Q.    More casual?

23       A.    I'm sorry, more casual.  And, you know, jeans and

24   a T-shirt.  And, you know, different -- different types of

25   gospel.  So, I was just -- it was just interesting, because

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

Page 90

1      A.    No, I just kind of gradually brought it on to him

2   saying, "I think you are cute," and things like that.

3      Q.    And he didn't reciprocate?

4      A.    Not that I remember.

5      Q.    And how long was that after you had met him that

6   you began letting him know you thought he was cute?

7      A.    I don't remember.

8      Q.    And after Christmas, you went to Missouri to be

9   with your dad and stepmom?

10     A.    Not after.  It was during Christmas.

11     Q.    During Christmas?

12     A.    Yes.

13     Q.    How long were you there?

14     A.    I believe I was there for a week.

15     Q.    So, you went out to Missouri maybe a week before

16  Christmas, and you stayed until a week after, until early

17  January?

18     A.    I don't remember exactly the dates.

19     Q.    But approximately?

20     A.    Approximately.

21     Q.    Okay.  And while you were in Missouri did you

22  continue to communicate with him both by phone calls and

23  text messages?

24     A.    Yes.

25     Q.    Do you recall any of those conversations?

A.R., by her next friend, Patricia A. Pacetti v. The Church of Jesus Christ of Latter Day Saints     Ashley Russ...k     January 21, 2013

Page 91

```
 1          A.   No.

 2          Q.   And that would still go on for about an hour or

 3   two a day?

 4          A.   Approximately.

 5          Q.   Did Brian ever have any physical contact with you

 6   at all, ever hold your hand or touch you or --

 7          A.   No.

 8          Q.   Did he ever invite you to his home?

 9          A.   No.

10          Q.   Were you ever in his home?

11          A.   No.

12          Q.   He didn't have his own car, did he?

13          A.   Not that I know of.

14          Q.   Did his dad have a car and would pick him up

15   sometimes?

16          A.   Yes.

17          Q.   Did you meet his dad when he would pick him up at

18   school occasionally?

19          A.   I would see him, yes.

20          Q.   And did Brian introduce you to his dad?

21          A.   At the church.

22          Q.   But did he -- did you meet him when he would pick

23   him up at school?

24          A.   No.

25          Q.   You never talked to him at school?
```

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

A R , by her next friend, Patricia A. Pacetty v  Il e Church of Jesus Christ of Latter Day Saints      Ashley Russ k

January 21, 2013

1    church?

2         A.   Yeah.  I mean, I think -- I believe that he told

3    me the basics about it.  Like what they believe.  What they

4    read.  Some of the books.  And all of that.  But I don't --

5    I don't remember exactly what he said.

6         Q.   Okay.  And did he invite you to the ward, or did

7    you ask to come to the ward?

8         A.   I think it was a little bit of both.

9         Q.   And when did you start coming to the ward?

10        A.   It was January 3rd.

11        Q.   And how do you remember that date?

12        A.   I don't know why I remember that date, but I do.

13        Q.   2010?

14        A.   Yes.

15        Q.   Did you ever tell Brian as your relationship

16   developed with him or his dad -- did you ever tell him, "You

17   know, I am going to have sex with your dad"?

18        A.   No.

19        Q.   You are sure of that?

20        A.   Yes.

21        Q.   And did you ever tell Brian that you were going

22   to commit suicide?

23        A.   Not that I am aware of.

24        Q.   And, so, you are not sure of that, I take it?

25        A.   I don't remember exactly, but I am pretty sure

Local
(719) 578-2062

Peton Reporting Service, Inc.
www.petonreporting.com

Denver
(303) 575-6606

A R , by her next friend, Patricia A. Pacett  v. The Church of Jesus Christ of Latter Day Saints          Ashley Russk                                January 21, 2013

Page 96

```
 1          Q.   Could you even give me roughly?  Was it less than

 2    ten?

 3          A.   I don't recall.

 4          Q.   You don't recall.  You have no recollection.  So,

 5    do you have any recollection if you were there three Sundays

 6    or -- what do we have here, five months, 20 Sundays?  You

 7    have no idea?

 8          A.   No.

 9          Q.   It could be as little as three; it could be as

10    many as 20?

11          A.   Uh-huh.

12          Q.   Is that right?

13          A.   Yes, yes.

14          Q.   You just don't know?

15          A.   I just don't know.  I did see him take

16    attendance, so...

17          Q.   Who did you see take attendance?

18          A.   David Scott Frank.

19          Q.   And what was a typical morning like at the

20    church?

21          A.   We would just sit down in the area, the big

22    area, I don't know what the LDS calls it, I guess the

23    sanctuary area, and before the service we would just, you

24    know, chat with people and stuff like that.  And then we

25    would sit down.  There would be like, you know, the hymns
```

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

A.R., by her next friend, Patricia A. Pacetti v. The Church of Jesus Christ of Latter Day Saints        Ashley Russek        January 21, 2013

Page 107

```
 1    off of Fountain and Platte."

 2          Q.    What is that about?

 3          A.    Some kind of conference, I guess.  Something

 4    about like -- I guess -- I recall it as some teachings.

 5          Q.    A church conference of some sort?

 6          A.    Yes.

 7          Q.    It is fair to say there is no romantic or sexual

 8    content to that handwriting?

 9          A.    Yes.

10          Q.    And there is no other handwriting on that page?

11          A.    Yes.

12          Q.    And on page 297, there is no handwriting?

13          A.    Yes.

14          Q.    Are you aware of any other bulletins that exist

15    that show the two of you exchanging any notes?

16          A.    Not that I am aware of.

17          Q.    Is it fair to say that in the notes that you

18    exchanged, they are all -- from this group, Deposition

19    Exhibit 9, they are all essentially about the church

20    teachings, the readings, or church events?

21          A.    Yes.

22          Q.    In your experience of attending the worship

23    service, the first hour of this Sunday morning activity with

24    Brian and Scott Frank, is it fair to say that there was

25    never any sexual or romantic content whatsoever to what
```

1     happened in that first hour?

2              A.    Yes.

3              Q.    And did a bell ring when the service came to an

4     end, or --

5              A.    Yes.

6              Q.    And the service goes right up to the bell?

7              A.    Sometimes a little longer.

8              Q.    And after the bell do people promptly move to the

9     Sunday School class?

10             A.    What do you mean?

11             Q.    After the bell rang of the first hour, did you

12    promptly move to the Sunday School class after that?

13             A.    If there -- if they were done with the service,

14    yes.

15             Q.    And were there any communications between you and

16    Scott Frank from the time the service ended until Sunday

17    School class?

18             A.    Sometimes, yes.

19             Q.    Like what?

20             A.    I don't remember.

21             Q.    Do you remember if any of that ever had any

22    romantic or sexual content?

23             A.    There could have been.  I am not sure.

24             Q.    But you don't recall?

25             A.    I don't recall.

A.R., by her next friend, Patricia A. Pacetti v. The Church of Jesus Christ of Latter Day Saints     Ashley Russek     January 21, 2013

Page 109

1     Q.     And then you went to Sunday School class, and who

2     would teach that class?

3     A.     That would be David Scott Frank.

4     Q.     And every Sunday that you were there, did he

5     teach the class?

6     A.     Every Sunday that I am aware of.

7     Q.     And then how did that -- how did you know when

8     that class came to an end?

9     A.     There was another bell that would ring.

10    Q.     And then where did you go?

11    A.     Young women's.

12    Q.     And would you typically go promptly to the young

13    women's class?

14    A.     Yes.

15    Q.     And would that class then continue until yet

16    another bell?

17    A.     Yes.

18    Q.     And then you would go home?

19    A.     Yes.

20    Q.     And did you have any contact with Scott Frank

21    after the young women's class?

22    A.     I would sometimes.  He would be putting up chairs

23    or something like that, and I would go and help him.

24    Q.     Okay.  And when you would help him put up chairs,

25    was there ever any sexual or romantic content to that that

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

Page 120

1       A.      Yes.

2       Q.      And you don't know how often?

3       A.      No.

4       Q.      But every time you went to the ward you went to

5    Sunday School class?

6       A.      Yes.

7       Q.      Somewhere between three and 20 times?

8       A.      Yes.

9       Q.      Actually I do want to go back.  Let's not go to

10   the Sunday School class yet.  Were you ever at worship when

11   the person leading the service, the bishop, or whoever it

12   was, announced that someone was nominated to be -- to hold a

13   position in a church?  It is called a sustaining procedure.

14   Were you ever present when that occurred?

15       A.      I don't remember.

16       Q.      Do you remember people being asked to stand or to

17   affirm that someone is worthy to serve in a particular role?

18       A.      There might have been.

19       Q.      But you don't remember?  You don't have a memory

20   of that?

21       A.      No, I don't.

22       Q.      Okay.  Let's go back to Sunday School, then.  How

23   many kids were in the Sunday School class you attended?

24       A.      Anywhere between five to a dozen.

25       Q.      Boys and girls?

Page 121

```
 1        A.    Yes.

 2        Q.    Your age?

 3        A.    Yes.

 4        Q.    Do you remember any of their names?

 5        A.    Not -- not off the top of my head.

 6        Q.    Was Brian in it?

 7        A.    No.

 8        Q.    And why was he not in it?

 9        A.    Because he was older, because there was -- they

10   broke up in age groups.

11        Q.    Were these kids mostly sophomores in high school?

12        A.    I am not exactly sure, but I do know that the age

13   group was, I think, in between 13 and 15.

14        Q.    Okay.  And did they behave and have good

15   comportment?

16        A.    That I know of, yes.

17        Q.    There was no messing around between the students

18   in the class?

19        A.    Not that I know of.

20        Q.    By that I mean horseplay, no sexy talk, or

21   anything like that, right?

22        A.    Not that I am aware of.

23        Q.    If Scott Frank at some point wanted to have sex

24   with you, would Sunday School class have been a good place

25   to do it?
```

A R., by her next friend, Patricia A. Pacetti, v. The Church of Jesus Christ of Latter Day Saints     Ashley Russ k     January 21, 2013

Page 122

1     A.     I don't know.

2     Q.     What do you think?

3     A.     What do you mean?

4     Q.     To do it in the Sunday School class.

5     A.     Would have been an okay thing?

6     Q.     Would that have been a good place?  Would that

7     have been a good strategy on his part to try to have a

8     sexual relationship with you?

9     A.     No.

10    Q.     Why not?

11    A.     Because that is very inappropriate.  Not only my

12    age is inappropriate, but also the time and the place.

13    Q.     Okay.  And what is wrong with the time and the

14    place?

15    A.     Well, what is wrong with it is if, you know, you

16    are -- if you are married and you are going to have sexual

17    relations, the proper place to do it is in a bed.

18    Q.     Without other people around?

19    A.     Yes.

20    Q.     Okay.  And, so, there were a lot of people around

21    on Sunday morning in the Sunday School class?

22    A.     Yes.

23    Q.     And were there people around besides the students

24    in the class and the teacher?

25    A.     What do you mean?

Page 123

1          Q.   Was there anybody else that would be -- was there

2     a door on the classroom?

3          A.   There was two.

4          Q.   Two doors.  Were they open or closed?

5          A.   They were closed.

6          Q.   And would people come in and pick up the roll or

7     deliver messages or make announcements from outside the

8     class at any time?

9          A.   Honestly, only every once in a great, great

10    while.  I think maybe twice that I remember there was

11    someone who just came in, sat down for a few seconds, and

12    then left.

13         Q.   Okay.  And did anybody come in to drop off

14    anything to the teacher?

15         A.   Not that I know of.

16         Q.   Obviously there are students in the class, and

17    one wouldn't have sexual union in front of the other

18    students?

19         A.   Yes.

20         Q.   Were you ever alone in the class with Scott

21    Frank?

22         A.   Do you mean just the classroom is like empty?

23         Q.   Yes.  Just the two of you.

24         A.   There was a few times.

25         Q.   And was that when he was putting up chairs and

Page 133

```
 1        A.   Yes.

 2        Q.   When you turned 18?

 3        A.   Uh-huh.

 4        Q.   And when you were having sexual relations with

 5   him, you thought that was a very distinct possibility?

 6        A.   Yes.

 7        Q.   Do you know what it means to be chased?

 8        A.   No.

 9        Q.   Okay.  Had you experienced intercourse, sexual

10   intercourse, before you met Scott Frank?

11        A.   No.

12        Q.   And, so, was your first time to have sexual

13   intercourse with Scott Frank?

14        A.   Yes.

15        Q.   And that was a choice you made, right?

16        A.   Yes.

17        Q.   Tell me how your relationship with Scott Frank

18   began.  I think -- and let's begin with you had met Brian,

19   and then you had talked to Brian about coming to church.

20        A.   Uh-huh.

21        Q.   Had you had any communications with Scott Frank

22   before the first time you went to church?

23        A.   Yes.

24        Q.   The first time you went to church you said was

25   January 3, 2010?
```

```
1          A.    Yes.

2          Q.    What communications did you have with Scott Frank

3    before you went to church?

4          A.    I had a conversation with him via text, and I had

5    texted the phone intending it for Brian, but his father

6    answered.

7          Q.    By text?

8          A.    Yes.  By text.  And he was asking me, "Oh, are

9    you right for my boy," and all of that other stuff.  I don't

10   know exactly what he -- what he was -- what he said, but

11   something about, "Are you" -- "Are you right for him" kind

12   of thing.

13                And then he said, "Oh, well, he is asleep."

14         Q.    What hour was this; do you remember?

15         A.    I don't remember.

16         Q.    Was there any more exchange in that first

17   exchange, other than you were thinking you were sending a

18   text to Brian, Scott responded.  Did he identify himself as

19   responding as Scott?

20         A.    I believe so, yes.

21         Q.    And said, "Are you right for my boy?"  And do you

22   remember what you said in response?

23         A.    No.

24         Q.    Okay.  So, what other communications did you have

25   with him before January 3, 2010?
```

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

Page 135

1        A.   That's all.

2        Q.   All right.  So, you met him on January 3 at

3    church.  That is your first meeting?

4        A.   Uh-huh.

5        Q.   With him?

6        A.   Yes.

7        Q.   You go to the three classes on that day.

8        A.   Yes.

9        Q.   Then did anything inappropriate happen on that

10   first day --

11       A.   Not that I remember.

12       Q.   -- at church?

13            MR. WATERS:  Time out.  Be real careful.  Let him

14   finish his question and then answer.  She is going to reach

15   over here and slap you eventually.  You are right on the

16   tail of his question.

17            MR. NUSSBAUM:  She is actually going to slap me.

18            MR. WATERS:  He goes first; you answer.  You are

19   right on the end of his questions.

20            THE WITNESS:  I am just a mind reader.  I know

21   what he is going to say.

22            MR. WATERS:  I know.  She is awfully patient.

23   BY MR. NUSSBAUM:

24       Q.   What happened next in your communications with

25   him?  Do you remember?  Was the next communication the next

Page 136

```
 1   Sunday?

 2        A.   I don't remember.

 3        Q.   You don't remember the sequence?

 4        A.   Huh-uh, no.

 5        Q.   At some point did you begin to communicate with

 6   him outside of Sunday School?

 7        A.   Yes.

 8        Q.   And outside of worship?

 9        A.   Yes.

10        Q.   And do you have any rough idea when that would

11   have begun?

12        A.   No.

13        Q.   How did you begin those other communications?

14        A.   It was mostly just regular conversation.  Some of

15   it was about what he was going to be teaching the next

16   Sunday, and all of that.  But otherwise, I don't remember

17   what else.

18        Q.   Phone conversations?

19        A.   Texts, usually.

20        Q.   Text conversations?

21        A.   Yes.

22        Q.   And at some point did you begin discussing

23   subjects besides the next week's class?

24        A.   I would assume so.

25        Q.   I am not asking you to assume or guess.  I am
```

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

Page 140

1    but I didn't know beyond that.  I mean, I knew that it could

2    happen, but I didn't know exactly what would happen.

3         Q.    Okay.  But even knowing that it could happen, you

4    decided to delete them?

5         A.    Yes.

6         Q.    Okay.  So, you had hundreds of text messages with

7    Scott Frank between January 3, 2010, and June 30, 2010?

8         A.    Uh-huh.  Yes.

9         Q.    And how many times did you have a phone

10   conversation with him during that period?

11        A.    I don't remember, but there are, I think, about

12   2,000 pages of phone records of just his number calling me

13   and me calling him.

14        Q.    Okay.  So, thousands of times?  Thousands and

15   thousands of times?

16        A.    Yep.  Yes.

17        Q.    What did you talk about?

18        A.    I don't remember exactly what he talked about.

19        Q.    What was the prime time for all of these

20   communications?

21        A.    Mostly in between about 9:00 to 2:00 or 3:00 in

22   the morning.  In between then.

23        Q.    And why those hours?

24        A.    Because he had work really late at night, and he

25   would get off work around 12:00, 1:00 in the morning.

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

A.R., by her next friend, Patricia A. Pacetti v. The Church of Jesus Christ of Latter Day Saints    Ashley Russik    January 21, 2013

Page 148

1        A.    I don't remember.

2        Q.    Late at night?

3        A.    It was early in the morning, I would -- that

4    would be about the time that he would have --

5        Q.    Tell me what you remember about that phone call.

6        A.    I don't remember anything.

7        Q.    You don't remember anything in that phone call.

8    Do you remember inviting him to come over to your house?

9        A.    No.

10       Q.    Do you remember him saying, "I would like to come

11   over to your house"?  You don't remember?

12       A.    No.

13       Q.    Okay.  So, if the call was in the early

14   morning -- and by that you mean around 1:00 a.m.?

15       A.    Uh-huh.

16       Q.    Is that yes?

17       A.    Yes.

18       Q.    Did he come over to your house then?

19       A.    Yes.

20       Q.    And were you hoping that he would come over to

21   the house?

22       A.    I don't remember.

23       Q.    You don't remember whether you welcomed this.  Do

24   you remember whether you said to him, "Don't come over"?

25       A.    No.

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

Page 149

1          Q.    By this point you were interested in him; you

2     were sexually interested in him, weren't you?

3          A.    Yes.

4          Q.    And vice versa?

5          A.    Yes.

6          Q.    Okay.  And when he came over, you were open to

7     have a sexual encounter with him?

8          A.    Yes, but we didn't.

9          Q.    Okay.  So, what did you do when he came over?

10         A.    We just kissed.

11         Q.    Where did you kiss?

12         A.    Just on the lips.

13         Q.    I mean, where were your bodies located?

14         A.    I was in the passenger seat and he was in the --

15     in the driver's seat.

16         Q.    If you would, please, draw me a map here of your

17     house.  Is there a barn on your property or something?

18         A.    Yes.

19         Q.    Would you draw that as best you can?  I will loan

20     you my pen.

21         A.    From the aerial view?

22         Q.    Yes, yes.  If you mess up, I will give you

23     another piece of paper.

24         A.    Here is the road.

25         Q.    What street is that called?

Page 150

```
 1            A.    It is called Peaceful Valley.  Do you want me to

 2      write that?

 3            Q.    Would you write that on there?

 4            A.    And then my house is right here.  And then it

 5      goes like that way.

 6            Q.    If you will label things as you go along, that

 7      will help us.

 8            A.    And this is part of the driveway.  And then I

 9      have a barn over here.  And then this is a fence.

10            Q.    Would you mark the fence?

11            A.    (Witness complies.)  And then there is kind of a

12      partial fence over -- like over here.  And then a shed.  And

13      that is pretty much it.

14            Q.    Okay.  And, so, when he came out in late April

15      2010, sometime after 1:00 a.m., did he come knock on the

16      door?

17            A.    No.

18            Q.    What happened when he came out?

19            A.    He called me and told me that he was -- he was at

20      my house.

21            Q.    Okay.  Where was he parking when he called you?

22            A.    He parked like right over here.

23            Q.    On Peaceful Valley Road before he came up your

24      drive?

25            A.    Yeah.
```

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

Page 154

```
 1    night?

 2         A.   No.

 3         Q.   And was there then more text messaging after

 4    that?

 5         A.   Yes.

 6         Q.   And more phone calls?

 7         A.   Yes.

 8         Q.   All late at night?

 9         A.   Yes.

10         Q.   And at some point did you -- did he come over to

11    your house the second time?

12         A.   Yes.

13         Q.   Do you recall that?

14         A.   I recall it.  I don't know what day, though.

15         Q.   Okay.  And I think the police report says toward

16    the end of May 2010?

17         A.   Yes.

18         Q.   Does that sound right?

19         A.   Yes.

20         Q.   Okay.  And what happened?  Do you remember -- was

21    there a conversation before he came over that night?

22         A.   Yes.

23         Q.   By phone?

24         A.   Yes.

25         Q.   Who initiated the call?
```

Page 155

1          A.   I think he did.

2          Q.   Approximately what time?

3          A.   I don't remember.  About the same time.

4          Q.   You are not sure whether he initiated, but you

5     think he did?

6          A.   Yes.

7          Q.   And what do you recall about that phone call?

8          A.   Nothing.

9          Q.   But you were open to have him come over to the

10    house again?

11         A.   Yes.

12         Q.   On the first time he came over to your house, was

13    your mother in the house at the time you guys were in the

14    street?

15         A.   I don't remember.

16         Q.   Is she normally at home at 1:00 a.m. and 2:00

17    a.m. in the morning?

18         A.   Yes.  Normally.

19         Q.   Do you think of anything that would have her out

20    beyond those hours?

21         A.   No.

22         Q.   And would Randy Pacetti have been home as well?

23         A.   Yes.

24         Q.   Okay.  Back to the second time that he came over.

25    You called.  You both agreed that he would come over; is

Page 156

1    that fair?

2          A.   Yes.

3          Q.   You are not sure whether you invited him or he

4    invited himself?

5          A.   Yes.

6          Q.   You are unsure?

7          A.   I am unsure.

8          Q.   And he came over.  And did he park on the street

9    again?

10         A.   Yes.

11         Q.   Okay.  And then what happened?  Did he call you

12   again?

13         A.   Yes.

14         Q.   From being parked on the street?

15         A.   Yes.

16         Q.   And did you walk out on the street again?

17         A.   Yes.

18         Q.   And is this street not used very heavily at

19   night?

20         A.   No.  I live in the country.

21         Q.   I see.  And, so, did you enter his car again?

22         A.   Yes.

23         Q.   And then what happened?

24         A.   And we had sexual relations.

25         Q.   Can you describe it, please?

A.R., by her next friend, Patricia A. Pacetti v. The Church of Jesus Christ of Latter Day Saints        Ashley Russck                                    January 21, 2013

Page 159

```
 1          Q.   Do you remember any communications between those

 2     two dates?

 3          A.   Yes, yes.

 4          Q.   And there were a lot of late-night calls again?

 5          A.   Yes.

 6          Q.   A lot of late-night text messages?

 7          A.   Yes.

 8          Q.   Do you recall any other communications?

 9          A.   Not that I know of.

10          Q.   Do you recall the content of those

11     communications?

12          A.   No.

13          Q.   Do you recall him being reluctant or remorseful

14     about having had sex with someone as young as you?

15          A.   I don't remember.

16          Q.   Did you have any reluctance or remorse about

17     this?

18          A.   I don't remember.

19          Q.   Okay.  What did you do with the fact that you are

20     going to class on Sunday morning that is talking about not

21     even covering your -- having your shoulders exposed and

22     having your blouse up high and not having your knees

23     exposed?  Did you ever put together the incongruity of these

24     two things?

25          A.   No.
```

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

A R..., by her next friend, Patricia A. Pacetti v. The Church of Jesus Christ of Latter Day Saints          Ashley R.....          January 21, 2013

```
 1          Q.    No?

 2          A.    No.

 3          Q.    There are like two different worlds?

 4          A.    Yes.

 5          Q.    They were compartmentalized; is that fair?

 6          A.    Yes.

 7          Q.    Do you recall when the third encounter was?

 8          A.    It was shortly after the second.  I am not

 9     exactly sure when, but it was shortly after.

10          Q.    You told the police on -- in August of 2010 it

11     was on June 25.  Does that sound right?

12          A.    It sounds about right, yes.

13          Q.    That would have been a Friday evening.  Sound

14     okay?

15          A.    Yeah.

16          Q.    Okay.

17          A.    Sounds about right.

18          Q.    And same pattern?

19          A.    Yes.

20          Q.    Did you have a phone call before he came over?

21          A.    Yes.

22          Q.    Do you remember anything about that phone call

23     specifically?

24          A.    No.

25          Q.    Do you remember if you initiated it or he
```

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

A.R., by her next friend, Patricia A. Pacetti v. The Church of Jesus Christ of Latter Day Saints     Ashley Russek     January 21, 2013

Page 161

1     initiated it?

2          A.   No.

3          Q.   What happened that evening?

4          A.   The same thing.

5          Q.   As the second time?

6          A.   As the second time.

7          Q.   You got in the car, quickly went about the

8     business of having intercourse?

9          A.   Yes.

10         Q.   Finished, and left?

11         A.   Yes.

12         Q.   Consensual?

13         A.   Yes.

14         Q.   Pleasurable to you?

15         A.   Yes.

16         Q.   You were not raped?

17         A.   No.

18              MR. WATERS:   Objection to the form.

19    BY MR. NUSSBAUM:

20         Q.   And I take it from where he parked on the street,

21    would the barn have precluded a sight line to the house so

22    the car couldn't be seen from the house?

23         A.   Yes.

24         Q.   So, this drawing doesn't quite show that, does

25    it?

1        A.    When I realized that it wasn't right what he was

2   doing to me, and I kind of just came about this realization,

3   and I told my mom about it.

4        Q.    Okay.  Did you -- before you told her, did you

5   see on Facebook that he had another woman in his life?

6        A.    Yes.

7        Q.    And was that part of what made you understand

8   this wasn't right?

9        A.    That was part of it, yes.

10        Q.    Because -- and I don't mean to put words in your

11   mouth.  Did you have a sense, if we are going to get

12   married, it is not as big a thing to have intercourse, than

13   if we are not going to get married?  Was that part of your

14   sense?

15        A.    I think so, yes.

16        Q.    And once you realized you weren't going to get

17   married, what?

18        A.    I felt hurt.  I felt betrayed.  I felt

19   manipulated.

20        Q.    And angry?

21        A.    Yes.

22        Q.    And you told your mom?

23        A.    Yes.

24        Q.    Did you tell her first or your dad first?

25        A.    My mom.

Page 165

1    Q.   Okay.  And were you in Missouri at that time?

2    A.   Yes.

3    Q.   So, you called her and told her?

4    A.   Yes.

5    Q.   And then what happened?

6    A.   And she called the police and they made a report

7    over the phone.

8    Q.   Did you tell your mother you were raped?

9    A.   At first I did, yes.

10   Q.   And why did you do that?

11   A.   Because I felt like I was.

12   Q.   Did you also tell her you were raped because you

13   didn't want her to know that you were a willing participant

14   in all of this?

15   A.   I don't think that was the case.

16   Q.   Okay.  I had asked you several times if this was

17   consensual, and you said it was.

18   A.   Yes.

19   Q.   Each incident?

20   A.   Yes.

21   Q.   And was it after the instance occurred that you

22   later came to think that it wasn't consensual and it was, in

23   fact, rape?

24   A.   Yes, it -- yes, it did feel like he had forced my

25   mind to thinking that it was okay.