**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 12-cv-02197-PAB

A.R., by her next friend, PATRICIA A. PACETTI,
     Plaintiff,
       v.

THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY
SAINTS, a Utah Corporation sole a/k/a the MORMON CHURCH
and DAVID SCOTT FRANK,
     Defendants.

---

**CHURCH DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT THEREOF**

---

## INTRODUCTION

With no legally cognizable claim identified, plaintiff asks this Court to make The Church of Jesus

Christ of Latter-day Saints ("Church") liable for a volunteer Sunday School teacher's off-premises, after-

hours sexual activity. Neither the common law, the heart balm statute, nor the First Amendment permit this.

When plaintiff was fifteen, she had intercourse with her classmate's father, David Scott Frank. She admits

her communications leading to this were with Scott "as a guy; not as a Sunday School teacher."  She sued

the Church anyway theorizing that, because she had visited the Sunday School class Scott taught, the

Church should be liable for negligent hiring and supervision, breach of fiduciary duty, and outrageous

conduct. Her claims fail because:  (a) the Church has no duty to protect against or supervise a member's

"frolic"; (b) a Sunday School teacher is not a fiduciary; (c) the Church's conduct was not outrageous; (d) the

heart balm statute bars plaintiff's claims; and (e) the First Amendment does so as well.

## JURISDICTION

The Court has jurisdiction under 28 U.S.C. §§ 1441(a) (removal) and 1332 (diversity).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.R. MEETS BRYAN FRANK AND STARTS VISITING THE CHURCH

1. In the fall of 2009, Plaintiff, A.R., 15, met Bryan Frank at school. Ex. A, A.R. Deposition ("Ex. A, A.R.") 85:16-86:4. A.R. wanted to be Bryan's girlfriend; he had no interest. Id. 89:15-90:4.

2. Bryan lived with his father, Scott. They shared a cell phone that Bryan used to talk and text with A.R. Id. 86:3– 87:9. They communicated for an hour or two every day. Id. 87:3-9. 90:15– 91:7.

3. A.R. was curious about the Church. Bryan told her about it. Id. 87:12-88:11.

4. Bryan and Scott were members of the Church. A.R. was not. Id.87:3; 88;7-17.

5. In late 2009, Bryan invited A.R. to attend Sunday services with him. Id. 93:6-9. She came for the first time on January 3, 2010. Id. 93:9-12.

6. A.R. visited on subsequent Sundays, but cannot remember how often; it could have been as few as three Sundays or as many as twenty. Id. 96:9-13.

7. The first hour of church services was devoted to worship with the entire congregation. Id. 96:19–97:7. A.R. sat next to Bryan and Scott during this hour. Id. 97:19-21.

8. Scott, 40, was an ordinary congregation member, not a leader or an employee. Id. 98:7–99:15.

9. Sunday School was after Sunday church services. Id. 97:8-14. A.R. attended a 40 minute class Scott taught. Id. 109:1-6. His duties were limited to teaching this class. He provided no pastoral counseling to A.R. Id. 126:22-127:23. After Sunday School, A.R. attended the Young Women's Class. Id. 97:11-14.

### A.R.'S SECRET RELATIONSHIP WITH SCOTT FRANK

10. A.R. and Scott texted each other before they first met at church services. Id. 133:21–134:6. They met in person for the first time at Sunday services on January 3, 2010. Id. 135:2-6.

2004258365_1

11.   Outside of church, they texted and called each other "thousands and thousands" of times, id. 136:5-7; 140:11-16, mostly between 9 p.m. and 3 a.m., id. 140:19-22.

12.   A.R. understood that these communications "weren't part of [Scott's] Sunday School teaching duties" and that they were with Scott "as a guy; not as a Sunday School teacher." Id. 141:15-11.

13.   In April 2010, around 1:00 a.m., Scott came over to A.R.'s house; and parked his car out of sight. A.R. walked to the car, entered, and then they kissed for a few seconds. Id. 147:3-152:6.

14.   A.R. and Scott continued their late night phone calls and text messages. Id. 154:23-154:3-9.

15.   They met a second time late at night in Scott's car near A.R's house and had intercourse. Id. 155:10–158:19. This was the first time A.R. ever had sexual intercourse. Id. 133:9-14.

16.   They continued having "a lot" of late night phone calls and text messages. Id. 159:1-7.

17.   On June 25, 2010, they met for a third time late at night in Scott's car in front of A.R.'s house and again engaged in intercourse, following the same pattern as before. Id. 160:7–161:17.

18.   A.R. kept these encounters to herself until she later felt betrayed. Id. 173:22-23.

19.   After this third encounter, A.R. learned, through Facebook, that Scott "had been using her only for sexual purposes and had lied to her about his engagement to the woman he later married."  Compl. ¶ 20; Ex. A, A.R. 164:1-14. She felt "hurt," "betrayed," and "manipulated."  Id. 164:18-19. Scott had convinced A.R. that he wanted a long-term relationship. Id. 132:7-11. He misled her, telling her he wanted to marry her. Id. 132:19-21. He "manipulate[d her] into having sexual interactions." Id. 132:19-24.

20.   A.R. told her mom about the relationship, and her mom called the police. Id. 164:22-165:7.

21.   Scott was arrested and pleaded guilty to sex with a 15-year-old with more than a 10-year age difference, a class 1 misdemeanor defined at C.R.S. § 18-3-402(1)(e). Scott's Answer ¶ 21.

2004258365_1

### No Sexual Misconduct Occurred on Church Property or During Church Events

22.   A.R. and Scott had "no sexual or romantic content" or contact during Sunday worship, Sunday School, or the Young Women's Class. Ex. A, A.R. 107:22–108:2; 118:3-13; 121:23–122:22; 123:16-19. There were many people around for each of those events. Id. 97:18–99:1; 120:22–121:13.

23.   On a couple of occasions after Sunday School was over, A.R. would stay behind and help Scott stack chairs. Scott hugged her and said good-bye out of the view of anyone else. Id. 109:20–110:23. This was the only time they were alone at church. Id. 123:20–124:7.

### Scott Frank Was an Ordinary Member, Not a Clergyman or an Employee of the Church

24.   Like almost every member who regularly attends an LDS Church congregation, Scott had a volunteer responsibility. Specifically, Bishop Miller called him to serve as an unpaid Sunday School teacher in December 2009. Comp. ¶ 8; Ex. B, Bishop Todd Miller Deposition 12:1-15:2 ("Ex. B, Miller").

25.   Bishop Miller called members to service only after prayerfully considering the congregation's needs. Id. 21:22-23.

26.   Bishop Miller explained the Church's process for calling a member to service that he used:

[Then, "as a matter of course," [I took] that recommendation . . . to the bishopric, where again it is prayerfully considered . . . [I]f the member accepts the calling, it is their choice whether or not they wish to serve in that position, then during . . . our worship service, [with] the whole congregation there, we present that individual for a sustaining vote from the congregation. We say . . . so-and-so has been called to serve in this capacity. We would like your sustaining vote. All members are given the opportunity to raise their hand to sustain that individual. [We] also . . . ask if there are any opposing votes . . . If there is any opposition, then it is my job to discuss with that person what those oppositions are.

Id. 29:14-30:13; Ex. C, Roger Van Komen Affidavit ¶ 7.

27.   Teaching Church doctrine during a 40-minute Sunday School class was Scott's only responsibility in the Church. He was not an employee of the Church, a clergyman, or a pastoral counselor. Ex. A, A.R. 127:9-22. He worked at Chili's Restaurant. Id. 140:24–141:4.

4

<u>CHURCH SAFETY POLICIES</u>

28.  The Church teaches that "abuse cannot be tolerated in any form. In instances of abuse, the first responsibility of the Church is to help those who have been abused and to protect those who may be vulnerable to future abuse. All members, especially parents and leaders, are encouraged to be alert and . . . do all they can to protect children and others . . . " Ex. C, Van Komen ¶ 3.

29.  Before a bishop asks a member to serve in any position, he interviews the person and determine his or her moral worthiness. <u>Id</u>. ¶ 6.

30.  The Church has a 24/7 "Help Line" for bishops to call whenever they become aware of child abuse. A professional therapist answers the Help Line call and discusses options for assisting the victim. If there are potential legal issues involved, such as a possible reporting obligation, an attorney is joined on the call to advise the bishop regarding the state's privilege and reporting laws. <u>Id</u>. ¶ 9.

32.  The Church has a "two-deep" policy for certain situations, such as overnight camps. Two adults must be present and adults are not permitted to share tents with youths. The Church also has a policy of having two teachers in classrooms with children ages 3 to 11. <u>Id</u>. ¶ 10.

33.  The two-deep policy does not apply to youth Sunday School classes because it is not a setting where sexual misconduct occurs because the church is full of people; the class has multiple teenagers; parents, attendance takers, and members of the Sunday School presidency, come and go without notice; and the class lasts only 40 minutes. <u>Id</u>. ¶¶ 10-11.

34.  The Church has almost 30,000 congregations that meet weekly. Each has multiple Sunday School classes. The Church is aware of only one instance of sexual misconduct on Church property between such a teacher and his student—a brief grope in the hallway outside the classroom. <u>Id</u> . ¶ 12.

5

<u>D<small>AVID</small> S<small>COTT</small> F<small>RANK'S</small> C<small>RIMINAL</small> H<small>ISTORY</small></u>

35.  Colorado law prohibits disclosure of arrests or convictions that, from the date of disposition predate the report by more than seven years. C.R.S. § 12-14.3-30.5; C.R.S. § 12-14.5-107(1)(a); <u>see also</u> 15 U.S.C. § 1681c(a)(2). Assuming the Church conducted a criminal background check on Scott that complied with these laws, the record publicly available in December 2009 would have revealed:

• On 3-26-02, Scott was arrested for misdemeanor violation of a restraining order resulting in a conviction, a sentence to probation, and a discharged from probation on 4-18-05. Ex. D, Colorado Bureau of Investigation report ("CBI").

• After an earlier *ex parte* order, a consensual permanent restraining order entered on 4-25-02, in which no admissions to the allegations were acknowledged. Ex. E, Icon/Register of Actions <u>Dershem v. Frank</u>, County Court, El Paso County, Colorado, Case No. 2002C005870).

• In 2003, Scott was found guilty of four counts of violating a custody order (a class 5 felony) for taking his four children out of state resulting in a $558 fine, a sentence to 60 days work release and three years' probation. Ex. F, Order, 1-13-03. On 1-6-06, after satisfying all orders and probation terms, Scott was discharged. Ex. G Order to Terminate, El Paso District Court, Colorado, in <u>People v. Frank</u>, Case No. OICR4235.

• On 6-5-03, Scott pled guilty to civil contempt for violating a restraining order resulting in a $138 fine, a suspended jail sentence, and probation. Ex. H, Sentence Order, 6-5-03,<u>People v. Frank</u>, County Court, El Paso County, Colorado, Case No. 02M2239. Scott was discharged on 4-18-05 because he "satisfied all court orders and . . . all conditions of probation."  Ex. I, Petition and Order to Terminate, County Court, El Paso County, Colorado, in <u>People v.Frank</u>, Case No. 02M2239.

• On 8-11-05, Scott's ex-wife insisted that Scott be arrested for violation a restraining order because he called to speak to her about the children 38 minutes later than permitted by the court order. Ex. J, El Paso County Sheriff's Office Case Report No. 05-12140, pp. 1-2.

• On 8-24-05, Scott's ex-wife insisted Scott be arrested for violation of a restraining order because he called to speak to her about the children 8 minutes earlier than permitted by the court order. Ex. K, El Paso County Sheriff's Office Case Report No. 05-12814, 8-24-05.

• On 12-12-08, he was arrested for misdemeanor violation of restraining order. Ex. D, CBI report, 4.

36.  Until his conduct with A.R., Scott had no arrests or convictions for any sexual misconduct and was not on any sex offender registry. Ex. L, Scott Request for Admission Resp. #6; Exs. in ¶ 35, *supra*.

6

37.  Scott was a lifetime member of the Church. Before he taught Sunday School, a member of the bishopric interviewed him. When his proposed appointment was presented to the congregation, no one objected. Ex. L, Scott Request for Admission Response #3; Interrogatory Response #5.

38. No one in Scott's Sunday School class reported any odd behavior or abuse. Ex. B 19:16-20:17.

39.  The Church first learned of Scott's relationship with A.R. after he was arrested. Compl. ¶ 22.

## ARGUMENT

**I.    PLAINTIFF'S NEGLIGENCE CLAIMS FAIL AS A MATTER OF LAW.**

A.R. sues the Church for negligently hiring and supervising Scott. Comp. ¶¶ 31-51.

**A.    Plaintiff's negligent hiring claim fails because the Church had no duty to protect A.R. from unforeseeable, after-hours, off premises misconduct wholly unrelated to teaching Sunday School.**

"[T]he initial question in any negligence action is whether the defendant owed a legal duty to protect the plaintiff against injury. [This] is a question of law to be determined by the court." HealthONE v. Rodriguez, 50 P.3d 879, 888 (Colo. 2009). "A negligence claim must fail if it is based upon circumstances for which the law imposes no duty of care upon the defendant." Davenport v. Cmty. Corrs., 962 P.2d 963, 967 (Colo. 1998). The Church did not owe A.R. a duty for three independent reasons:  (1) The misconduct did not occur while Scott was carrying out his teaching responsibility. (2) The Church had no reason to know or suspect that Scott would be sexually attracted to a 15-year-old visitor in his Sunday School, and it had no duty to conduct a criminal background check. (3)  A lawful criminal background check would not have made Scott's conduct with A.R. foreseeable.

**1.  No duty exists to prevent conduct unrelated to Scott's Sunday teaching duties.**

In a negligent hiring case, "the scope of the employer's legal duty" depends upon "the employer's actual knowledge at the time of hiring or reason to believe that the person being hired, by reason of some attribute of character or prior conduct, would create an undue risk of harm *in carrying out his or her employment*

7

*responsibilities.*" Kaleigh v. Performance Plumbing & Heating, Inc., 130 P.3d 1011, 1016 (Colo. 2006) (emphasis added). "When a driver is hired," for example, "the duty is to use reasonable care in hiring a safe driver who would not create a danger to the public *in carrying out the duties of the job*." Id. at 1017. Scott's "job" was 40 minutes of teaching scripture in a safe environment once a week. When Scott secretly met A.R. in his car in front of her home, he was not "carrying out his … employment responsibilities." Connes v. Molalla Transp. Sys., Inc., 831 P.2d 1316, 1321 (Colo. 1992). He was committing a crime for his own ends.

**2.  No duty of heightened diligence exists without notice of prior similar misconduct.**

Even if the harm occurs carrying out employment responsibilities, no duty exists unless the employer has notice of the employee's dangerous propensity. Kaleigh, 130 P.3d at 1016. When Scott was asked to teach Sunday School, the Church did not know or have reason to know of any attribute or prior conduct that created an undue risk of harm in teaching Sunday School. There is no evidence that the Church was aware or should have been aware of any prior conduct making it foreseeable that Scott would have sex with a minor.

A.R. alleges that the Church had a duty to conduct a criminal background check. "Whether a defendant owes a duty to investigate a potential employee's criminal record is a threshold question of law for the court." Connes, 817 P.2d 567, 570 (Colo. App. 1991). Connes held that no such duty exists unless the employer already has reason to know that the applicant poses a risk:

> [I]n the absence of circumstances antecedently giving the employer reason to believe that the job applicant … would constitute an undue risk to members of the public with whom the applicant will be in frequent contact or to particular persons in a special relationship to the employer and with whom the applicant will have close contact, **the employer's duty of reasonable care does not extend to searching for and reviewing official records of a job applicant's criminal history**.

2004258365_1

Connes, 831 P.2d at 1323 (emphasis added). The Church did not have any reason to know that Scott posed a risk and, therefore, had no duty to do a criminal background check. No court, to our knowledge, has held that churches have a duty to conduct criminal background checks on volunteers.

### 3. No duty exists because Scott's history did not make his misconduct foreseeable.

Foreseeability is a "prime factor" in the duty analysis. Miller v. Byrne, 916 P.2d 566, 578 (Colo. App. 1995). Even if the Church had done a criminal background check, Scott's criminal history--violation of a restraining order, taking his own children out of state in violation of a custody decree, and two phone calls to his ex-wife 8 and 38 minutes outside the court-ordered temporal window--did not make it foreseeable that he would engage in sex with a minor. In Van Osdol v. Vogt, 892 P.2d 402 (Colo. App. 1994), the plaintiff alleged that she was sexually abused by a minister who was hired notwithstanding the church's knowledge of his extra-marital affair. The court of appeals upheld summary judgment because "the extra-marital affair was sufficiently different from [the sexual abuse] and, thus, did not create a duty on the part of the Church to foresee [the minister's] conduct." Id. at 408. See also Connes, 817 P.2d 567 (truck driver's non-sexual criminal history did not make sexual assault foreseeable); Davenport, 962 P.2d at 968 (burglary conviction did not make drunk driving foreseeable).[1]  Because Scott had no criminal history that was even remotely similar to sex with a minor, the Church had no duty to foresee such a possibility.

### B.   Plaintiff's negligent supervision claim fails because the Church had neither a duty nor the authority to supervise Scott's off-premises, after-hours conduct.

"An employer generally does not have a duty to supervise employees in their off-duty time unless the employee is on the employer's premises or possesses the employer's property." Biel v.

---

[1]See also Doe v. Boys Club of Greater Dallas, Inc., 907 S.W.2d 472, (Tex. 1995) (two DWI convictions did not make man ineligible to volunteer at Boys Club and "did not indicate criminal conduct in any way akin to sexual assault of young boys"); Roman Catholic Bishop of San Diego v. Sup. Ct. of San Diego, 42 Cal.App.4th 1556 (1996) ("Even if the church had learned of [priest's] prior sexual affairs with adults, it is illogical to conclude the church should have anticipated [priest] would commit sexual crimes on a minor.").

Alcott, 876 P.2d 60, 63 (Colo. App. 1993) (emphasis added). When Scott secretly met A.R. in his own car by her home, he was neither "on the employer's premises" nor using "the employer's property." Id. This egregious conduct was light years removed from the duty of a Mormon Sunday School teacher. See Jeffrey E. v. Cent. Baptist Church, 197 Cal.App.3d 718 (1988) ("There is no aspect of a Sunday school teacher's or member's duties that would make sexual assault anything other than highly unusual and very startling."). Thus, the Church had no duty to supervise Scott's secret relationship with A.R.

The employer must also have "the ability to control his servant" and know "of the necessity and opportunity for exercising such control."  Restatement (Second) Torts § 317. The Church had neither the authority nor the ability to control Scott's late night misconduct, and it did not know of the need to do so. Imposing a legal duty to supervise after-hours conduct would create an impossible situation for employers and member organization--especially churches--and massively expand tort liability in Colorado.

In reversing a jury verdict finding a business owner liable for negligent supervision, the Colorado Supreme Court explained that:

> [W]here a plaintiff asserts a claim for negligent supervision, the question of whether the employer owes a duty of care to the injured third party boils down to issues of knowledge and causation—*whether the employee's acts are so connected with the employment in time and space such that the employer knows that harm may result from the employee's conduct and that the employer is given the opportunity to control such conduct*.

Keller v. Koca, 111 P.3d 445, 448-49 (Colo. 2005) (emphasis added). The Court explained that while the business owner "may have had a duty to take reasonable steps to protect women employees and customers from the known risk of harm that [the manager] posed to [three adult] women *during working hours*, this known risk does not extend to the sexual assault suffered by [a 12-year-old girl]." Id. at 450 (emphasis added).

In Keller, the misconduct occurred on the employer's premises and the employer had notice of previous sexual misconduct. Yet that still was not enough to impose a duty because the sexual assault at

10

issue was not during working hours, and it was far more serious than the sexual harassment known by the employer. Here, the misconduct did **not** occur on Church property and the Church did not have knowledge of **any** similar, prior misconduct by Scott. Scott's after-midnight misconduct in his personal car in front of A.R.'s home was not "so connected with the employment in time and space" that the Church had the opportunity to control it. Indeed, the misconduct had no "time and space" connection whatsoever to Scott's limited role as a Sunday School teacher.[2]

## II.     A SUNDAY SCHOOL TEACHER IS NOT A FIDUCIARY.

A.R. alleges that the Church owed her a fiduciary duty "with respect to providing religious instruction and creating a setting for interaction that creates trust and reliance."  Compl. ¶ 46. While a few courts recognize that a fiduciary relationship can arise when a priest has a pastoral counseling relationship with his parishioner, see Destefano v. Grabian, 763 P.2d 275, 284 (Colo. 1988) (priest created a fiduciary duty to counselee by holding himself out "as a professional or trained marriage counselor"), no court has ever recognized a fiduciary duty based on a basic clergy-congregant relationship, much less a mere

---

[2]See also R.A. v. First Church of Christ, 748 A.2d 692, 699 (Sup. Ct. Pa. 2000) (church not liable for sexual abuse of friend of minister's daughter where "none of the harm was caused on Church premises" and he was not acting "in his capacity as a minister" at the time of the abuse); Roman Catholic Bishop of San Diego, 42 Cal.App.4th at 1567 (church not liable for priest's sexual relationship with 15-year-old because the priest had no history of sexual abuse and "nearly all of the contact Jane had with [the priest] occurred when [the priest] took Jane from her home to various public places and hotels"); Federico v. Sup. Ct., 59 Cal.App.4th 1207 (1997) (man with long criminal history of molestation was hired to work in a beauty college where he met a minor he molested; abuse did not occur during his work hours or on work premises; court dismissed negligent hiring/supervision claim:  "an employer's liability must be determined in the context of the specific duties the work entails," id. at 1215; an "employer is not charged with guaranteeing the safety of anyone his employee might incidentally meet while on the job against injuries inflicted independent of the performance of work-related functions," id.);  Boys Club of Greater Dallas, Inc., 907 S.W.2d at 478 (court rejected negligent supervision claim where abuse by volunteer occurred on outings not sponsored by the Boys Club because "there is no evidence that [the volunteer] molested or assaulted any boys **at the club's premises**"); Berry v. Watchtower Bible & Tract Soc. of New York, Inc., 879 A.2d 1124 (N.H. 2005) (affirming dismissal of negligence claim against church because, in part, "there was no allegation that the alleged abuse took place on congregation property or at congregation-related activities"); Meyer v. Lindala, 675 N.W.2d 635 (Minn. App. 2004) (church had no duty to prevent abuse of minor that occurred "at [her] residence, on a snowmobile, and in an automobile" and not on church property or during church functions); Doe v. Corp. of the President of The Church of Jesus Christ of Latter-day Saints, 98 P.3d 429, 432 (Utah App. 2004) (affirming dismissal where the abuse did not occur "on [church] property, during a [church] sponsored activity, or in connection with [the perpetrator's] position as a High Priest or scout leader"); Betty Y. v. Al-Hellou, 988 P.2d 1031 (Wash. App. 1999) (no liability for negligent supervision when, even though employer knew employee was on probation for sexual assault, the employee was not hired to work with the victim and the assault did not occur on work premises).

2004258365_1

Sunday School teacher- student relationship. See Doe v. Holy See, 793 N.Y.S.2d 565, 568 (N.Y. App. 2005). Public schools have daily custody and control over their students; and yet no court has ever held that this creates a fiduciary duty. See Thomas v. Bd. of Educ. of the Brandywine Sch. Dist., 759 F. Supp. 2d 477, 503 (D. Del. 2010) (refusing to become "the first state to recognize a fiduciary relationship between a public school district and its students"). Attendance at church does not create a fiduciary relationship. To hold otherwise would impose on a church a fiduciary duty to every person who enters its doors. In any case, there is no evidence that the Church breached the alleged fiduciary duty.

Courts routinely reject claims of fiduciary duty based on a church-parishioner relationship on First Amendment grounds. See Victor E. Schwartz & Christopher E. Appel, *The Church Autonomy Doctrine: Where Tort Law Should Step Aside*, 80 Cinn. L. Rev. 431, 462-65 (2011).[3]  They also reject such claims because they do not involve the type of relationship that creates a fiduciary duty. *See* Mark E. Chopko & Michael F. Moses, *Freedom to be a Church:  Confronting Challenges to the Right of Church Autonomy*, 3 Geo. J. of L. & Pub. Pol'y 387, 428 (2005) ("Courts frequently reject fiduciary duty claims against churches . . . for non-constitutional reasons.").[4]  This Court should likewise reject such a duty here.

---

[3] Petrell v. Shaw, 902 N.E.2d 401, 407 (Mass. 2009) ("ruling that a . . . member of the clergy of any . . . religion owes a fiduciary-confidential relationship to a parishioner that inheres in their shared faith and nothing more is impossible as a matter of law"); H.R.B. v. J.L.G., 913 S.W.2d 92, 99 (Mo. App. 1995) (fiduciary duty claim "inevitably require[s] inquiry into the religious aspects of the [clergy-parishioner] relationship"); Langford v. Roman Catholic Diocese of Brooklyn, 677 N.Y.S.2d 436, 439 (N.Y. 1998) (it is "impossible to show the existence of a fiduciary relationship [in clergyman-parishioner cases] without resort to religious facts"); Amato v. Greenquist, 287 Ill. App. 3d 921 (1997) ("[A] cleric has breached his duty as a fiduciary is not actionable.  We believe that when a parishioner lodges such a claim, religion is not merely incidental to a plaintiff's relationship with a defendant, it is the foundation for it.") (quotation marks, brackets, and citation omitted); Dausch v. Rykse, 52 F.3d 1425 (7th Cir.1994) (fiduciary duty claim against a pastor violates First Amendment); Kelsey v. Ray, 719 A.2d 1248, 1251 (D.C. App.1998) (fiduciary duty claim by church members against a pastor, deacons, and trustees as to management of church property violates First Amendment); Schieffer v. Catholic Archdiocese of Omaha, 508 N.W.2d 907 (Neb. 1993) (First Amendment bars fiduciary duty claim).

[4] See Roman Catholic Bishop, 42 Cal.App.4th 1556 (no special relationship exists between church and its members); Bryan R. v. Watchtower Bible & Tract Soc'y, 738 A.2d 839, 847 (Me. 1999) (church had no "generalized fiduciary duty … to protect members of its congregation from other members . . . an amorphous common law duty on the part of a church . . . requiring it to protect its members from each other would give rise to both unlimited liability and liability out of all proportion to culpability."); Berry v. Watchtower Bible & Tract Soc'y, 879 A.2d 1124, 1129 (N.H. 2005) ("We decline to hold that the fact of church membership or adherence to church doctrine by the plaintiff creates a special relationship between the plaintiff and [the church]."); Doe v. Hartz, 52 F. Supp. 2d 1027 (N.D. Iowa 1999) (no fiduciary relationship between diocese and parishioner).

2004258365_1

III.    **PLAINTIFF'S OUTRAGE CLAIM FAILS AS A MATTER OF LAW.**

Plaintiff conclusorily alleges that the Church "engaged in extreme and outrageous conduct."

Compl. ¶¶ 49-50. The Church did nothing negligent, much less outrageous.

The tort of outrageous conduct was designed to create liability for a very narrow type of conduct. Such liability can be found only if the defendant's conduct toward another is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

Green v. Qwest Serv. Corp., 155 P.3d 383, 385 (Colo. App. 2006). Colorado courts have only "permitted

outrageous claims to go to the jury, [when] the defendants' conduct was directed toward the plaintiffs." Id.

at 386. A.R. alleges no outrageous conduct that the Church directed against her. The law distinguishes

between severe consequences and outrageous conduct. "The loss of an entire home . . . is a severe

consequence. However, we are required to look at defendants' conduct itself and not simply the

consequences of that conduct." Id. at 386-87. A particular defendant's actions must be directed against the

plaintiff and must be "so extreme in degree as to go beyond all possible bounds of decency so as to be

regarded as atrocious and utterly intolerable in a civilized community." Id. That was not the case here.

V.    **A.R.'s CLAIMS ARE BARRED BY THE HEART BALM STATUTE.**

Colorado's heart balm statute abolishes "all civil causes of action for breach of promise to marry,

alienation of affections, criminal conversation, and seduction . . ." C.R.S. § 13-20-202. (The legislature

preferred to remedy such wrongs exclusively, as here, through criminal statutes that themselves afforded

the opportunity for compensation.)[5]  A plaintiff cannot "mask one of the abolished actions behind a common

---

[5] See factual statement no. __, supra.  A victim has "[t]he right to have the court determine the amount, if any, of restitution to be paid to a victim . . . , by any person convicted of a crime against such victim for the actual pecuniary damages that resulted from the commission of the crime."  Under C.R.S. § 24-4.1-302.5(1)(h).  A prosecutorial agency "shall ensure" that the victim is afforded this right. Id. § 24-4.1-303(1). "Every order of conviction of a felony . . . shall include consideration of restitution." Id. § 18-1.3-603(1), The order must require the defendant to pay restitution unless the court makes a specific finding that the victim suffered no pecuniary loss. See Id. §§ 18-1.3-603(1); 18-1.3-601(2). The prosecutor and the victim may come to an agreement on the appropriate amount of restitution. See id. § 18-1.3-601(3)(b)(I).

2004258365_1

law label." <u>Destefano</u>, 763 P.2d at 282. If the facts alleged "place them squarely within [an] abolished action," the claim is barred. <u>Goldberg v. Musim</u>, 427 P.2d 698 (Colo. 1977). Thus, where a priest had an affair with a woman he counseled, the heart balm statute barred the husband's claims of negligent supervision, intentional infliction of emotional distress, and *respondeat superior*. <u>Destefano</u>, 763 P.2d at 288-89   It would have barred the wife's claims of fiduciary duty, negligent supervision, and vicarious liability as masked claims for seduction but did not because seduction is "limited to unmarried females." <u>Id</u>. at 282.

A.R.'s claims are "squarely within" the abolished tort of seduction. "Seduction is 'the act of a man in enticing a woman to have unlawful intercourse with him by means of persuasion, solicitation, promise, bribes, or other means without the employment of force.'" [6] <u>Id</u>. A.R. alleges that Scott "recruited" her "to a sexual relationship" when she was 15. Compl. ¶ 19. Seduction, as here, often involves an element of deceit.[7]  These facts fit squarely within the abolished tort of seduction.[8]  Because the heart balm statute bars A.R.'s direct claims based on the sexual contact, it also bars claims against the Church for *respondeat superior* liability. <u>Destefano</u>, 763 P.2d at 278. <u>See</u> <u>also</u> <u>Bladen v. First Presbyterian Church</u>, 857 P.2d 789, 797 (Okla. 1993) (no negligent hiring claim when underlying claim barred by heart balm statute).

## VI.    THE FIRST AMENDMENT BARS PLAINTIFF'S CLAIMS AGAINST THE CHURCH.

The First Amendment ensures that religious organizations remain free from "secular control or manipulation" and retain "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." <u>Kedroff v. St. Nicholas Cathedral of Russian Orthodox</u>

---

[6]The analogous criminal statute for seduction, relied upon by the <u>Destefano</u> court, stated, "Any man who shall, under promise of marriage, seduce and have illicit connection with any unmarried female, of previous chaste character, *under the age of sixteen years*, shall be guilty of a felony …." <u>Destefano</u>, 763 P.2d at 282 n.6.  A.R. was 15 when she had sex with Scott.

[7] *See* Statement of Undisputed Material Facts, *supra*, at ¶ 19.

[8]The heart balm statute would not bar claims based on childhood sexual abuse. The sexual relationship between A.R. and Scott Frank was not childhood sexual abuse. In Colorado, a 15-year-old can consent to sex. The conduct at issue here was a crime (a misdemeanor) only because Scott Frank was more than 10 years older than Ashley. C.R.S. § 18-3-402.

2004258365_1

Church, 344 U.S. 94, 116 (1952). These principles "severely circumscribe[] the role that civil courts may play in resolving" disputes involving religious organizations. Presbyterian Church v. Hull Mem. Presbyterian Church, 393 U.S. 440, 449 (1969). Plaintiff's complaint asserts that Scott was "unfit" to be a Sunday School teacher. The First Amendment prohibits judicial interference with a church's right to decide for itself who will teach its doctrine. Unless a church knows that its ministerial employee is likely to commit sexual misconduct and intentionally ignores that danger, the First Amendment also prohibits secular interference in the supervisory relationship between a church and its ministerial volunteers.

A.    The Supreme Court recently reaffirmed a church's right to select ministerial employees without secular interference, barring plaintiff's negligent hiring claim.

The Supreme Court recently affirmed the right of churches to choose religious teachers without interference from secular courts. See Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C., 132 S. Ct. 694 (2012). "[T]he authority to select and control who will minister to the faithful--a matter 'strictly ecclesiastical'--is the church's alone." Id. at 709. (internal citation omitted); see also id. at 704 ("it is impermissible for the government to contradict a church's determination of who can act as its ministers"). This "ministerial exception" is rooted in both the Establishment Clause and the Free Exercise Clause. "The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own." Id. at 703.

"[T]he ministerial exception is not limited to the head of a religious congregation …." Id. at 707. It applied in Hosanna-Tabor to a kindergarten teacher "called" by the congregation. Her "job duties reflected a role in conveying the Church's message and carrying out its mission." Id. at 708. Because the teacher "was a minister within the meaning of the exception, the First Amendment required dismissal" of her claim.

2004258365_1

Id. at 709.[9]  The Tenth Circuit has held that the ministerial exception "extends to any employee who serves in a position that is important to the spiritual and pastoral mission of the church." Skrzypczak v. Roman Catholic Diocese of Tulsa, 611 F.3d 1238, 1243 (10th Cir. 2010). There is no doubt it applies to a Sunday School teacher whose only responsibility is to teach doctrine. See EEOC v. Catholic Univ. of Am., 83 F.3d 455 (D.C. Cir. 1996) (canon law prof); EEOC v. Southwestern Baptist Theological Seminary, 651 F.2d 277 (5th Cir. 1981) (seminary faculty); Powell v. Stafford, 859 F.Supp. 1343 (D. Colo. 1994) (religion teacher).

Hosanna-Tabor was a Title VII claim and the Supreme Court expressed "no view on whether the [ministerial] exception bars other types of suits, including actions … alleging … tortious conduct by religious employers." Hosanna-Tabor, 132 S. Ct. at 710. In Skrzypczak, however, the Tenth Circuit held that the ministerial exception applies "without regard to the type of claims being brought." Skrzypczak, 611 F.3d at 1245 (quotation marks omitted). Other courts have specifically held that it bars claims that a church negligently hired a ministerial employee. In Ayon v. Gourley, 47 F. Supp. 2d 1246 (D. Colo. 1998), aff'd on other grounds, 185 F.3d 873 (10th Cir. 1999) (unpublished), the plaintiff alleged that the Archdiocese of Denver was negligent in hiring a priest who had previously been accused of sexual abuse. The court agreed with "the majority of cases" that "Plaintiff's negligent hiring claim would violate both the Free Exercise and Establishment Clauses." Id. at 1250.

> The choice of individuals to serve as ministers is one of the most fundamental rights belonging to a religious institution. It is one of the most important exercises of a church's freedom from government control. For this Court to insert itself into the process by which priests are chosen would substantially burden these Defendants' free exercise of a crucial power to control the future of the church and therefore constitute interference with the practice of their religion.

---

[9]The teacher argued that the ministerial exception was inapplicable after she abandoned her claim for reinstatement and instead sought only damages. The Court rejected this argument. "An award of such relief would operate as a penalty on the Church for terminating an unwanted minister, and would be no less prohibited by the First Amendment than an order overturning the termination. Such relief would depend on a determination that Hosanna-Tabor was wrong to have relieved Perich of her position, and it is precisely such a ruling that is barred by the ministerial exception." Id. at 709.

2004258365_1

It would also cause excessive entanglement in church operations by fostering inappropriate government involvement. The application of even general tort law principles to church procedures on the choice of priests would require an inquiry into present practices with an intent to pass on their reasonableness. Such court examination and oversight of internal church policies would constitute an encroachment on the church's religious functions.

Id. The Court also dismissed the plaintiff's outrage claim based on hiring an unfit priest. Id.[10]

More recently, in Erdman v. Chapel Hill Presbyterian Church, 286 P.3d 357 (Wash. 2012) (en banc), the Washington Supreme Court, citing Hosanna-Tabor, applied the ministerial exception to claims for negligent hiring, supervision and retention of a minister.

As the [Supreme] Court's analyses in Kedroff and Hosanna-Tabor indicate, negligent retention and supervision claims implicate a religious organization's First Amendment right to select its clergy. Questions of hiring, ordaining, and retaining clergy necessarily involve interpretation of religious doctrine, policy and administration. A minister's employment concerns internal church discipline, faith, and organization, all of which are governed by ecclesiastical rule, custom, and law. Religious organizations each have their own intricate principles of governance, as to which the state has no rights of visitation, and it would therefore be improper for a civil court to determine after the fact that the ecclesiastical authorities negligently supervised or retained a minister. Pastoral supervision is an ecclesiastical prerogative.

Id. at 364 (internal citations, quotation marks, and brackets omitted).

The Washington Supreme Court further explained that "[i]mposing liability on a church" based on who it chooses to minister would "influence a religious organization's decisions about who are to act as its ministers" which would "chill" this fundamental First Amendment freedom and lead "indirectly to state control over the future conduct of affairs of a religious organization." Id. at 365 (quotation marks omitted).

Here, A.R. alleges that Scott was "an improper person for the task" of teaching Sunday School. Compl. ¶ 37. Paul, the Christian persecutor, was seemingly unfit for the apostleship, but was nevertheless called to that position. Fitness for such a spiritual calling is not a determination a court can make without interfering with the church's selection of its ministers.

[10]Colorado courts have taken a narrower view of the protections offered by the First Amendment. But the court in Ayon recognized that "case law from the state of Colorado on the First Amendment does not constrain this Court in any way. The fact that the Colorado state courts have taken an extremely expansive view of the claims allowed against religious organizations is not even particularly persuasive in light of the analysis by federal courts on th[ese] issue[s]." Ayon, 47 F. Supp. 2d at 1248.

2004258365_1

> The Constitution prevents courts from deciding what makes an individual competent to serve as a minister because it would require a court to interpret church canons and internal church practices and policies. Judicial inquiry into hiring, ordaining, and retaining clergy would result in an endorsement of religion, by approving one model for church hiring, ordination and retention of clergy.

Erdman, 286 P.3d at 365. (citations and quotation marks omitted).[11]  See also Schwartz, supra at 471

("Because the decision to hire or retain a minister is so infused with religion and with a church's right of self-

definition autonomy, courts have been … hostile to these claims when applied to churches."); Pritzlaff, 533

N.W.2d at 790 (Wis. 1995) ("First Amendment … prevents the courts . . . from determining what makes one

competent to serve as a . . . priest since such a determination would require interpretation of church canons

and internal church policies . . .")  Likewise, A.R.'s outrage claim is based on nothing more than the

Church's selection of Scott as Sunday School teacher. Thus, the First Amendment bars that claim as well.

**B.    The First Amendment also bars A.R.'s negligent supervision claim because the Church had no notice of Scott Frank's dangerous propensities.**

While Hosanna-Tabor makes it clear that courts cannot interfere in a church's selection of its

ministerial volunteers, "[j]udicial decisions have been divided" on whether churches can be held liable for

negligent supervision of ministerial volunteers. Schwartz, supra, 80 Cinn. L. Rev. at 476. Many hold that the

First Amendment prohibits courts from setting secular standards of supervision of those doing ministry.

> The tort of negligent supervision is based upon the concept that principals have certain duties to supervise those under their control. When a civil court undertakes to compare the relationship between a religious institution and its clergy with the agency relationship of the business world, secular duties are necessarily introduced into the ecclesiastical relationship and the risk of constitutional violation is evident…. The imposition of secular duties and liability on the church as a "principal" will infringe upon its right to determine the standards governing the relationship between the church, its bishop, and the parish priest…. Because of the existence of these constitutionally protected beliefs governing ecclesiastical relationships, clergy members cannot be treated in law as though they were common law employees…. [I]t would be

---

[11] See also Pritzlaff v. Archdiocese of Milwaukee, 533 N.W.2d 780 (Wis. 1995) ("the tort of negligent hiring and retention may not be maintained against a religious governing body due to concerns of excessive entanglement"); Gibson v. Brewer, 952 S.W.2d 239, 247 (Mo. 1997) ("By the same token, judicial inquiry into hiring, ordaining, and retaining clergy would result in an endorsement of religion, by approving one model for church hiring, ordination, and retention of clergy.").

2004258365_1

> inappropriate and unconstitutional for this Court to determine after the fact that the ecclesiastical authorities negligently supervised . . . the defendant. Any award of damages would have a chilling effect leading indirectly to state control over the future conduct . . . of a religious denomination.

Swanson v. Roman Catholic Bishop of Portland, 692 A.2d 441, 445-46 (Me. 1997) (internal quotation marks, brackets, ellipses, emphasis, and citations omitted).[12]

But this Court does not need to go as far as holding, as some courts have, that courts can never adjudicate negligent supervision claims involving churches. There is "limited authority for permitting negligent supervision claims to proceed" when the church **knew** that the perpetrator was dangerous. Id. at 446 (citing cases). The Missouri Supreme Court, for example, adopted a reasonable approach in Gibson v. Brewer, 952 S.W.2d 239 (Mo. 1997), by distinguishing between ordinary negligent supervision and cases where a church turns a blind eye to a known danger. In a recent article, Professor Victor Schwartz, coauthor of Prosser's torts hornbook, explains that Gibson provides "a constitutionally sensitive model for such claims. The approach permits relief in egregious cases involving failure-to-supervise a clerical employee known to pose a specific danger, while avoiding constitutionally prohibited inquiries into religious belief, church government, and what ecclesiastical leaders 'should have known' in the conduct of their religious duties." Schwarz, supra at 478.

In this case, there is no evidence that Scott had engaged in previous similar misconduct or that the Church was aware of any previous misconduct by Scott or the risk of such. The Church certainly did not intentionally turn a blind eye to a known danger. To impose liability under these circumstances "would pressure churches to change their policies and practices--which arise from religious beliefs." Id. Churches

---

[12]Schmidt v. Bishop, 779 F. Supp. 321 (S.D.N.Y. 1991) ("[A]ny inquiry into the policies and practices of the Church Defendants in hiring or supervising their clergy raises ... First Amendment problems of entanglement ..., which might involve the Court in making sensitive judgments about the propriety of the Church Defendants' supervision in light of their religious beliefs .... Any award of damages would have a chilling effect leading indirectly to state control over the future conduct of affairs of a religious denomination, a result violative of ... the establishment clause."); Swanson, 692 A.2d at 445 ("imposing a secular duty of supervision on the church [restricts] its freedom to interact with its clergy [as] deemed proper by ecclesiastical authorities").

2004258365_1

would have to "reject any person from ministry … who may have once been accused (perhaps unfairly) of wrongdoing, frustrating religious beliefs in repentance, forgiveness, and redemption." Id.

In sum, the First Amendment prohibits adjudication of A.R.'s negligent hiring, negligent supervision, and outrage claims because each would interfere with the Church's constitutionally protected right to choose its ministerial volunteers and minister to its members according to its doctrines and teachings.

## CONCLUSION

It is well settled that courts should avoid constitutional issues when a ruling on narrower grounds is possible. United States v. Hardman, 297 F.3d 1116 (10th Cir. 2002). Here, A.R.'s claims fail both on basic tort principles and by the heart balm statutory bar. The Church had no duty to protect A.R. from the after-hours, off-premises conduct of an unpaid, 40-minute-a-week Sunday School teacher. The Church simply was not negligent. It has policies and procedures to prevent sexual misconduct in settings where it might occur. Those practices worked in this case. None of the misconduct occurred on Church property or during a Church-sponsored activity. The Church exercised reasonable care. If the Court reaches the First Amendment issues, summary judgment is appropriate because the First Amendment as articulated in Hosanna-Tabor bars judicial interference with a church's selection or supervision of its ministers.

**THE CHURCH RESPECTFULLY REQUESTS ORAL ARGUMENT.**

s/ L. Martin Nussbaum
L. Martin Nussbaum
Charles Goldberg
ROTHGERBER JOHNSON & LYONS LLP
90 S. Cascade Avenue #1100
Denver, CO  80202
719-386-3004
mnussbaum@rothgerber.com
cgoldberg@rothgerber.com

*Attorneys for Defendant The Corporation of the President of the Church of Jesus Christ of Latter-day Saints*

20

2004258365_1

**CERTIFICATE OF SERVICE**

On July 3, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sends notification of the same to:

Michael R. Waters, Esq.
David L. Geislinger, Esq.
Jones, Waters, Geilinger & Seymour, LLC
707 South Tejon, Ste. 200
Colorado Springs, CO  80903

David Chipman
Chipman Glasser, LLC
2000 S. Colorado Boulevard, Tower One, #7500
Denver, Colorado 80222

*s/  L. Martin Nussbaum*
L. Martin Nussbaum

2004258365_1