### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-02197-PAB

A.R., by her next friend, PATRICIA A. PACETTI,
    Plaintiff,
     v.

THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY
SAINTS, a Utah Corporation sole a/k/a the MORMON CHURCH
and DAVID SCOTT FRANK,
    Defendants.

---

### DEFENDANT CHURCH'S BRIEF IN OPPOSITION TO PLAINTIFF'S
### MOTION FOR SUMMARY JUDGMENT

---

### INTRODUCTION

Plaintiff's motion for summary judgment falls short on every front. Plaintiff's key "facts"--that David Scott Frank ("Scott") had a "history of domestic violence" and "crimes involving his own children" and that Bishop Miller had knowledge of such when he asked Scott to teach Sunday school--are baseless. She fails to establish three key elements to her negligent hiring and supervision claims--duty, standard of care and breach, and causation. She offers no evidence why the Church had a heightened duty to perform criminal background checks on one who was to teach forty minutes a week in the historically safe setting of Sunday School and who had no history of abusing any minor. She offers no precedents remotely suggesting that the Church had a duty to anticipate or supervise Scott's nocturnal text messaging spree with his son's classmate or his three sexual liaisons with her after midnight in his car parked near her family home. Nor does Plaintiff explain how, even if a court were inclined to impose a duty to supervise a church member's after-hours, off-premises conduct, a church could possibly do so. And if plaintiff had law and undisputed facts supporting her claims, those claims are barred by the heart balm statute and the First Amendment. The Church incorporates by reference the facts and law in its own pending motion for summary judgment.

## RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff's statement of facts violates Practice Standard IV(L)(3)(b)(ii)(1). The court has discretion to strike the brief or deny the motion. Id. IV(L)(3)(b)(ii)(5)(d). The Church will treat each of the nineteen paragraphs in Plaintiff's statement of facts as though they were numbered 1 through 19. (Paragraph 5 has three subparts, 5a, 5b, and 5c.) For this motion, the Church disputes paragraphs 2, 4, 5a, 8-10, 15-16, but not 1, 3, 5b-7, 11-14, 17-19.

**Response to 2:** The Church disputes that Scott "had a criminal record that included domestic violence, protection order violations, kidnapping and menacing." The "kidnapping" charge plaintiff references was not for kidnapping or any sort of violent act but for violation of a custody order when Scott took his own kids out of state. Ex. D,1-13-03 Order. Scott was arrested in 2000 for "menacing," but the charges were dropped.[1] Ex. B, Scott's Resp. to Interrog. no. 1, sub-para. 4. Scott was charged with "harassment" in 1998. These charges were dropped in August 2000 after Scott completed the conditions imposed by the court. Id., sub-para 3. Some other incidents are listed on Scott's history as "domestic violence," but no violence was involved. As the Church's expert, Dr. Park Dietz, explains in his report:

> Although some forms concerning [Scott] have a box checked for "Domestic Violence" and this code was used in the CBI reporting system, not one of the events concerning [Scott] involves any domestic violence.... Any complaint regarding a minor violation of a restraining order in a divorce action is going to be coded as "domestic violence," because that term is a closer fit than terms like "burglary" or "grand theft auto." In the case of [Scott], events that were coded as "domestic violence" include calling his wife to check on the children 38 minutes later or 8 minutes earlier than he was supposed to call. *It is a distortion of the facts to call this a history of abuse, menacing, or domestic violence.*

Ex. C, Dietz Rebuttal Report at 2 (emphasis added).

---

[1] The Colorado Consumer Reporting Act prohibits disclosure of 'arrest, indictment, or conviction of a crime that, from the date of disposition, release, or parole, predate the report by more than seven years." C.R.S. § 12-14-3-105.3; C.R.S. § 12-14.5-107(1)(a). See also 15 U.S.C. § 1681c(a)(2) (consumer reports cannot contain "records of arrest that, from date of entry, antedate the report by more than seven years"). Thus, any conduct, including the charges for "menacing" or 'harassment" *would not have appeared on a background check* conducted in 2009 when Scott was asked to teach Sunday School.

There is no evidence the Church knew of any menacing. The Church disputes that Bishop Miller was "aware of a domestic violence situation." When asked whether he had "any knowledge" of "domestic violence" related to Scott, Bishop Miller testified simply that he had a "confidential" discussion with Scott. He never disclosed what they discussed. Ex. A, Miller 38:17-24.

**Response to 4:** The Church disputes the assertion that "[t]he Bishop considers spousal and child abuse comparable." Bishop Miller testified only that he considered both serious sins. Ex. A, Miller 36:21–37:2. There is no evidence the Church believes that, because a husband abused his spouse, he is likely to sexually assault a minor. The Church disputes that "[t]he ward has disposed of the membership record." Bishop Miller testified that he reviewed the membership record at the local level when he appointed Scott in 2009, that it had no annotation at that time, and that, by the time of his deposition in 2013, it was no longer kept at the local level. Id. at 49:19-50:23.

**Response to 5a:** See Response to 10, *infra*.

**Response to 8:** The Church disputes that 'Bishop Miller was aware of a domestic violence situation involving [Scott]." See Response to 2, *supra*.

**Response to 9:** The statement is true only if it means a *criminal* background check.

**Response to 10:** The Church disputes that Scott "was permitted to teach the class contrary to LDS policy, by himself and without the help of a co-teacher or assistant." Ex. A, Miller 43:18-44:6-7; Ex. E, Van Komen ¶ 10. There is a two-deep rule for primary (ages 3-11) but not for Sunday School. Id.

**Response to 15:** The Church disputes that Scott "began to groom [Plaintiff]" for sexual activity during church. Plaintiff did not depose Scott. There is no evidence of his intentions. A. R. and Scott had "no sexual or romantic content" or contact at the church. Ex. F, A.R. 107:22-108:2; 118:3-13; 121:23-122:22: 123:16-19. The Church disputes that Scott's "classroom was infrequently visited and the visitors

would only stay for a few seconds." Plaintiff may have attended as few as three times and recalls at least two visits from adults. Ex. F, A.R. 96:4-13; 123:9-12. Scott testified that "[m]embers of the Eighth Ward Sunday School presidency regularly oversaw and regularly visited the class." Ex. B, Scott Resp. to Req. for Adm. no. 3. Scott further explained that "other adults, including members of the Sunday School presidency, commonly attended the class or entered the classroom during lessons. Sometimes, when a student was unruly, Scott would request that the student's parent sit in on the class." Id. at 2. Also, there was a peephole in the door that allowed anyone to look in and see the entire room. Ex. A, Miller 46:16-20.

**Response to 16:** Plaintiff states that Scott "repeatedly" had intercourse with plaintiff. They did so on two occasions. Ex. F, A.R. 155:10-158:19; 133:9-14; 160:7-161:17.

### CHURCH'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1. In the fall of 2009, A.R. met Bryan Frank at school. She wanted to be Bryan's girlfriend. Ex. F., A.R. 85:7-86:4; 89:15-90:4.

2. Bryan lived with his father, Scott, and they shared a cell phone. Id. 86:6-87:9.

3. Scott and Bryan were members of the LDS Church. A.R. was not but became interested, so Bryan invited her to attend Sunday services with him. Id. 87:12-88:21; 93:6-12.

4. A.R. attended the LDS Church for the first time on January 3, 2010, and attended as few as three times. Id. 93:9-14, 96:9-13.

5. The first hour of church services was devoted to worship with the entire congregation. A.R. sat in the congregation next to Bryan and Scott during worship services. Id. 96:19-97:21.

6. A.R. then attended a forty minute Sunday School class Scott taught. Ex. E, Van Komen ¶ 10; Ex. F, A.R. 97:8-14, 109:1-6. After Sunday School, she attended the Young Women's class. Id. 97:8-14.

7. A.R. and Scott had texted each other before they met at church services. Id. 133:21-134:6.

8. Outside church, they texted and called each other thousands of times, mostly from 9 p.m. to 3 a.m. Id. 136:5-7, 140:11-22. A.R. knew these communications "weren't part of [Scott's] Sunday School teaching duties" and that they were with Scott "as a guy; not as a Sunday School teacher." Id. 141:5-21.

9. A.R. and Scott met three times in Scott's car in front of A.R.'s house, late at night, and engaged in kissing once and intercourse twice. Id. 147:3-152:6, 155:9-158:19, 160:7-161:17.

10. The Church learned about these secret meetings only after A.R. had told her mother and they had gone to the police. There was no prior notice. Compl. ¶ 22.

11. A.R. and Scott had "no sexual or romantic content" or contact during Sunday worship, Sunday School, or the Young Women's class. Ex. F., A.R. 107:22-108:2, 118:3-13, 121:23-123:19.

12. Scott had not engaged in any previous sexual misconduct with a minor. Ex. B., Scott Resp. to Req. for Adm. no. 6.

13. Sunday School teachers do not volunteer for the job; they are recommended to the bishop by the Sunday School president. Ex. G, Zortman 7:17-8:1. The bishop then discusses the recommendation with his two counselors. Ex. E. Van Komen ¶ 5. If approved, the bishop or one of his counselors conducts a formal interview. Id. ¶ 6.

14. Then the bishop or one of his counselors announces the proposed assignment to every member of the congregation in an open meeting and asks if there are any objections. Id. ¶ 7. If anyone objects, the bishop meets with them to determine if the objector knows of any reason that should disqualify him from serving in the position. Id. A single objection can thwart the calling. Id. Thus, "[t]he Church seeks to mitigate the risk of abuse and other misconduct by drawing upon the collective knowledge of the congregation whose members are often personally acquainted with the person being called and his background." Id.

2004361151_2

15.  Scott was called and sustained according to these procedures.  Ex. B at 2-4.  No one objected when his name was presented. Id. at 3.

16.  Sunday School is not a setting where sexual misconduct occurs because the Church is full of people at that time; the class has multiple teenagers; parents, attendance takers, and members of the Sunday School presidency come and go without notice; and the class lasts only 40 minutes.  Ex. E ¶ 10-11.

17.  The Church has almost 30,000 congregations that meet weekly, each with multiple Sunday School classes.  The Church knows of only one instance of sexual misconduct on Church property between a Sunday School teacher and a student – a brief grope in the hallway outside the classroom. Id. ¶ 11.

18.  An "annotation" is placed on the membership record of any member (not just clergy) who has engaged in conduct endangering children or youth.  Ex. A, Miller 40:16-24.  When a person's record is annotated, he or she is not allowed to serve with children or youth. Id.

19.  Because Scott had not engaged in any misconduct with a minor before December 2009, his record bore no annotation when Bishop Miller assigned him as a Sunday School teacher.  Ex. B at 4; Ex. A, Miller 40:16-24; 49:12-50:20.

24.  A.R. suffered from depression before she met Scott.  Ex. F, A.R. 45:23 – 46:22.  She was suicidal in December 2009. Id. 68:22 – 70:11.

25.  A.R. admits she is doing better today than before she met Scott, and her current mental health is "very good." Id. at 72:11-13; 79:1-5.

ARGUMENT

I.  PLAINTIFF CANNOT ESTABLISH THE ELEMENTS OF NEGLIGENT HIRING.

"[A] common law *prima facie* cause of action [for negligence] requires the proof of four elements: first, the defendant owed a legal duty of care; second, the defendant breached that duty; third, the plaintiff was injured; and fourth, the defendant's breach caused that injury." Vigil v. Franklin, 103 P.3d 322, 325

6

(Colo. 2004).  To prevail, Plaintiff must prove that there are no disputed issues of material fact with respect

to any of these essential elements and that she is entitled to judgment as a matter of law.  "Failure of proof

of an essential element renders all other facts immaterial." Koch v. Koch Indus., Inc., 203 F.3d 1202, 1212

(10th Cir. 2000).  In contrast, to defeat Plaintiff's motion for summary judgment and to prevail on its own

motion for summary judgment, the Church need defeat only one of these elements. Treff v. Galetka, 74

F.3d 191, 195 (10th Cir. 1996).

      **A. The Church had no duty to prevent Scott's after-hours, off-premises conduct.**  "Of these

[elements], duty is the threshold element. Only if there is a legal duty to avoid unreasonably risky conduct

does the issue of breach and then the other negligence elements arise." Id.  "[T]o maintain an action for

negligent hiring, the plaintiff must first show that the defendant owed a duty to the plaintiff ...." Connes v.

Molalla Transport Sys., Inc., 817 P.2d 567, 570 (Colo. App. 1991).  The existence and scope of a duty "is a

question of law to be determined by the court." HealthONE v. Rodriguez, 50 P.3d 879, 888 (Colo. 2009).

      In a negligent hiring case, "the scope of the employer's legal duty" depends upon "the employer's

actual knowledge at the time of hiring or reason to believe that the person being hired, by reason of some

attribute of character or prior conduct, would create an undue risk of harm *in carrying out his or her

employment responsibilities.*" Raleigh v. Performance Plbg. & Heating, Inc., 130 P.3d 1011, 1016 (Colo.

2006) (emphasis added); See also id. at 1017 (for job with driving duties, the duty is to hire a safe driver).

      Plaintiff, accordingly, argues that the Church was negligent in hiring Scott because "[d]espite being

aware of [Scott's] history of domestic violence and crimes involving his own children, the LDS failed to

discover [Scott's] character to harm children."  Plaintiff's Opening Brief, 9.  As previously shown, Plaintiff,

offers no evidence of domestic violence, no evidence of crimes against his own children, and no evidence

the Church had knowledge of either.

The "job" in this case was limited to 40 minutes of teaching scripture in a safe environment once a week. When Scott secretly met Plaintiff in his car in front of her home, he was not "carrying out his ... employment responsibilities." Connes, 831 P.2d at 1321. He was committing a criminal act for his own ends. Plaintiff cites no authority that the Church had a duty to conduct screening with regard to a candidate's possible after-hours, off-premises conduct. An employer's duty cannot extend that far.

A good example of the limitations of a negligent hiring (and supervision) claim is Federico v. Superior Court, 59 Cal.App.4th 1207 (1997), where an employer was held not liable for after-hours, off-premises abuse by a sex offender employee even though the employee met the minor at the place of employment. The court held that "an employer's liability must be determined in the context of the specific duties the work entails" and that "an employer is not charged with guaranteeing the safety of anyone his employee might incidentally meet while on the job against injuries inflicted independent of the performance of work-related functions." Id. at 1215. This case is even further removed from liability because Plaintiff met Scott through his son, not through his "job" as a Sunday School teacher. To impose a duty because, in an ocean of nocturnal communications, Plaintiff and Scott also saw each other at Sunday School would expand liability beyond all precedent and reason. See Keller v. Koca, 111 P.3d 445, 448-49 (Colo. 2005) (duty to protect against "known risk does not extend" to after-hours assault). In contrast, many courts have held that churches are not liable for the after-hours, off-premises misconduct of employees and volunteers.[2]

---

[2]See R.A. v. First Church of Christ, 748 A.2d 692, 699 (Sup. Ct. Pa. 2000) (church not liable for sexual abuse where "none of the harm was caused on Church premises" and he was not acting "in his capacity as a minister" at the time of the abuse); Roman Catholic Bishop of San Diego v. Sup. Ct., 42 Cal.App.4th 1556, 1567 (1996) (church not liable for priest's sexual relationship with 15-year-old because "nearly all of the contact Jane had with [the priest] occurred when [the priest] took Jane from her home to various public places and hotels"); Berry v. Watchtower Bible & Tract Soc. of New York, Inc., 879 A.2d 1124 (N.H. 2005) (affirming dismissal because "there was no allegation that the alleged abuse took place on congregation property or at congregation-related activities"); Meyer v. Lindala, 675 N.W.2d 635 (Minn. App. 2004) (no duty to prevent abuse of minor parishioner that occurred "at [her] residence, on a snowmobile, and in an automobile" and not on church property or during church functions); Doe v. Corp. of the President of The Church of Jesus Christ of Latter-day Saints, 98 P.3d 429, 432 (Utah App. 2004) (affirming dismissal where abuse did not occur "on [church] property, during a [church] sponsored activity"); Betty Y. v. Al-Hellou, 988 P.2d 1031 (Wash. App. 1999) (assault did not occur on work premises).

8

Moreover, there is no duty to prevent an unforeseeable risk.  See Cosmopolitan Homes, Inc. v. Weller, 663 P.2d 1041, 1045 (Colo. 1983); Walcott v. Total Petroleum, Inc., 964 P.2d 609, 612 (Colo. App. 1998).  In the context of criminal conduct, foreseeability is based on similar prior misconduct by the perpetrator.  Davenport v. Cmty. Corrs., 962 P.2d 963, 968 (Colo. 1998) (burglary conviction did not make drunk driving foreseeable; must be an awareness "that the offender possesses a specific trait that poses a danger to the plaintiff").  Thus, sexual assault on a minor is not foreseeable merely because the perpetrator has engaged in unrelated misconduct.[3]  Before meeting Plaintiff, Scott had engaged in no misconduct remotely similar to sexual assault on a minor.  Plaintiff asserts that the Church had a duty to prevent such sexual misconduct because Scott had a bad marriage with his first wife.  No court has ever ruled this way.

**B. Plaintiff neither establishes the standard of care nor that the Church breached it.**  "A negligence claim requires proof of a standard of care."  Gerrity Oil & Gas Corp. v. Magness, 946 P.2d 913, 929 (Colo. 1997).  Plaintiff offers no evidence to establish the standard of care for "hiring" unpaid Sunday School teachers.  Further, Plaintiff's motion ignores the undisputed evidence regarding the Church's abuse prevention policies.  Dr. Park Dietz says the Church has an "exemplary program of child abuse prevention." Ex. H, Dietz Report 17.  Sunday School teachers do not volunteer for the job but are recommended to the bishop, Ex. G, Zortman 7:17-8:1, who then vets the recommendation with his two counselors, Ex. E, Van Komen ¶ 5, and directs a formal interview. Id. ¶ 6. Then the bishop presents the proposed assignment to the entire congregation for approval, where the objection of a single member can thwart the calling. Id. ¶ 7. Thus, "[t]he Church seeks to mitigate the risk of abuse . . . by drawing upon the collective knowledge of the

---

[3] See Van Osdol v. Vogt, 892 P.2d 402, 408 (Colo. App. 1994) ("the extra-marital affair was sufficiently different from [the sexual abuse] and, thus, did not create a duty on the part of the Church to foresee [the priest's] conduct."); Connes, 817 P.2d 567 (truck driver's non-sexual criminal history did not make sexual assault foreseeable); Doe v. Boys Club of Greater Dallas, Inc., 907 S.W.2d 472, 478 (Tex. 1995) (two DWI convictions did not make man ineligible to volunteer at Boys Club and "did not indicate criminal conduct in any way akin to sexual assault of young boys"); Roman Catholic Bishop of San Diego v. The Sup. Ct. of San Diego, 42 Cal.App.4th 1556, 1566-67 (1996) ("Even if the church had learned of [priest's] prior sexual affairs with adults, it is illogical to conclude the church should have anticipated [priest] would commit sexual crimes on a minor.").

9

congregation whose members are often personally acquainted with the person being called and his

background." Id. Dr. Dietz explains how this process mitigates the risk posed by predators:

> [This] procedure . . . avoids an error common to most churches, schools, day care facilities, police explorer programs, sports organizations, youth-serving professions, youth-focused businesses, and youth-serving organizations, which inadvertently offer opportunities to so-called "predators" to seek contact with favored target victims by volunteering or seeking employment with a preferred target group.  In contrast, within the Church, it is the members of the ward who choose their Sunday School teachers through community consensus and prayer and not the member who chooses to be a Sunday School teacher.  Ex. H, Dietz Report at 19.

Scott was called and presented according to these procedures.  See Ex. B, Resp. to Req. for Adm.

nos. 3, 5, 6.  No one in the congregation objected.  Id. no. 3.

Also, the Church's membership record "annotation" procedure allows the Church to track persons

who have harmed children.  Because Scott had never harmed a minor, his record had no annotation when

Bishop Miller called him.  Ex. B, Scott Resp. to Req. for Adm. no. 6; Ex. A, Miller 40:16-25; 49:12-50:20.

Plaintiff retained and submitted a report from her supposed standard-of-care expert, Paul M.

Isenstadt.[4]  Plaintiff's motion ignores her own expert.  Instead, she cites Raleigh v. Performance Plumbing

& Heating, Inc., 130 P.3d 1011, 1016 (Colo. 2006), to argue that the "LDS failed in the heightened duty to

investigate" Scott.  Plaintiff's Opening Brief, 9.  But the Colorado Supreme Court has explained that such a

heightened duty only arises when the employer has knowledge that the applicant or position carries a

heightened risk.  Destefano v. Grabrian, 763 P.2d 275, 287 (Colo. 1988) (special duty to investigate arises

only when "the work is likely to subject third persons to serious risk of great harm").  No court has ever

imposed such a heightened duty on a church's selection of an unpaid Sunday School teacher.

Furthermore, the facts show the Church had no knowledge that Scott or its Sunday School classrooms

presented a heightened risk for sexual assault on a minor.

---

[4] The Church has moved to exclude Isenstadt's report.

Dr. Park Dietz explains that "[i]t is not the standard of care for churches to conduct criminal background checks on those who teach Sunday School, even in churches that permit people to affirmatively seek the role of Sunday School teacher." Ex. H, Dietz Rep. at 20.  Sunday School involves only forty minutes each Sunday with the public.  It is an extremely safe activity with lots of people around.  After decades and hundreds of thousands of youth attending, the Church can identify only one brief incident of sexual misconduct by a Sunday School teacher.  Ex. E, Van Komen, ¶¶ 10-11.  Plaintiff cites nothing to show that Sunday School "presents a serious risk of great harm" requiring additional measures.

In sum, Plaintiff has neither established a standard of care nor that the Church breached it.  Thus, consideration of the other elements of negligence "is entirely unnecessary."  See Vigil, 103 P.3d at 325.

**C. Plaintiff cannot establish causation.**  "Negligence results in liability only if accompanied by causation."  Miller v. Mountain Valley Ambulance Service, Inc., 649 P.2d 362, 364 (Colo. App. 1984).  To prevail on a negligent hiring claim, there must be "a sufficient causal relationship between the defendant's breach and the plaintiff's injuries."  Connes, 831 P.2d 1320.  Plaintiff's motion ignores causation.

Even if the Church were somehow negligent in assigning Scott as a Sunday School teacher, that was not the proximate cause of Scott's inappropriate relationship with Plaintiff.  "The proximate cause requirement is only satisfied where it is foreseeable that the defendant's negligence will result in injuries to others and where this negligence is a substantial factor in causing the injuries sustained."  Build It and They Will Drink, Inc. v. Strauch, 253 P.3d 302, 306 (Colo. 2011).  "[T]he plaintiff must establish causation beyond mere possibility or speculation."  Kaiser Found. Health Plan of Colo. v. Sharp, 741 P.2d 714, 719 (Colo. 1987).  Plaintiff's negligent hiring claim fails the causation test in two respects.  First, the Church's alleged failure to conduct a more thorough background check was not the cause of Plaintiff's injuries because Scott

had nothing in his background that would have made his sexual assault on a teenager foreseeable. See Church's Motion for Summary Judgment, Undisputed Facts ¶¶ 35-36.

Second, it is grossly speculative to say that the sexual encounters between Plaintiff and Scott would not have occurred if the Church had not assigned Scott as the Sunday School teacher. The forty minute Sunday School class was a miniscule part of their relationship. The spark of the relationship was Plaintiff's interest in Scott's son, Bryan. Scott had already texted with Plaintiff before Plaintiff ever came to Church. Id. 133:21-134:6. Plaintiff came to Church because Bryan invited her, Ex. F, A.R. 85:16-86:4; 89:15-90:4; 93:6-9), and she sat next to Bryan and Scott for worship services before attending Sunday School, id. 96:19-97:21. Thus, she met Scott independent of Sunday School. Moreover, Plaintiff and Scott communicated with each other outside church "thousands and thousands" of times, mostly between 9 p.m. and 3 a.m. Id. 135:5-7; 140:11-22. This texting began, not because of Sunday School, but because Bryan and Scott shared the same phone. Id. 86:3-87:9. Plaintiff understood that these communications "weren't part of [Scott's] Sunday School teaching duties" but were with Scott "as a guy; not as a Sunday School teacher." Id. 141:15-21. Plaintiff came to church as few as three times. Id. 96:9-13.

On these facts, Plaintiff is not entitled to summary judgment.[5]

## II.   PLAINTIFF CANNOT ESTABLISH THE ELEMENTS OF NEGLIGENT SUPERVISION.

The same four elements apply to Plaintiff's negligent supervision claim, and it fares no better.

### A. The Church had no duty to supervise Scott's after-hours, off-premises behavior. "An

employer generally does not have a duty to supervise employees in their off-duty time unless the employee

---

[5] The final element of a negligence claim is damages. Although Plaintiff could likely prove some damages as a result of Scott's sexual misconduct, she failed to put forth any evidence of such. In fact, her own testimony has been unclear on the issue. Plaintiff suffered from depression before she met Scott. Ex. F, A.R. 45:23-46:22. She was suicidal in December 2009. Id. 68:24-70:11. By her own admission, she is doing better today than before she met Scott. Id. 79:1-5; 72:12-13. There are disputed issues of fact regarding damages that preclude summary judgment.

2004361151_2

is on the employer's premises or possesses the employer's property." <u>Biel v. Alcott</u>, 876 P.2d 60, 63 (Colo. App. 1993).

Hence, in <u>R.A. v. First Church of Christ</u>, 748 A.2d 692 (Sup. Ct. Pa. 1999), the court rejected a negligent supervision claim against a church for sexual abuse perpetrated by its minister when the plaintiff was a friend of the minister's daughter but not a church member and where none of the abuse occurred on church premises, even though the plaintiff participated in a number of church activities. <u>Id.</u> at 695, 699. Similarly, Scott's late night, incessant texting with Plaintiff and his sexual misconduct in his own car in front of Plaintiff's home had no connection to his assignment as a Sunday School teacher. The Church had no ability to control such conduct, and it could not have known of the necessity of doing so. The settled rule is:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others ..., if:
>
>     (a)    the servant
>         (i)    is upon the premises in possession of the master..., or
>         (ii)    is using a chattel of the master, **and**
>     (b)    the master
>         (i)    knows or has reason to know that he has the ability to control his servant, and
>         (ii)    knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts § 317 (1965) (emphasis added). As a matter of law, the Church had no duty to supervise Scott's after-hours, off-premises misconduct. <u>See</u> <u>Keller</u>, 111 P.3d at 448-49 (while employer "may have had a duty to take reasonable steps to protect women employees and customers from the known risk of harm that Uzan posed to these women during working hours, this known risk does not extend" to after-hours assault).

    **B. Plaintiff has not established a standard of care or breach of that standard for Sunday School teachers.** Plaintiff cites nothing to establish the standard of care for supervising Sunday School

teachers or similar functionaries. Plaintiff claims, instead, that the Church "failed to employ its own guidelines for supervising Sunday School teachers," as though the Church's own policies establish the standard of care. Plaintiff's Opening Brief at 9. As discussed below, they do not.

But first, Plaintiff is simply wrong in her assertion that the Church violated its own policies. Contrary to Plaintiff's allegation, Scott was trained regarding sexual misconduct. Scott was asked by Plaintiff in an interrogatory to "describe what training or instruction [he] received by the Church as a member or teacher on the subject of sexual abuse or child abuse." He responded:

> The Church constantly preaches that sexual immorality of any kind is a serious sin and that children are precious and should be protected from such harm. [Scott] had been taught and knew that sexual abuse and child abuse were wrong. [Scott] knew that it was wrong to have sexual contact with anyone outside the bonds of marriage. [Scott] was taught that teaching the gospel requires one to have the Holy Ghost and that [he] could not be an effective teacher if [he] was not morally worthy and striving to keep the commandments of God. Additionally, [Scott] was taught to avoid situations, such as being alone with a woman, that might create temptations or potentially cause misunderstandings. When [Scott] engaged in immoral conduct with [Plaintiff] in his car in front of her home, [he] knew that it was a serious sin and that [he] should not have been there.

Ex. B, Scott Resp. to Interrog. no. 4. There is no evidence that the Church violated its own internal policy regarding the training of Sunday School teachers on matters relevant to this case.

Nor did the Church violate any other internal policies. The "two-deep policy" applies to primary (ages 3 to 11), not Sunday School. "There is no two-deep policy for Sunday School teachers." Ex. A, Miller 44:6-7. There was no window in the door because the Church had only recently adopted that policy, but there was a peephole in it that allowed anyone to look in and see the entire room. Id. 46:16-20.

Furthermore, these policies do not establish the standard of care. Numerous courts have held that internal company policies do not create a standard of care. See Gunlock v. Gill Hotels Co., Inc., 622 So.2d 163, 164 (Fla. App. 1993) ("we can find no authority that evidence of an internal policy creates a

14

substantive duty to conform to the standard of conduct contained therein").[6] Courts recognize that imposing

a standard of care and corresponding duty based on internal policies would discourage the creation of

beneficial policies. In Staples v. Duell, 494 S.E.2d 639 (S.C. App. 1997), the court rejected the plaintiff's

argument that a landowner's policy and practice of regularly inspecting his land and clearing dead trees

created a legal duty, reasoning that imposing a duty "would create the highly undesirable precedent of

encouraging rural landowners to shield their eyes and never inspect their land." Id. at 643. In Pytlewski v.

United States, 991 F. Supp. 1043, 1049 (N.D. Ill. 1998), the court, likewise, rejected the argument that the

United States Postal Service had voluntarily assumed a duty to protect customers from naturally

accumulating water on its property because of policy manuals that required the removal of such water,

reasoning that businesses should be encouraged to adopt such policies, not penalized for doing so:

> Many places of business have maintenance manuals or policies which suggest guidelines
> or procedures to be followed to alleviate the dangers of natural accumulations.  A finding
> that such a manual or policy in and of itself created a legal duty on the part of the business
> to remove natural accumulations would discourage businesses from producing or
> formulating such guidelines, which would be detrimental to the general public's best
> interest.  Such a finding would also penalize those businesses which had made a laudable
> effort to formulate guidelines in an attempt to alleviate the dangers of natural
> accumulations when the law imposed no such duty.

---

[6] See also Everett v. General Elec. Co., 979 A.2d 760 (N.H. 2009)("the mere existence of an internal policy setting forth procedures to deal with an impaired employee does not, standing alone, create a duty of care to the public at large"); Estate of Day v. Willis, 897 P.2d 78, 81 n.7 (Alaska 1995) (internal administrative and training manual used by police did not impose a duty towards fleeing suspects); O'Connell v. Killington, Ltd., 665 A.2d 39 (Vt. 1995) (employee manual setting forth policies and procedures for investigating skier accidents did not create duty to skier injured in accident caused by another skier); Burke v. Raytheon Co., 1 Mass. L. Rptr. 364, at *5 (Mass. Super. 1993) ("Solely because Raytheon's Manual on procedure may state that the Company will document injuries and absences does not give rise to a duty that would be owed to each employee, permitting employees to sue for negligence in the event the procedure is not followed"); Estate of Catlin v. General Motors Corp., 936 S.W.2d 447, 451 (Tex. App. 1996) ("mere creation of an internal policy" did not create a duty); Entex v. Gonzales, 94 S.W.3d 1, 9-10 (Tex. App. 2002) (gas company's policy of inspecting and warning customers about storing flammable vapors near unelevated water heaters did not constitute voluntary assumption of a duty); Metropolitan Dade County v. Zapata, 601 So. 2d 239, 243 (Fla. App. 1992) (refusing to admit lifeguard training film as evidence because the plaintiff "was impermissibly seeking to elevate internal training procedures voluntarily promulgated by the County to the status of evidence of a legal duty"); Honeycutt v. City of Wichita, 836 P.2d 1128, 1137 (Kan. 1992) (school district transportation policies did not create a duty without some "affirmative act, to render aid or services").

2004361151_2

Id. at 1049. Numerous courts have offered a similar rationale for refusing to impose a duty based on internal policies and procedures.[7] In short, the law does not impose legal duties based on an organization's internal policies for addressing abuse, lest imposing such duties counterproductively discourage beneficial efforts to prevent abuse and assist victims.

Other than the Church's own internal policies, Plaintiff makes no effort to establish a standard of care for supervising Sunday School teachers or similar functionaries. In contrast, the Church's expert explains that the Church's supervision met the appropriate standard of care: "Teaching under similar conditions of supervision occurs daily in junior high and senior high schools throughout Colorado and across the nation, and in those settings, the teachers who meet with groups of teenagers see them more often." Ex. H, Dietz at 21. Plaintiff's motion falls far short of establishing, as a matter of law, that the Church's supervision of Scott was negligent.

**C. The Church's allegedly negligent supervision of Scott as a Sunday School teacher was not the proximate cause of his late night sexual encounters with Plaintiff.** Another glaring deficiency in Plaintiff's motion for summary judgment on her negligent supervision claim is the complete lack of causation between the alleged negligence and the sexual misconduct. Plaintiff says the Church should have had a second teacher in the classroom, a window in the classroom door, more frequent visitors, and an open door during class. But none of this would have prevented the sexual misconduct because *none of it occurred in the classroom.* Even if the Sunday School classroom "had been walled with transparent

---

[7] See also Buczkowski v. McKay, 490 N.W.2d 330, 332 (Mich. 1992) ("Imposition of a legal duty ... on the basis of its internal policies is actually contrary to public policy. Such a rule would encourage retailers to abandon all policies enacted for the protection of others in an effort to avoid future liability."); McGuire v. Curry, 766 N.W.2d 501, 506 (S.D. 2009) (holding the internal safety policy created a duty that "would discourage employers from adopting policies that prohibit dangerous conduct by employees."); Killian v. Caza Drilling, Inc., 131 P.2d 975 (Wyo. 2006) ("an imposition of a duty under these circumstances would merely result in an employer forgoing adoption of any safety rules to avoid the risk of liability"); Premo v. General Motors Corp., 533 N.W.2d 332 (Mich. App. 1995) ("To impose liability upon an employer who, by means of work rules, policies, etc. undertakes to address the problem of alcohol use/or abuse is clearly against public policy and would encourage employers to abandon all efforts which could benefit such employees in order to avoid future liability."); Lev v. Beverly Enterprises-Massachusetts, Inc., 74 Mass. App. 413, 420 (2009) (contrary rule 'might dissuade businesses" from adopting such policies).

glass, the secret relationship and sexual liaisons between [Plaintiff] and [Scott] would still have occurred." Ex. H, Dietz Rep. at 22. See Koca, 97 P.3d 346 (negligent supervision was not proximate cause of sexual assaults that occurred off employer's premises), rev'd on other grounds, 111 P.3d 445 (Colo. 2005).

III.    THE HEART BALM STATUTE BARS PLAINTIFF'S CLAIMS FOR NEGLIGENT HIRING AND SUPERVISION.

Just as the heart balm statute barred Robert Destefano's negligent management claim and would have barred Edna Destefano's as well if Edna were unmarried, it bars plaintiff's claims here because the gist of her claims are the abolished tort of seduction. See C.R.S. § 13-20-202; Destefano, 763 P.2d at 278, 282-83, 288-89; and the Church's arguments set forth in its brief supporting its motion for summary judgment at pp. 13-14; and its reply in support of the same at pp. 8.

IV.    THE FIRST AMENDMENT BARS PLAINTIFF'S CLAIMS FOR NEGLIGENT HIRING AND SUPERVISION.

Plaintiff's negligence claims also run afoul of the First Amendment. The First Amendment ensures that religious organizations remain free from "secular control or manipulation" and retain "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church, 344 U.S. 94, 116 (1952). These principles "severely circumscribe[] the role that civil courts may play in resolving" disputes involving religious organizations. Presbyterian Church v. Mary E.B. Hull Memorial Presbyterian Church, 393 U.S. 440, 449 (1969). Plaintiff's complaint asserts that Scott was "unfit" to be a Sunday School teacher. The First Amendment prohibits judicial interference with a church's right to decide who will teach its doctrine.

1. The First Amendment bars Plaintiff's negligent-hiring claim. In Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C., __ U.S. __, 132 S. Ct. 694 (2012), the Supreme Court held that "the authority to select and control who will minister to the faithful--a matter 'strictly ecclesiastical'--is the church's alone" under the First Amendment. Id. at 709 (internal citation omitted). See also id. at 704 ("it is impermissible for the government to contradict a church's determination of who can act as its ministers").

2004361151_2

"The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own." Id. at 703.

"[T]he ministerial exception is not limited to the head of a religious congregation ...." Id. at 707. It "extends to any employee who serves in a position that is important to the spiritual and pastoral mission of the church." Skrzypczak v. Roman Catholic Diocese of Tulsa, 611 F.3d 1238, 1243 (10th Cir. 2010). There is no doubt it applies to a Sunday School teacher.[8] Additionally, the ministerial exception applies "without regard to the type of claims being brought." Skrzypczak, 611 F.3d at 1245. Thus, in Ayon v. Gourley, 47 F. Supp. 2d 1246 (D. Colo. 1998), the court agreed with "the majority of cases" that a negligent hiring claim involving a ministerial employee "would violate both the Free Exercise and Establishment Clauses." Id. at 1250. "The choice of individuals to serve as ministers is one of the most fundamental rights belonging to a religious institution. It is one of the most important exercises of a church's freedom from government control." Id. at 1250.

A.R. alleges that Scott was "an improper person for the task" of teaching Sunday School, Compl. ¶ 37, but "[t]he Constitution prevents courts from deciding what makes an individual competent to serve as a minister because it would require a court to interpret church canons and internal church practices and policies." Erdman v. Chapel Hill Presbyterian Church, 286 P.3d 357, 365 (Wash. 2012) (en banc) (citations and quotation marks omitted).[9]

    **B. The First Amendment also bars A.R.'s negligent supervision claim.** While Hosanna-Tabor makes clear that courts cannot interfere in a church's selection of its ministerial volunteers, many courts

---

[8] See EEOC v. The Roman Catholic Diocese of Raleigh North Carolina, 213 F.3d 795 (4th Cir. 2000) (church choir director); EEOC v. Catholic Univ. of Am., 83 F.3d 455 (D.C. Cir. 1996) (member of Catholic university's department of religious canon law); EEOC v. Southwestern Baptist Theological Seminary, 651 F.2d 277 (5th Cir. 1981) (seminary faculty).

[9] See also Pritzlaff v. Archdiocese of Milwaukee, 533 N.W.2d 780 (Wis. 1995) ("the tort of negligent hiring and retention may not be maintained against a religious governing body due to concerns of excessive entanglement"); Gibson v. Brewer, 952 S.W.2d 239, 247 (Mo. 1997) ("By the same token, judicial inquiry into hiring, ordaining, and retaining clergy would result in an endorsement of religion, by approving one model for church hiring, ordination, and retention of clergy.").

2004361151_2

have held that the First Amendment prohibits courts from setting secular standards of supervision for ministerial volunteers. Ayon v. Gourley, 47 F.Supp.2d 1246, 1248-51 (D. Colo. 1998).[10]

This Court need not go as far some have in holding that courts can never adjudicate negligent supervision claims involving ministerial employees. There is "limited authority for permitting negligent supervision claims to proceed" when the church knew that the perpetrator was dangerous. Swanson v. Roman Catholic Bishop of Portland, 692 A.2d 441, 446 (Me. 1997) (citing cases). The Missouri Supreme Court adopted a middle way in Gibson v. Brewer, 952 S.W.2d 239 (Mo. 1997), by distinguishing between ordinary negligent supervision and cases where a church intentionally turns a blind eye to a known danger. Gibson provides "a constitutionally sensitive model for such claims. The approach permits relief in egregious cases involving the failure to supervise a cleric known to pose a specific danger, while avoiding constitutionally prohibited inquiries into religious belief, church government, and what ecclesiastical leaders 'should have known' in the conduct of their religious duties." Schwarz & Appel, *The Church Autonomy Doctrine: Where Tort Law Should Step Aside*, 80 Cinn. L. Rev. 431, 478 (2011).

In this case, there is no evidence that Scott had engaged in previous similar misconduct, much less that the Church was aware of such misconduct. The Church certainly did not intentionally turn a blind eye to a known danger. To impose liability under these circumstances "would pressure churches to change their policies and practices—which arise from religious beliefs." Id. Churches would have to "reject any

---

[10] Ayon, 47 F.Supp.2d 1248-51 (D. Colo. 1998) (First Amendment bars outrageous conduct and negligent hiring and supervision claims), *aff'd on other grounds*, 185 F.3d 873 (10th Cir. 1999); Schmidt v. Bishop, 779 F. Supp. 321 (S.D.N.Y. 1991) ("[A]ny inquiry into the policies and practices of the Church Defendants in hiring or supervising their clergy raises the same kind of First Amendment problems of entanglement discussed above, which might involve the Court in making sensitive judgments about the propriety of the Church Defendants' supervision in light of their religious beliefs .... Any award of damages would have a chilling effect leading indirectly to state control over the future conduct of affairs of a religious denomination, a result violative of the text and history of the establishment clause."); Swanson, 692 A.2d at 445 ("imposing a secular duty of supervision on the church and enforcing that duty through civil liability would restrict its freedom to interact with its clergy in the manner deemed proper by ecclesiastical authorities").

2004361151_2

person from ministry…who may have once been accused (perhaps unfairly) of wrongdoing"—even totally unrelated wrongdoing—"frustrating religious beliefs in repentance, forgiveness, and redemption." Id.

In sum, the First Amendment prohibits adjudication of A.R.'s negligent hiring and negligent supervision claims because each would interfere with the Church's constitutionally protected right to choose its ministerial volunteers and minister to its members according to its doctrines and teachings.

## CONCLUSION

With her material facts disputed; with her failure to establish duty, standard of care and breach, and causation; with her failure to provide any reason to impose a heightened duty of care in a nearly risk-free setting; with her failure to identify any precedent imposing a duty to supervise a Sunday School teacher's after-hours, off-premises conduct; and with the heart balm bar and the bar of the First Amendment; plaintiff is not entitled to summary judgment.  We respectfully request that the Court rule accordingly.

**The Church respectfully requests oral argument.**

/s/ L. Martin Nussbaum
L. Martin Nussbaum
Charles Goldberg
ROTHGERBER JOHNSON & LYONS LLP
90 S. Cascade Avenue #1100
Colorado Springs, CO  80903
719-386-3004
mnussbaum@rothgerber.com
cgoldberg@rothgerber.com

*Attorneys for Defendant The Corporation of the President of the Church of Jesus Christ of Latter-day Saints*

2004361151_2

## CERTIFICATE OF SERVICE

On August 26, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sends notification of the same to:

Michael R. Waters, Esq.
David L. Geislinger, Esq.
Jones, Waters, Geilinger & Seymour, LLC
707 South Tejon, Ste. 200
Colorado Springs, CO  80903

David Chipman
Chipman Glasser, LLC
2000 S. Colorado Boulevard, Tower One, #7500
Denver, Colorado 80222

s/ L. Martin Nussbaum
L. Martin Nussbaum

4841-2991-9509, v.  2

2004361151_2