Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 12-CV-02197-PAB

————————————————————————————————————————————

Plaintiff(s):

A.R., by her next friend, PATRICIA A. PACETTI

Defendant(s):

THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS
CHRIST OF LATTER-DAY SAINTS, a Utah Corporation sole
a/k/a the MORMON CHURCH and DAVID SCOTT FRANK

————————————————————————————————————————————

Scheduling Attorney for the Defendant Church of Jesus Christ
of Latter-Day Saints:

MR. L. MARTIN NUSSBAUM, ESQ.

Rothgerber, Johnson & Lyons, LLP

90 South Cascade Avenue, Suite 1100

Colorado Springs, CO  80903

(719) 386-3000

Atty. Reg. No. 15370

MR. JUSTIN STARR, ESQ.

Kirton McConkie

1800 Eagle Gate Tower

60 East South Temple

Salt Lake City, UT  84111

(801) 328-3600

**Appearances continued on page 2**

————————————————————————————————————————————

DEPOSITION OF ASHLEY RUSSIK

January 21, 2013

# EXHIBIT F

Page 45

```
 1          A.   Yes.

 2          Q.   And you would punch holes in walls?

 3          A.   Yes.

 4          Q.   In your home?

 5          A.   Yes.

 6          Q.   Can you ever remember a time when you didn't have

 7     depression issues in your life?

 8          A.   Yes.

 9          Q.   When?

10          A.   I remember that there were some summers, I don't

11     know exactly what summers, but some summers I would be

12     happy.  Maybe that was because I was out of school.  I don't

13     know.  I do remember these past few years I have been

14     decently happy.

15          Q.   Good.  So, the past couple of years have been

16     pretty good?

17          A.   Yeah.

18          Q.   In terms of the depression?

19          A.   Decent, yeah.

20          Q.   But before the past couple of years depression

21     had been oftentimes a problem in your life; is that fair?

22          A.   Yes.

23          Q.   And when do you first remember that you began

24     having depression problems?

25          A.   I don't remember.
```

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

Page 46

```
 1          Q.    Medical records show over a decade; is that fair?

 2          A.    That's about fair.

 3          Q.    And when we spoke before during the junior high

 4   time, which you said was a low time, you also felt

 5   disappointed that your friends -- you felt abandoned by them

 6   when you were crying at school?

 7          A.    Yes.

 8          Q.    And in trouble?

 9          A.    Yes.

10          Q.    And by "in trouble," I mean emotional trouble.

11          A.    Yes.

12          Q.    What other low times do you remember?

13          A.    That's the -- about the only low time besides the

14   event with David Scott Frank.  That is one of the other low

15   times that I have had.

16          Q.    Do you remember in June when we talked about this

17   you indicated that your freshman and sophomore years were

18   also a low time?

19          A.    Yes.

20          Q.    And that was a time also you felt your friends

21   were not supporting you?

22          A.    Yes.

23          Q.    And you had put your event with David Scott Frank

24   as being a low time as well?

25          A.    Yes.
```

Page 68

1      A.   Yes.

2      Q.   And apparently he -- it appears he has a PA or a

3   physician's assistant named Carissa Benedict.  Do you

4   remember Ms. Benedict, a PA?

5      A.   No.

6      Q.   But you do remember going to see Dr. Zimmer?

7      A.   Uh-huh.

8      Q.   Is that a yes?

9      A.   Yes.

10      Q.   Let me just read you beginning with the second

11   sentence.  Well, start with the first sentence, "Comes in

12   with mother today."  This is all quoted.  "Has been seeing

13   her psychiatrist, Dr. Rinsky, for about six months now.

14   Dr. Rinsky had initially suspected that Ashley had bipolar

15   disorder because Ashley's mother, sister, and brother have

16   all been diagnosed with bipolar disorder."

17          Let me stop there.  Do you believe that you or

18   your mother reported that to these medical providers that

19   your mother, sister, and brother have been diagnosed with

20   bipolar?

21      A.   It is possible, but I don't recall.

22      Q.   And it is possible you reported that to them?

23      A.   It is possible.

24      Q.   Okay.  Let me continue with the quote:  "However,

25   Ashley has not responded to the medications typically used

Page 69

1    for bipolar disorder.  She also sees Dr. Tuning, her

2    psychologist.  Ashley's mom's major concern is that Ashley

3    has been very out of control recently.  She throws fits and

4    cries, and frequently threatens to jump off a bridge.  In a

5    week she is going to leave to go to Missouri to visit her

6    father and stepmother.  Ashley does not get along well with

7    her stepmother at all, and Ashley's mother is worried about

8    sending Ashley in her current state and is wondering if we

9    can start her on an antidepressant.  I spoke with Ashley

10   about her depression.  She says that initially when she

11   threatened to jump off a bridge it was to get attention and

12   reaction from her parents.  However, she tells me yesterday

13   she was up on top of a building with her friend and had

14   considered jumping off.  She does frequently have thoughts

15   like this.  She had seen her psychologist a couple of days

16   ago and she had recommended trying to get an urgent

17   consultation with the psychiatrist.  However, mom believes

18   it would be two to three weeks before she can be seen by her

19   psychiatrist."

20           Did I read that accurately?

21      A.    Yes.

22      Q.    Does this refresh your recollection about being

23   suicidal in the period around December 17 of 2009?

24      A.    Yes.

25      Q.    And what do you remember about that?

Page 70

1      A.   I don't remember much.  I actually don't remember

2    saying anything about me being on top of a building with my

3    friend.  And that is my honest thing, is I don't remember

4    saying that to her.  So -- and I don't even recall this

5    conversation at all with the --

6      Q.   Physician assistant?

7      A.   -- physician assistant, yes.

8      Q.   Do you recall -- but you do recall now being

9    suicidal in this time period just before you met Brian

10   Frank?

11     A.   Yes.

12     Q.   And what do you recall about it?

13     A.   I don't recall much.

14     Q.   And you have no recollection as you sit here

15   today of climbing on top of a building with a friend?

16     A.   No.

17     Q.   Do you recall anxiety about going to see your

18   stepmother and your father in Missouri?

19     A.   Yes.  My stepmother.

20     Q.   Your stepmother, excuse me.  Do you recall your

21   mother seeking some medical help for you associated with

22   that anxiety?

23     A.   Rephrase the question.

24     Q.   Do you recall your mother getting some medical

25   help for you because you were anxious about seeing your

Page 72

1        A.    Not that I know of.

2        Q.    Do you have any present medical problems?

3        A.    Not that I know of.

4        Q.    Are you on any medications?

5        A.    No.

6        Q.    Good for you.  How would you characterize your

7    present state of health and physical well-being?

8        A.    I would say that I am healthy.

9        Q.    No limits on your activities?

10       A.    No.  Not that I know of.

11       Q.    And how would you characterize the state of your

12   mental health?

13       A.    I think that it is very good.

14       Q.    Okay.  Are you seeing anyone currently?

15       A.    Yes.  I am still seeing Pat Tuning.

16       Q.    Why are you seeing her if you are doing well?

17       A.    Because I don't want any reoccurrences, and I

18   still do get a little overwhelmed from time to time.

19       Q.    But overall the problems that you have had in the

20   past of depression, cutting, suicidal ideation, those have

21   pretty well passed?

22       A.    Yes.

23       Q.    How long has that been that you really haven't

24   had issues with that?

25       A.    Not very long.

Page 79

1          Q.   Would you characterize your physical and mental

2     health today versus what it was, let's say, in December of

3     2009, are you -- how are you doing?   Compare those two

4     periods of time.

5          A.   I am doing much better.

6          Q.   Physically you are doing better?

7          A.   Yes.

8          Q.   Less meds?

9          A.   Yes.

10          Q.   And less -- no cutting?

11          A.   No cutting.

12          Q.   No suicidal ideation?

13          A.   No.

14          Q.   And you are just doing better?

15          A.   Yes.

16               MR. NUSSBAUM:   Okay.   That's great.   I think we

17     ought to take a break at this point.   He have gone for a

18     long time.   It is 10:15.   Why don't we take a 5-minute break

19     or so.   Is that all right?

20               THE WITNESS:   Yes.

21               MR. NUSSBAUM:   Thank you.

22                    (Recess from 10:14 a.m. to 10:33 a.m.)

23     BY MR. NUSSBAUM:

24          Q.   Thank you for the break.   Ashley, do you hope to

25     get married and have a family some day?

Page 85

1       Q.   And he appeared one day in your art class?

2       A.   Yes.

3       Q.   What does he look like?

4       A.   He has got light-colored hair, I would say blond,

5  last time I saw him.  He was taller than me.  I don't know

6  how else to describe him.  Average build.

7       Q.   Did you think he was cute?

8       A.   Yes.

9       Q.   And the two of you became friends?

10      A.   Yes.

11      Q.   How did you become friends?  What happened?

12      A.   We would just talk.

13      Q.   Just beginning in class?

14      A.   Uh-huh.

15      Q.   Yes?

16      A.   Yes.

17      Q.   Did you sit by him?

18      A.   Well, he sat at the same table as me, but I

19  didn't sit by him.

20      Q.   What would you talk about?

21      A.   We would just talk about our interests.

22      Q.   Like?

23      A.   Like art, for example.

24      Q.   Okay.

25      A.   I don't recall anything else that we talked

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

A.R., by her next friend, Patricia A. Pacetti v. The Church of Jesus Christ of Latter Day Saints        Ashley Russik                                    January 21, 2013

Page 86

1    about.

2        Q.    And did you then begin communicating with him

3    after class as well?

4        A.    Yes.

5        Q.    And how did you do that?

6        A.    Through Scott Frank's -- or David Scott Frank's

7    phone.

8        Q.    So, Brian had a phone that his dad owned?

9        A.    Uh-huh.

10       Q.    Is that yes?

11       A.    Yes.

12       Q.    And you would speak with him on the phone?

13       A.    Yes.

14       Q.    And you would also text with him on the phone?

15       A.    Yes.

16       Q.    I have never texted, so you will have to help me

17   here.  Do you dial the same number when you text as when you

18   call someone?

19       A.    Yes.

20       Q.    So, those telephone numbers you gave me earlier

21   would also be the number for texting?

22       A.    Yes.

23       Q.    And would you speak to him on the phone like in

24   the evening and on the weekends?

25       A.    Yes.

Page 87

```
 1          Q.   A lot?

 2          A.   Frequently.

 3          Q.   And how often did you talk to Brian?

 4          A.   I don't remember.

 5          Q.   Would it be maybe a couple hours a day?

 6          A.   Yes.

 7          Q.   And you would also text him during that period of

 8   time?

 9          A.   Yes.

10          Q.   What would you talk about?  That is a lot of time

11   talking.

12          A.   Sometimes we would talk about religion, and that

13   is when he introduced me to the LDS religion, and all of

14   that.  And we would talk about that.  We would talk about

15   our interests, honestly.

16          Q.   And you have an interest in a lot of things,

17   don't you?

18          A.   Yes.

19          Q.   And you were kind of interested in different

20   religions?

21          A.   Yes.

22          Q.   And you didn't know much about the Mormon Church?

23          A.   No, I didn't.

24          Q.   Is that right?

25          A.   Yes.
```

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

Page 88

```
 1          Q.    This was a curiosity to you?

 2          A.    Yes.

 3          Q.    Did you think, oh, I want to join that church, or

 4    did you think more let's -- I am curious, let's just learn

 5    about it?

 6          A.    Was more curious and just wanted to learn.

 7          Q.    And when you were in Sunday school and go to

 8    services in the months ahead, were you still kind of curious

 9    as an intellectual sense, or were you thinking, "Maybe I

10    will join"?

11          A.    A mixture of both.

12          Q.    So, what you were exposed to at the church you

13    found some things attractive about it?

14          A.    Yes.

15          Q.    And what were those?

16          A.    It was just different from all the churches that

17    I have ever been to.  Because most of the churches that you

18    have been to are a little less -- they are -- I am trying to

19    think of a word how to describe it.  They are -- the

20    churches that I have usually been to are more formal -- or

21    casual.

22          Q.    More casual?

23          A.    I'm sorry, more casual.  And, you know, jeans and

24    a T-shirt.  And, you know, different -- different types of

25    gospel.  So, I was just -- it was just interesting, because
```

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

Page 89

```
 1    it was different.

 2         Q.   So, people would dress a little more in Sunday

 3    clothes at the ward than what you had experienced in other

 4    churches?

 5         A.   Yes.

 6         Q.   When you were communicating with Brian Frank

 7    after class by phone, would it be more by the telephone,

 8    speaking to each other, or more texting?

 9         A.   Probably more texting.

10         Q.   More texting.  And is texting limited to 140

11    characters or something?

12         A.   160 on my phone.

13         Q.   So, just short little statements?

14         A.   Yes.

15         Q.   And did you ever have any exchanges with Brian

16    suggesting that you found him cute or that you had an

17    interest in being a girlfriend/boyfriend?

18         A.   Yes.

19         Q.   You said that to him?

20         A.   Yes.

21         Q.   Did he say that back to you?

22         A.   Not necessarily.  I don't remember exactly what

23    he said.  But he didn't show as much interest in me.

24         Q.   And did you just say straight to him, "Let's be

25    boyfriend/girlfriend"?
```

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

Page 90

1       A.   No, I just kind of gradually brought it on to him

2   saying, "I think you are cute," and things like that.

3       Q.   And he didn't reciprocate?

4       A.   Not that I remember.

5       Q.   And how long was that after you had met him that

6   you began letting him know you thought he was cute?

7       A.   I don't remember.

8       Q.   And after Christmas, you went to Missouri to be

9   with your dad and stepmom?

10      A.   Not after.  It was during Christmas.

11      Q.   During Christmas?

12      A.   Yes.

13      Q.   How long were you there?

14      A.   I believe I was there for a week.

15      Q.   So, you went out to Missouri maybe a week before

16  Christmas, and you stayed until a week after, until early

17  January?

18      A.   I don't remember exactly the dates.

19      Q.   But approximately?

20      A.   Approximately.

21      Q.   Okay.  And while you were in Missouri did you

22  continue to communicate with him both by phone calls and

23  text messages?

24      A.   Yes.

25      Q.   Do you recall any of those conversations?

Page 93

1    church?

2           A.    Yeah.   I mean, I think -- I believe that he told

3    me the basics about it.   Like what they believe.   What they

4    read.   Some of the books.   And all of that.   But I don't --

5    I don't remember exactly what he said.

6           Q.    Okay.   And did he invite you to the ward, or did

7    you ask to come to the ward?

8           A.    I think it was a little bit of both.

9           Q.    And when did you start coming to the ward?

10          A.    It was January 3rd.

11          Q.    And how do you remember that date?

12          A.    I don't know why I remember that date, but I do.

13          Q.    2010?

14          A.    Yes.

15          Q.    Did you ever tell Brian as your relationship

16   developed with him or his dad -- did you ever tell him, "You

17   know, I am going to have sex with your dad"?

18          A.    No.

19          Q.    You are sure of that?

20          A.    Yes.

21          Q.    And did you ever tell Brian that you were going

22   to commit suicide?

23          A.    Not that I am aware of.

24          Q.    And, so, you are not sure of that, I take it?

25          A.    I don't remember exactly, but I am pretty sure

Page 96

1      Q.   Could you even give me roughly?  Was it less than

2  ten?

3      A.   I don't recall.

4      Q.   You don't recall.  You have no recollection.  So,

5  do you have any recollection if you were there three Sundays

6  or -- what do we have here, five months, 20 Sundays?  You

7  have no idea?

8      A.   No.

9      Q.   It could be as little as three; it could be as

10  many as 20?

11      A.   Uh-huh.

12      Q.   Is that right?

13      A.   Yes, yes.

14      Q.   You just don't know?

15      A.   I just don't know.  I did see him take

16  attendance, so...

17      Q.   Who did you see take attendance?

18      A.   David Scott Frank.

19      Q.   And what was a typical morning like at the

20  church?

21      A.   We would just sit down in the area, the big

22  area, I don't know what the LDS calls it, I guess the

23  sanctuary area, and before the service we would just, you

24  know, chat with people and stuff like that.  And then we

25  would sit down.  There would be like, you know, the hymns

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

Page 97

1   and stuff like that.  And then we would break off into

2   Sunday School.

3           Q.    So, start in the sanctuary with --

4           A.    Yeah.

5           Q.    -- visiting and hymns?

6           A.    Yeah.  And then just the regular service and

7   stuff like that.

8           Q.    And then you go to Sunday School?

9           A.    And then you went to Sunday School.  And then we

10  would just have our lessons, and stuff like that.  And then

11  we would go to -- like I would go to young women's.

12          Q.    Okay.  And, so, there were three steps, really.

13  The worship, Sunday School, and the young ladies' class?

14          A.    Yes.

15          Q.    And how long were each?

16          A.    I don't recall exactly.  I think they were about

17  an hour long.

18          Q.    And in the worship portion of it, where would you

19  sit?

20          A.    I would sit next to David Scott Frank and his

21  son, Brian.

22          Q.    Would you sit in the middle with them on either

23  side, or it changed?

24          A.    It would sometimes change.

25          Q.    A lot of people around?

Page 107

1    off of Fountain and Platte."

2         Q.    What is that about?

3         A.    Some kind of conference, I guess.  Something

4    about like -- I guess -- I recall it as some teachings.

5         Q.    A church conference of some sort?

6         A.    Yes.

7         Q.    It is fair to say there is no romantic or sexual

8    content to that handwriting?

9         A.    Yes.

10        Q.    And there is no other handwriting on that page?

11        A.    Yes.

12        Q.    And on page 297, there is no handwriting?

13        A.    Yes.

14        Q.    Are you aware of any other bulletins that exist

15   that show the two of you exchanging any notes?

16        A.    Not that I am aware of.

17        Q.    Is it fair to say that in the notes that you

18   exchanged, they are all -- from this group, Deposition

19   Exhibit 9, they are all essentially about the church

20   teachings, the readings, or church events?

21        A.    Yes.

22        Q.    In your experience of attending the worship

23   service, the first hour of this Sunday morning activity with

24   Brian and Scott Frank, is it fair to say that there was

25   never any sexual or romantic content whatsoever to what

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

A.R., by her next friend, Patricia A. Pacetti v. The Church of Jesus Christ of Latter Day Saints      Ashley Russik                              January 21, 2013

Page 108

1    happened in that first hour?

2          A.   Yes.

3          Q.   And did a bell ring when the service came to an

4    end, or --

5          A.   Yes.

6          Q.   And the service goes right up to the bell?

7          A.   Sometimes a little longer.

8          Q.   And after the bell do people promptly move to the

9    Sunday School class?

10         A.   What do you mean?

11         Q.   After the bell rang of the first hour, did you

12   promptly move to the Sunday School class after that?

13         A.   If there -- if they were done with the service,

14   yes.

15         Q.   And were there any communications between you and

16   Scott Frank from the time the service ended until Sunday

17   School class?

18         A.   Sometimes, yes.

19         Q.   Like what?

20         A.   I don't remember.

21         Q.   Do you remember if any of that ever had any

22   romantic or sexual content?

23         A.   There could have been.  I am not sure.

24         Q.   But you don't recall?

25         A.   I don't recall.

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

A.R., by her next friend, Patricia A. Pacetti v. The Church of Jesus Christ of Latter Day Saints      Ashley Russik      January 21, 2013

Page 109

1      Q.    And then you went to Sunday School class, and who

2    would teach that class?

3      A.    That would be David Scott Frank.

4      Q.    And every Sunday that you were there, did he

5    teach the class?

6      A.    Every Sunday that I am aware of.

7      Q.    And then how did that -- how did you know when

8    that class came to an end?

9      A.    There was another bell that would ring.

10     Q.    And then where did you go?

11     A.    Young women's.

12     Q.    And would you typically go promptly to the young

13   women's class?

14     A.    Yes.

15     Q.    And would that class then continue until yet

16   another bell?

17     A.    Yes.

18     Q.    And then you would go home?

19     A.    Yes.

20     Q.    And did you have any contact with Scott Frank

21   after the young women's class?

22     A.    I would sometimes.  He would be putting up chairs

23   or something like that, and I would go and help him.

24     Q.    Okay.  And when you would help him put up chairs,

25   was there ever any sexual or romantic content to that that

Page 118

1      Q.   And did you find that attractive as well?

2      A.   Yes.

3      Q.   And you had no contact with Scott Frank during

4  the young ladies' class, right?

5      A.   He would text me.

6      Q.   He would text you during that class?

7      A.   Yes.

8      Q.   Okay.  And tell us about that.

9      A.   He would tell me to skip the class and go hang

10  out with him.  I don't know exactly what he would say, but

11  he would say to skip it and go be with him.

12      Q.   And you didn't -- did you do that?

13      A.   No.

14      Q.   Did you understand that if he told you that, that

15  would be contrary to what the church would have intended?

16      A.   What do you mean?

17      Q.   The church had a plan for how the day would

18  proceed on Sunday morning, right?

19      A.   Yes.

20      Q.   And having you skip the young ladies' class, you

21  would understand, would be contrary to what the church

22  intended the young ladies to do?

23      A.   Yes.

24      Q.   Did you think he was doing that as a Sunday

25  School teacher or just as a guy?

A.R., by her next friend, Patricia A. Pacetti v. The Church of Jesus Christ of Latter Day Saints      Ashley Russik

January 21, 2013

Page 121

1      A.   Yes.

2      Q.   Your age?

3      A.   Yes.

4      Q.   Do you remember any of their names?

5      A.   Not -- not off the top of my head.

6      Q.   Was Brian in it?

7      A.   No.

8      Q.   And why was he not in it?

9      A.   Because he was older, because there was -- they

10  broke up in age groups.

11      Q.   Were these kids mostly sophomores in high school?

12      A.   I am not exactly sure, but I do know that the age

13  group was, I think, in between 13 and 15.

14      Q.   Okay.  And did they behave and have good

15  comportment?

16      A.   That I know of, yes.

17      Q.   There was no messing around between the students

18  in the class?

19      A.   Not that I know of.

20      Q.   By that I mean horseplay, no sexy talk, or

21  anything like that, right?

22      A.   Not that I am aware of.

23      Q.   If Scott Frank at some point wanted to have sex

24  with you, would Sunday School class have been a good place

25  to do it?

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

Page 122

```
 1          A.    I don't know.

 2          Q.    What do you think?

 3          A.    What do you mean?

 4          Q.    To do it in the Sunday School class.

 5          A.    Would have been an okay thing?

 6          Q.    Would that have been a good place?  Would that

 7    have been a good strategy on his part to try to have a

 8    sexual relationship with you?

 9          A.    No.

10          Q.    Why not?

11          A.    Because that is very inappropriate.  Not only my

12    age is inappropriate, but also the time and the place.

13          Q.    Okay.  And what is wrong with the time and the

14    place?

15          A.    Well, what is wrong with it is if, you know, you

16    are -- if you are married and you are going to have sexual

17    relations, the proper place to do it is in a bed.

18          Q.    Without other people around?

19          A.    Yes.

20          Q.    Okay.  And, so, there were a lot of people around

21    on Sunday morning in the Sunday School class?

22          A.    Yes.

23          Q.    And were there people around besides the students

24    in the class and the teacher?

25          A.    What do you mean?
```

Page 123

1      Q.    Was there anybody else that would be -- was there

2   a door on the classroom?

3      A.    There was two.

4      Q.    Two doors.  Were they open or closed?

5      A.    They were closed.

6      Q.    And would people come in and pick up the roll or

7   deliver messages or make announcements from outside the

8   class at any time?

9      A.    Honestly, only every once in a great, great

10  while.  I think maybe twice that I remember there was

11  someone who just came in, sat down for a few seconds, and

12  then left.

13     Q.    Okay.  And did anybody come in to drop off

14  anything to the teacher?

15     A.    Not that I know of.

16     Q.    Obviously there are students in the class, and

17  one wouldn't have sexual union in front of the other

18  students?

19     A.    Yes.

20     Q.    Were you ever alone in the class with Scott

21  Frank?

22     A.    Do you mean just the classroom is like empty?

23     Q.    Yes.  Just the two of you.

24     A.    There was a few times.

25     Q.    And was that when he was putting up chairs and

A.R., by her next friend, Patricia A. Pacetti v. The Church of Jesus Christ of Latter Day Saints        Ashley Russik                                    January 21, 2013

Page 133

```
 1        A.   Yes.

 2        Q.   When you turned 18?

 3        A.   Uh-huh.

 4        Q.   And when you were having sexual relations with

 5   him, you thought that was a very distinct possibility?

 6        A.   Yes.

 7        Q.   Do you know what it means to be chased?

 8        A.   No.

 9        Q.   Okay.  Had you experienced intercourse, sexual

10   intercourse, before you met Scott Frank?

11        A.   No.

12        Q.   And, so, was your first time to have sexual

13   intercourse with Scott Frank?

14        A.   Yes.

15        Q.   And that was a choice you made, right?

16        A.   Yes.

17        Q.   Tell me how your relationship with Scott Frank

18   began.  I think -- and let's begin with you had met Brian,

19   and then you had talked to Brian about coming to church.

20        A.   Uh-huh.

21        Q.   Had you had any communications with Scott Frank

22   before the first time you went to church?

23        A.   Yes.

24        Q.   The first time you went to church you said was

25   January 3, 2010?
```

Page 134

1      A.    Yes.

2      Q.    What communications did you have with Scott Frank

3  before you went to church?

4      A.    I had a conversation with him via text, and I had

5  texted the phone intending it for Brian, but his father

6  answered.

7      Q.    By text?

8      A.    Yes.  By text.  And he was asking me, "Oh, are

9  you right for my boy," and all of that other stuff.  I don't

10  know exactly what he -- what he was -- what he said, but

11  something about, "Are you" -- "Are you right for him" kind

12  of thing.

13            And then he said, "Oh, well, he is asleep."

14      Q.    What hour was this; do you remember?

15      A.    I don't remember.

16      Q.    Was there any more exchange in that first

17  exchange, other than you were thinking you were sending a

18  text to Brian, Scott responded.  Did he identify himself as

19  responding as Scott?

20      A.    I believe so, yes.

21      Q.    And said, "Are you right for my boy?"  And do you

22  remember what you said in response?

23      A.    No.

24      Q.    Okay.  So, what other communications did you have

25  with him before January 3, 2010?

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

Page 135

1       A.    That's all.

2       Q.    All right.  So, you met him on January 3 at

3   church.  That is your first meeting?

4       A.    Uh-huh.

5       Q.    With him?

6       A.    Yes.

7       Q.    You go to the three classes on that day.

8       A.    Yes.

9       Q.    Then did anything inappropriate happen on that

10  first day --

11      A.    Not that I remember.

12      Q.    -- at church?

13          MR. WATERS:  Time out.  Be real careful.  Let him

14  finish his question and then answer.  She is going to reach

15  over here and slap you eventually.  You are right on the

16  tail of his question.

17          MR. NUSSBAUM:  She is actually going to slap me.

18          MR. WATERS:  He goes first; you answer.  You are

19  right on the end of his questions.

20          THE WITNESS:  I am just a mind reader.  I know

21  what he is going to say.

22          MR. WATERS:  I know.  She is awfully patient.

23  BY MR. NUSSBAUM:

24      Q.    What happened next in your communications with

25  him?  Do you remember?  Was the next communication the next

Page 136

1   Sunday?

2       A.   I don't remember.

3       Q.   You don't remember the sequence?

4       A.   Huh-uh, no.

5       Q.   At some point did you begin to communicate with

6   him outside of Sunday School?

7       A.   Yes.

8       Q.   And outside of worship?

9       A.   Yes.

10      Q.   And do you have any rough idea when that would

11  have begun?

12      A.   No.

13      Q.   How did you begin those other communications?

14      A.   It was mostly just regular conversation.  Some of

15  it was about what he was going to be teaching the next

16  Sunday, and all of that.  But otherwise, I don't remember

17  what else.

18      Q.   Phone conversations?

19      A.   Texts, usually.

20      Q.   Text conversations?

21      A.   Yes.

22      Q.   And at some point did you begin discussing

23  subjects besides the next week's class?

24      A.   I would assume so.

25      Q.   I am not asking you to assume or guess.  I am

Page 140

1    but I didn't know beyond that.  I mean, I knew that it could

2    happen, but I didn't know exactly what would happen.

3         Q.   Okay.  But even knowing that it could happen, you

4    decided to delete them?

5         A.   Yes.

6         Q.   Okay.  So, you had hundreds of text messages with

7    Scott Frank between January 3, 2010, and June 30, 2010?

8         A.   Uh-huh.  Yes.

9         Q.   And how many times did you have a phone

10   conversation with him during that period?

11        A.   I don't remember, but there are, I think, about

12   2,000 pages of phone records of just his number calling me

13   and me calling him.

14        Q.   Okay.  So, thousands of times?  Thousands and

15   thousands of times?

16        A.   Yep.  Yes.

17        Q.   What did you talk about?

18        A.   I don't remember exactly what he talked about.

19        Q.   What was the prime time for all of these

20   communications?

21        A.   Mostly in between about 9:00 to 2:00 or 3:00 in

22   the morning.  In between then.

23        Q.   And why those hours?

24        A.   Because he had work really late at night, and he

25   would get off work around 12:00, 1:00 in the morning.

Page 141

1        Q.   And was he working at the church?

2        A.   No.

3        Q.   Where was he working?

4        A.   He was working at Chili's.

5        Q.   And you certainly understood that these thousands

6   of calls and hundreds of text messages weren't part of his

7   Sunday School teaching duties, right?

8        A.   Yes.

9        Q.   This was him as a guy; not as a Sunday School

10  teacher?

11       A.   Yes.

12       Q.   What possibly could you have communicated that

13  much about?  What is the subject matter of all of these

14  communications?

15       A.   I don't remember.

16       Q.   You don't remember?  How can you not remember

17  thousands of calls?

18       A.   I remember some of them would be maybe like, "Oh,

19  well, do you want to go do this?"  He would try to

20  manipulate me to have sex with him.

21       Q.   Okay.  And when you said that he would try to

22  manipulate you to have sex, would he do that by indirect

23  suggestion?

24       A.   I don't remember.

25       Q.   Okay.  You said that some of the messages was,

Page 147

1                THE WITNESS:  Okay.

2    BY MR. NUSSBAUM:

3        Q.    So, do you remember the events -- you said Scott

4    came over to your house three times, correct?

5        A.    Yes.

6        Q.    And tell me -- let's go to the first event.

7    Approximately when was that in time?

8        A.    I don't remember.

9        Q.    You told the police it was late April 2010.  Does

10   that refresh your recollection at all?

11       A.    Yes.

12       Q.    Okay.  So, do you think it probably was --

13       A.    Yes.

14       Q.    -- late April 2010?

15       A.    Yes.

16       Q.    Did the two of you communicate before he came

17   over?

18       A.    Yes.

19       Q.    Who initiated the communication?

20       A.    He did.

21       Q.    Phone call?

22       A.    Yes.

23       Q.    He called you?

24       A.    Yes.

25       Q.    What time?

Page 148

```
 1          A.    I don't remember.

 2          Q.    Late at night?

 3          A.    It was early in the morning, I would -- that

 4   would be about the time that he would have --

 5          Q.    Tell me what you remember about that phone call.

 6          A.    I don't remember anything.

 7          Q.    You don't remember anything in that phone call.

 8   Do you remember inviting him to come over to your house?

 9          A.    No.

10          Q.    Do you remember him saying, "I would like to come

11   over to your house"?  You don't remember?

12          A.    No.

13          Q.    Okay.  So, if the call was in the early

14   morning -- and by that you mean around 1:00 a.m.?

15          A.    Uh-huh.

16          Q.    Is that yes?

17          A.    Yes.

18          Q.    Did he come over to your house then?

19          A.    Yes.

20          Q.    And were you hoping that he would come over to

21   the house?

22          A.    I don't remember.

23          Q.    You don't remember whether you welcomed this.  Do

24   you remember whether you said to him, "Don't come over"?

25          A.    No.
```

A.R., by her next friend, Patricia A. Pacetti v. The Church of Jesus Christ of Latter Day Saints      Ashley Russik                                                      January 21, 2013

Page 149

1      Q.   By this point you were interested in him; you

2  were sexually interested in him, weren't you?

3      A.   Yes.

4      Q.   And vice versa?

5      A.   Yes.

6      Q.   Okay.  And when he came over, you were open to

7  have a sexual encounter with him?

8      A.   Yes, but we didn't.

9      Q.   Okay.  So, what did you do when he came over?

10     A.   We just kissed.

11     Q.   Where did you kiss?

12     A.   Just on the lips.

13     Q.   I mean, where were your bodies located?

14     A.   I was in the passenger seat and he was in the --

15  in the driver's seat.

16     Q.   If you would, please, draw me a map here of your

17  house.  Is there a barn on your property or something?

18     A.   Yes.

19     Q.   Would you draw that as best you can?  I will loan

20  you my pen.

21     A.   From the aerial view?

22     Q.   Yes, yes.  If you mess up, I will give you

23  another piece of paper.

24     A.   Here is the road.

25     Q.   What street is that called?

Page 150

1       A.    It is called Peaceful Valley.  Do you want me to

2   write that?

3       Q.    Would you write that on there?

4       A.    And then my house is right here.  And then it

5   goes like that way.

6       Q.    If you will label things as you go along, that

7   will help us.

8       A.    And this is part of the driveway.  And then I

9   have a barn over here.  And then this is a fence.

10      Q.    Would you mark the fence?

11      A.    (Witness complies.)  And then there is kind of a

12  partial fence over -- like over here.  And then a shed.  And

13  that is pretty much it.

14      Q.    Okay.  And, so, when he came out in late April

15  2010, sometime after 1:00 a.m., did he come knock on the

16  door?

17      A.    No.

18      Q.    What happened when he came out?

19      A.    He called me and told me that he was -- he was at

20  my house.

21      Q.    Okay.  Where was he parking when he called you?

22      A.    He parked like right over here.

23      Q.    On Peaceful Valley Road before he came up your

24  drive?

25      A.    Yeah.

A.R., by her next friend, Patricia A. Pacetti v. The Church of Jesus Christ of Latter Day Saints        Ashley Russik                                    January 21, 2013

Page 151

1        Q.    And what did you say to him?

2        A.    What do you mean?

3        Q.    When he called from still out on the street to

4    you, what did you say to him?

5        A.    Well, told him I would be out there.

6        Q.    Okay.  And did you walk down the driveway to him?

7        A.    Yes.

8        Q.    And enter his car?

9        A.    Yes.

10        Q.    Willingly?

11        A.    Yes.

12        Q.    No coercion?

13        A.    No.

14        Q.    And then what happened?

15        A.    And then we talked for a little bit, and then I

16    kissed him.

17        Q.    Parked on the street?

18        A.    Uh-huh.

19        Q.    Okay.  And you kissed him on the mouth?

20        A.    Yes.

21        Q.    And how long did you guys kiss?

22        A.    Not for very long.

23        Q.    Did you do anything else?

24        A.    No.

25        Q.    Okay.  No touching or anything like that?

A.R., by her next friend, Patricia A. Pacetti v. The Church of Jesus Christ of Latter Day Saints     Ashley Russik                    January 21, 2013

Page 152

```
 1        A.   Not that I remember.

 2        Q.   When you say "not for very long," 5 or 10

 3   minutes, 3 minutes?

 4        A.   Seconds.

 5        Q.   Seconds.  Like a goodnight kiss?

 6        A.   Yes.

 7        Q.   No tongue or any activity like that?

 8        A.   Not that I remember.

 9        Q.   And how long were you in the car that night?

10        A.   I don't remember.

11        Q.   5, 10 minutes, 4 minutes?

12        A.   I don't remember.

13        Q.   You don't know?

14        A.   I don't know.

15        Q.   The actual kissing was very brief?

16        A.   Yes.

17        Q.   And that kissing was something you consented to?

18        A.   Yes.

19        Q.   And did you find it pleasurable?

20        A.   Yes.

21        Q.   And then did he go home?

22        A.   Yes.

23        Q.   End of that?

24        A.   Yes.

25        Q.   Then in the days that followed, more text
```

Page 155

1       A.   I think he did.

2       Q.   Approximately what time?

3       A.   I don't remember.  About the same time.

4       Q.   You are not sure whether he initiated, but you

5  think he did?

6       A.   Yes.

7       Q.   And what do you recall about that phone call?

8       A.   Nothing.

9       Q.   But you were open to have him come over to the

10  house again?

11      A.   Yes.

12      Q.   On the first time he came over to your house, was

13  your mother in the house at the time you guys were in the

14  street?

15      A.   I don't remember.

16      Q.   Is she normally at home at 1:00 a.m. and 2:00

17  a.m. in the morning?

18      A.   Yes.  Normally.

19      Q.   Do you think of anything that would have her out

20  beyond those hours?

21      A.   No.

22      Q.   And would Randy Pacetti have been home as well?

23      A.   Yes.

24      Q.   Okay.  Back to the second time that he came over.

25  You called.  You both agreed that he would come over; is

Page 156

1     that fair?

2          A.   Yes.

3          Q.   You are not sure whether you invited him or he

4     invited himself?

5          A.   Yes.

6          Q.   You are unsure?

7          A.   I am unsure.

8          Q.   And he came over.  And did he park on the street

9     again?

10         A.   Yes.

11         Q.   Okay.  And then what happened?  Did he call you

12    again?

13         A.   Yes.

14         Q.   From being parked on the street?

15         A.   Yes.

16         Q.   And did you walk out on the street again?

17         A.   Yes.

18         Q.   And is this street not used very heavily at

19    night?

20         A.   No.  I live in the country.

21         Q.   I see.  And, so, did you enter his car again?

22         A.   Yes.

23         Q.   And then what happened?

24         A.   And we had sexual relations.

25         Q.   Can you describe it, please?

A.R., by her next friend, Patricia A. Pacetti v. The Church of Jesus Christ of Latter Day Saints        Ashley Russik                                    January 21, 2013

Page 157

1          A.    In what way?

2          Q.    What happened?   In sexual relations, you mean

3    intercourse?

4          A.    Yes.

5          Q.    And what happened before?   How did you lead up to

6    intercourse?

7          A.    We were just talking.

8          Q.    Okay.   And then what?

9          A.    And it just happened.

10         Q.    Okay.   And did you crawl on top of him?

11         A.    Yes.

12         Q.    Okay.   He was in the driver's seat?

13         A.    Yes.

14         Q.    And you welcomed that?

15         A.    Yes.

16         Q.    And he welcomed it?

17         A.    Yes.

18         Q.    Was there much kissing, or just actual

19    intercourse?

20         A.    It was mostly intercourse.

21         Q.    And did he ejaculate?

22         A.    I believe so, yes.

23         Q.    At that time you found this pleasurable?

24         A.    Yes.

25         Q.    How long did this take?

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

Page 158

```
 1          A.    Not very long.  A few minutes.

 2          Q.    Just kind of got right down to it that evening;

 3    is that fair?

 4          A.    Yeah.

 5          Q.    Not a lot of kissing or anything leading up to

 6    it?

 7          A.    Yes.

 8          Q.    And then after you had had intercourse, you put

 9    your pants back on?

10          A.    Yes.

11          Q.    And he did?

12          A.    Yes.

13          Q.    And then what?

14          A.    And then we would talk for a little bit, and then

15    go our separate ways.

16          Q.    Said good night, and you went in?

17          A.    Yes.

18          Q.    And that is all you remember about that?

19          A.    Yes.

20          Q.    Okay.  And then after -- after this event, do you

21    recall anything that happened before the third event between

22    you, from the second encounter, which is sometime in late

23    May, I think, is where we are roughly dating this, of 2010,

24    until you had a third sexual encounter?

25          A.    Okay.
```

Local
(719) 578-2062

Pelton Reporting Service, Inc.
www.peltonreporting.com

Denver
(303) 575-6606

Page 160

```
 1          Q.    No?

 2          A.    No.

 3          Q.    There are like two different worlds?

 4          A.    Yes.

 5          Q.    They were compartmentalized; is that fair?

 6          A.    Yes.

 7          Q.    Do you recall when the third encounter was?

 8          A.    It was shortly after the second.  I am not

 9     exactly sure when, but it was shortly after.

10          Q.    You told the police on -- in August of 2010 it

11     was on June 25.  Does that sound right?

12          A.    It sounds about right, yes.

13          Q.    That would have been a Friday evening.  Sound

14     okay?

15          A.    Yeah.

16          Q.    Okay.

17          A.    Sounds about right.

18          Q.    And same pattern?

19          A.    Yes.

20          Q.    Did you have a phone call before he came over?

21          A.    Yes.

22          Q.    Do you remember anything about that phone call

23     specifically?

24          A.    No.

25          Q.    Do you remember if you initiated it or he
```

A.R., by her next friend, Patricia A. Pacetti v. The Church of Jesus Christ of Latter Day Saints        Ashley Russik                                                    January 21, 2013

Page 161

1    initiated it?

2         A.   No.

3         Q.   What happened that evening?

4         A.   The same thing.

5         Q.   As the second time?

6         A.   As the second time.

7         Q.   You got in the car, quickly went about the

8    business of having intercourse?

9         A.   Yes.

10        Q.   Finished, and left?

11        A.   Yes.

12        Q.   Consensual?

13        A.   Yes.

14        Q.   Pleasurable to you?

15        A.   Yes.

16        Q.   You were not raped?

17        A.   No.

18             MR. WATERS:   Objection to the form.

19   BY MR. NUSSBAUM:

20        Q.   And I take it from where he parked on the street,

21   would the barn have precluded a sight line to the house so

22   the car couldn't be seen from the house?

23        A.   Yes.

24        Q.   So, this drawing doesn't quite show that, does

25   it?