IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-02197-RM-KLM

A.R., by her next friend,
PATRICIA A. PACETTI,

      Plaintiff,

v.

THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS, a Utah corporation sole, also known as Mormon Church, and
DAVID SCOTT FRANK,

      Defendants.

_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

      This matter is before the Court on **Defendant Corporation of the President of The
Church of Jesus Christ of Latter-day Saints'** *Daubert* **Motion to Exclude Paul
Isenstadt as an Expert Witness** [Docket No. 36; Filed May 15, 2013] (the "Motion").  On
June 5, 2013, Plaintiff filed a Response [#41] in opposition to the Motion.  On June 21,
2013, Defendant Corporation of the President of The Church of Jesus Christ of Latter-day
Saints ("LDS") filed a Reply [#44].  The Court has reviewed the Motion, the Response, the
Reply, the exhibits, the entire case file, and the applicable law, and is fully advised in the
premises.  For the reasons set forth below, the Motion [#36] is **GRANTED in part and
DENIED in part.**

**I. Factual Summary of the Case**

      In the fall of 2009, at age fifteen, Plaintiff "A.R." met Bryan Frank at school.  *A.R.*

1

*Depo.* [#36-1] at 67:8-9. Bryan lived with his divorced father, Defendant David Scott Frank ("Frank"). *Id.* at 86:5-87:9. Defendant "Frank and Bryan were members of the Colorado Springs [Eighth] Ward of the LDS Church." *Motion* [#36] at 1. Bryan soon invited A.R. to attend Sunday LDS worship services. *A.R. Depo.* [#36-1] at 93:6-9. She first attended Sunday services on January 3, 2010, where she met Defendant Frank in person for the first time. *Id.* at 93:9-12. A.R. returned to the LDS church on subsequent Sundays, but she cannot remember how many times. *Id.* at 96:9-13.

At that time, Defendant Frank was forty years old and taught Sunday school to thirteen- to fifteen-year-old students at the LDS Church, including A.R. *Response* [#41] ¶ 2. A.R. and Defendant Frank began to communicate frequently outside of LDS church functions. *A.R. Depo.* [#36-1] at 136:5-24. A.R. testified in her deposition that they "texted" and called each other "thousands and thousands" of times between January 3, 2010, and June 30, 2010. *Id.* at 140:6-16. Most of these calls and texts occurred between 9:00 p.m. and 3:00 a.m. *Id.* at 140:19-22. Defendant Frank also sent A.R. emails and pictures of himself, gave her underwear as a gift, and would occasionally hug her in class. *Response* [#41] ¶ 3.

One night in late March or April 2010 at about 1:00 a.m., A.R. called Defendant Frank, invited him over to her house, and met him in Defendant Frank's car on the road in front of A.R.'s house. *See Police Report* [#36-2] at 1-2; *A.R. Depo.* [#36-1] at 149:9-150:25. Although A.R. alleges that they only kissed at this first meeting, they subsequently met twice more in the same manner and engaged in sexual intercourse. *See Police Report* [#36-2] at 2; *A.R. Depo.* [#36-1] at 155:24-156:24, 160:7-161:9. The two continued to exchange late night phone calls and text messages during this period. *Id.* at 159:1-7.

2

In July 2010, A.R. learned through Facebook that Defendant Frank was engaged to marry a woman. *See Police Report* [#36-2] at 2. She then told her mother about the encounters with Defendant Frank, and her mother called the police. *A.R. Depo.* [#36-1] at 164:22-25, 165:6-7. Defendant Frank was arrested, and he pleaded guilty to a charge of sexual assault of a 15-year-old with more than a 10-year age difference, a class 1 misdemeanor. *Motion* [#36] at 2; *see* Colo. Rev. Stat. § 18-3-402(1)(e) ("Any actor who knowingly inflicts sexual intrusion or sexual penetration on a victim commits sexual assault if: (e) At the time of the commission of the act, the victim is at least fifteen years of age . . . and the actor is at least ten years older than the victim and is not the spouse of the victim."). The parties agree that with the exception of "occasional hugging," no sexual contact occurred between A.R. and Defendant Frank during either Sunday worship services or the Sunday school class taught by Defendant Frank. *See Motion* [#36] at 2-3; *A.R. Depo.* [#36-1] at 107:22-108:2; 121:23-122:22; 123:16-19.

Here, A.R. brings suit against Defendant Frank for battery, negligent infliction of emotional distress, and outrageous conduct. *Comp.* [#4] ¶¶ 23-30, 49-53. She sues Defendant LDS for negligent hiring, negligent supervision, breach of fiduciary duty, and outrageous conduct. *Id.* ¶¶ 32, 37-38, 40, 44, 46-53. Plaintiff offers the expert testimony of Paul Isenstadt ("Isenstadt") to support her claims. Briefly, Mr. Isenstadt opines: "in the determination of having [Defendant] Frank teach a class of students alone . . . church personnel should have reviewed his history and background," *Isenstadt Report* [#36-4] at 3; "[t]he role of background checks in working in this capacity has become increasingly mandatory in all settings in which an individual may be acting in a [p]osition of [t]rust," *id.*; certain steps should have been taken to allow others to monitor Mr. Frank's classes, *id.* at

3-4; "a large majority of sexual offenses involve individuals who engage in a cycle of behavior over a period of time," *id.* at 4; Defendant Frank "groomed"[1] Plaintiff A.R., *id.*; "[i]dentified sex offenders . . . tend to be very engaging and ingratiating in 'setting up' their victims," *id.* at 5; Defendant Frank has a STATIC-99R[2] score of two, *id.* at 6; Defendant Frank's "tattoos alone, given church teachings[,] should have generated some concern" about his background, *id.*; "[t]here does not appear to be any mentoring that occurred in regard to [Defendant] Frank with this class of adolescents." *Id.* at 8. Mr. Isenstadt also expresses "concern" about other topics. For example, among other things, Mr. Isenstadt expresses "concern" regarding his belief that Defendant LDS did not interview Defendant Frank or review his background and his interest in teaching. *Id.* at 7.

In the present Motion, Defendant LDS asserts multiple grounds for excluding Mr. Isenstadt's testimony pursuant to Fed. R. Evid. 702. First, Defendant LDS argues that Mr. Isenstadt is unqualified to serve as an expert "on standards of care for selecting and retaining teachers," or on "the standard of care for churches." *Motion* [#36] at 5. Second, Defendant LDS argues that Mr. Isenstadt's opinions are unreliable, as they make assumptions that are contrary to the facts. *Id.* at 8. Third, Defendant LDS argues that Mr.

---

[1] In *People v. Diaz*, 988 N.E. 2d 473, 475 (N.Y. 2013), an expert provided the following definition of "grooming":

It refers to the process by which the offender, first of all, gains access and opportunity to the child, establishes themselves in a trusted authority position over the child and then begins the process of breaking down the child's inhibitions about sex, in other words, how the offender normalizes sexual behaviors.

[2] Static–99R is an "actuarial risk assessment instrument" that compares a sexual offender "to a category of previously convicted sex offenders with whom [the individual] shares characteristics [and then] identifies the rates at which those men with whom [the individual] shares characteristics re-offended." *State v. Frank V.*, 934 N.Y.S.2d 37, at *2 (N.Y. Sup. 2011) (table decision).

Isenstadt's opinions will not assist the trier of fact, as they are "merely observations which are within a lay jury's ability." *Id.* at 5.

Defendant LDS addresses the allegedly objectionable opinions in Mr. Isenstadt's report one-by-one, noting where and how it believes each fails to meet the requirements of Fed. R. Evid. 702 and the standards prescribed in *Daubert*.[3]   The Court summarizes these objections as follows:

1.      Defendant LDS objects to Mr. Isenstadt's opinion that Defendant Frank assumed "a Position of Trust in teaching a class of adolescent students" on the grounds of lack of expertise.   *Motion* [#36] at 6 (citing *Isenstadt Report* [#36-4] at 3).

2.      Defendant LDS objects to Mr. Isenstadt's assertion that "the role of background checks . . . has become increasingly mandatory in all settings in which an individual may be acting in a Position of Trust" on the grounds of lack of expertise and failure to specify how his "experience leads to the conclusion reached." *Id.* (citing *Isenstadt Report* [#36-4] at 3; Fed. R. Evid. 702 advisory committee's note)

3.      Defendant LDS objects to Mr. Isenstadt's opinions regarding classroom safety, including concerns about class monitoring, on the grounds of lack of expertise and relevance. *Id.* at 7-8 (citing *Isenstadt Report* [#36-4] at 3-4).

4.      Defendant LDS objects to Mr. Isenstadt's opinions regarding "grooming" cycles on the ground of relevance. *Id.* at 8-12 (citing *Isenstadt Report* [#36-4] at 4-5).[4]

---

[3]   The Court notes that Defendant LDS's Motion complies with District Judge Moore's Practice Standards because it identifies each opinion challenged and the specific grounds for such challenges. *See* RM Civ. Practice Standard IV.K ("The motion shall identify with specificity each opinion the moving party seeks to exclude.   The motion shall also identify the specific ground(s) on which each opinion is challenged, e.g., relevancy, sufficiency of facts and data, methodology.").

[4]   Plaintiff separates the statements objected to by Defendants into nine separate statements, alleging that four relate to Defendant LDS's hiring practices, one to Defendant LDS's safety practices, and four to "Mr. Isenstadt's evaluation of [Defendant Frank] as a sexual offender." *Response* [#41] ¶ 23.  Three of the statements relating to "Mr. Isenstadt's evaluation of [Defendant Frank] as a sexual offender" relate to Defendant Frank's alleged grooming behaviors, and Defendant LDS objects to all of these statements as unreliable and irrelevant. *Motion* [#36] at 8-12.

5.      Defendant LDS objects to Mr. Isenstadt's opinions regarding issues of recidivism and application of STATIC-99R on the grounds of relevance. *Id.* (citing *Isenstadt Report* [#36-4] at 6).

6.      Defendant LDS objects to Mr. Isenstadt's "concern" about Defendant LDS's alleged failure to report Defendant Frank's misconduct to the proper authorities on the grounds of lack of expertise, relevance, and the "uncontradicted testimony that [Defendant LDS] learned about the misconduct after [A.R.'s] mother had already notified the police and the criminal investigation had already commenced." *Id.* at 14 (citing *Isenstadt Report* [#36-4] at 7; *Depo. of Patricia Pacetti* [#36-7] at 95:7-96:1; *Depo. of Todd Miller* [#36-8] at 70:20-25, 76:9-17).

7.      Defendant LDS objects to Mr. Isenstadt's "concern" about why Defendant Frank was not interviewed, why his record was not annotated for a history of abuse, and why Defendant LDS was not more concerned about his tattoos, on the grounds of lack of the necessary qualification "to opine on the standard of care for 'calling' teachers," relevance, and reliability.  *Id.* at 14-15 (citing *Isenstadt Report* [#36-4] at 7).

Plaintiff objects to the Motion and contends that Mr. Isenstadt is qualified to testify as an expert in these matters pursuant to Fed. R. Evid. 702.  *Response* [#41] ¶ 9.  Plaintiff counters Defendant LDS's arguments by asserting that Defendant LDS failed to perform either a *Daubert* analysis or an analysis pursuant to Fed. R. Evid. 702, and that Defendant LDS's "blanket objection" to the "portions of Mr. Isenstadt's report that are disfavorable to [Defendants'] case" is insufficient to support excluding Mr. Isenstadt as an expert witness. *Id.* ¶ 14.  Plaintiff argues that Mr. Isenstadt has not been endorsed, as Defendant LDS alleges, as an expert on church practices, but as "an expert in practices for evaluating employees/volunteers and in evaluating sexual offenders."  *Id.* ¶ 18.  Plaintiff asserts that Mr. Isenstadt's fifty years of experience in these fields establish his expertise and his ability to testify as an expert witness on these matters.  *Id.* ¶ 24.  Plaintiff also alleges than "Mr.

_____

The Court addresses these statements as a single category rather than as three separate opinions.

Isenstadt's opinions are based on sufficient facts and data," *id.* ¶ 34, and are "instructive to the jury on issues of [Defendant] LDS's organizational practices for evaluating employees/volunteers, [Defendant Frank]'s behavior as [a] sexual offender, and [Defendant] LDS's safety practices to prevent offender behavior." *Id.* ¶ 29. Plaintiff further alleges that Mr. Isenstadt applied "reliable principles in arriving at his opinions," satisfying the factors prescribed in *Daubert*. *Id.* ¶ 39. In the event that the Court considers precluding any part of Mr. Isenstadt's testimony, Plaintiff also "moves the Court for a *Daubert* hearing to qualify Mr. Isenstadt as an expert witness in this matter." *Id.* ¶ 13.

In its Reply, Defendant LDS argues that "[t]his is a negligence case[, and that if Mr.] Isenstadt cannot testify to the relevant standard of care, he cannot be of assistance to the jury." *Reply* [#44] at 3. Defendant LDS again challenges Mr. Isenstadt's qualifications, alleging he is not an expert on background checks, classroom safety measures, or the applicable standard of care for churches. *Id.* at 3-5. Defendant LDS also makes a variety of arguments about the relevance and reliability of Mr. Isenstadt's specific opinions on Defendant Frank's "grooming" behaviors and Defendant LDS's alleged "failure to report." *Id.* at 5-8.

## II. Summary of *Daubert* Principles and Analytical Framework

"Admission at trial of expert testimony is governed by Fed. R. Evid. 702, which imposes on the district court a gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). The gatekeeper function "requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is

both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003). The district court's discretion in admitting or excluding expert testimony under *Daubert* is broad, "both in deciding how to assess an expert's reliability, including what procedures to utilize in making that assessment, as well as in making the ultimate determination of reliability." *Id.* at 1223.

Rule 702 provides the foundational requirements for admission of expert opinions:

A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:

(a)  the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)  the testimony is based on sufficient facts or data;

(c)  the testimony is the product of reliable principles and methods; and

(d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty.* ("Tessier"), 402 F.3d 1092, 1107 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 592 n.10). Rule 702 anticipates that, if challenged, the factual foundation supporting the specific testimony will be provided by the proponent of the witness. *See Dodge*, 328 F.3d at 1222. However, the proponent need not prove that "the expert is undisputably correct or that the expert's theory is 'generally accepted' in the scientific community." *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999). Instead, the proponent must show that the witness has sufficient expertise to choose and apply a methodology, that the methodology is reliable, that the expert relied on sufficient facts and data, and that the methodology was otherwise reliably applied. *Id.*; *Daubert*, 509

U.S. at 595; *see also Dodge*, 328 F.3d at 1222.

## A.    Expertise

Regarding qualifications, "the court must determine whether the expert is qualified by 'knowledge, skill, experience, training, or education' to render an opinion." *Milne v. USA Cycling Inc.*, 575 F.3d 1120, 1133 (10th Cir. 2009) (quoting Fed. R. Evid. 702).  Any one of these qualifications can be sufficient to support a finding that an expert is qualified.  *See* Fed. R. Evid. 702 advisory committee's note.[5]  In some fields, experience alone is the "predominant, if not sole, basis for a great deal of reliable expert testimony."  *Id.* "Acceptance or rejection of an expert witness's qualifications is a matter within the discretion of the trial court."  *United States v. Dysart*, 705 F.2d 1247, 1251 (10th Cir. 1983). "Neither Rule 702 nor any other rule or precedent . . . sets forth a specific method by which the trial judge must determine the qualification of an expert."  *Id.*

## B.    Reliability

In addition to showing that the witness has appropriate qualifications, the proponent of the witness's opinions must demonstrate that the process by which the witness derived his or her opinions is reliable.  *See Dodge*, 328 F.3d at 1222.  To be reliable, an expert's scientific testimony must be based on scientific knowledge, which "implies a grounding in the methods and procedures of science" based on actual knowledge, not "subjective belief or unsupported speculation."  *Daubert*, 509 U.S. at 590.  Rule 702 anticipates that, if challenged, the factual foundation supporting the specific testimony will be provided by the

---

[5]  Because the witness's "qualifications must relate to the opinions offered in the present case, the fact that the witness has given expert testimony in other cases is not relevant unless the testimony was of the same nature using the same methodology." *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1221 n.4 (D. Colo. 2008).

proponent of the witness. *Dodge*, 328 F.3d at 1222.  The proponent must show that the method used by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements. *Mitchell*, 165 F.3d at 781.

The court reaches the second step of the analysis only if it determines that a witness is qualified. *See United States v. Yeley-Davis*, 632 F.3d 673, 684 (10th Cir. 2011). This step of the analysis "requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge*, 328 F.3d at 1221.  As referenced above, the Rule sets out three specific requirements to establish reliability: (1) a showing that the "testimony is based upon sufficient facts or data," (2) a showing that "the testimony is the product of reliable principles and methods," and (3) a showing that "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d).

### 1.    Sufficient Facts and Data

The proponent of the opinion must first show that the witness gathered "sufficient facts and data" to formulate the opinion.  In the Tenth Circuit, assessment of the sufficiency of the facts and data used by the witness is a quantitative, rather than a qualitative, analysis. Fed. R. Evid. 702, advisory committee's note; *see also United States v. Lauder*, 409 F.3d 1254, 1264 n.5 (10th Cir. 2005).  That is to say, the Court does not examine whether the facts obtained by the witness are themselves reliable; whether the facts used are qualitatively reliable is a question of the weight that should be given to the opinion by the fact-finder. *Lauder*, 409 F.3d at 1264.  Instead, "this inquiry examines only whether the witness obtained the amount of data that the methodology itself demands." *United States*

10

*v. Crabbe*, 556 F. Supp. 2d 1217, 1223 (D. Colo. 2008).

### 2. Methodology

Methodology, or the requirement that an opinion be derived from reliable principles or methods, involves two related inquiries: (1) identification of the methodology the witness used to reach the opinion; and (2) determination of whether the methodology is generally considered "reliable" in the field in which the expert works. *Crabbe*, 556 F. Supp. 2d at 1222. These inquiries are solely factual, and "the proponent of the opinion must establish both inquiries by sufficient, competent evidence." *Id.* "The first inquiry simply requires that the witness explain how he or she reached the opinion at issue—a simple explanation of the process normally is sufficient." *Benton v. Avedon Eng'g, Inc.*, No. 10-cv-01899-RBJ-KLM, 2012 WL 3399367, at *3 (D. Colo. Aug 15, 2012) (citing *Crabbe*, 556 F. Supp. 2d at 1222). The second inquiry, whether the methodology is reliable, requires that the court assess whether that method is "scientifically valid." *Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1210 (10th Cir. 2004)*; Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1204 (10th Cir. 2002). A determination that a method is "scientifically valid" requires an inquiry into whether it is a scientific or logical method that can be replicated and validated. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). A methodology that is not peer reviewed or tested may still be considered reliable, if it is considered a generally-accepted practice in the discipline. *See Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2004). However, even when a methodology has almost universal acceptance in a particular discipline, the Court may find that the entire discipline itself is not reliable. *Kumho Tire*, 526 U.S. at 151.

### 3.    Application

The Court must also consider "whether the witness followed the dictates of the methodology in considering the facts and data."  *Crabbe*, 556 F. Supp. 2d at 1223.  In assessing this reliability, the Court may consider a variety of factors, including, but not limited to: (1) whether the expert employed the same degree of intellectual rigor in formulating the opinion as he or she would be expected to employ in his or her own professional life; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion (or, whether the gap between the analytical data and the opinion proffered is too large); and (3) whether the expert adequately accounted for obvious alternative explanations.  *See generally Kumho Tire*, 526 U.S. at 152; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Bitler*, 400 F.3d at 1233.

## C.    Relevance

Finally, even if an expert is deemed qualified and his or her opinions are considered reliable, admissibility still requires a determination that the opinions are relevant.  That is, the Court must consider "whether expert testimony . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  *Daubert*, 509 U.S. at 591 (citation omitted).  Courts have routinely excluded expert testimony that was based on nothing more than speculation.  *See, e.g., Jetcraft Corp. v. Flight Safety Int'l*, 16 F.3d 362, 366 (10th Cir. 1993) (expert testimony excluded as professional speculation); *Eastridge Dev. Co. v. Halpert Assoc., Inc.*, 853 F.2d 772, 783 (10th Cir. 1988) (expert testimony excluded as "tentative and speculative").  However, "[d]oubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong facts such as time or surprise favoring exclusions."  *Cook v. Rockwell Int'l Corp.*,

12

580 F. Supp. 2d 1071, 1083 (D. Colo. 2006) (quoting *Robinson v. Mo. Pac. R.R. Co.*, 16 F.3d 1083, 1090 (10th Cir. 1994)).

The burden on the proponent of the expert testimony is significant, as any inadequacy in the proof on any of Rule 702's elements may render the entire opinion inadmissible.  *See Mitchell*, 165 F.3d at 782.  In the Tenth Circuit, determination of the sufficiency of the foundation for admission of expert testimony requires factual findings; an evidentiary hearing is one method that the Court may use to make factual findings, but this obligation may be satisfied without a hearing if the Court has sufficient evidence to make a determination.  *Dodge*, 328 F.3d at 1222, 1228.

### III.  Analysis

**A.     Relevance of Opinions Offered**

In her Complaint, Plaintiff asserts the following claims against Defendant LDS: (1) negligent hiring, *see Am. Compl.* [#11] at ¶¶ 31-38; (2) negligence, *id.* at ¶¶ 39-44; (3) breach of fiduciary duty, *id.* at ¶¶ 45-48; and (4) outrageous conduct, *id.* at ¶¶ 49-51.  In her Response to the Motion, Plaintiff states that she has endorsed Mr. Isenstadt "as an expert in practices for evaluating employees/volunteers and in evaluating sexual offenders." *Response* [#41] at 6.

While expert testimony regarding practices for evaluating employees and volunteers may be relevant to Plaintiff's claims, expert testimony regarding evaluating sexual offenders is not.  There is no dispute that Defendant Frank was not a "sexual offender" at the time when he was hired by the church.  *Isenstadt Depo. Trans.* [#44-1] at 65:21-25.  Mr. Isenstadt also admits that there is no evidence that Defendant Frank had engaged in sexual misconduct or had impulses to have sexual relations with a minor before meeting

13

A.R. at the LDS Church. *Isenstadt Depo.* [#44-1] at 51:12-52:23, 52:25-54:3; *Reply* [#44] at 7-8. Thus, evaluation of Defendant Frank as a sexual offender is not relevant to the negligent hiring claim. *See Daubert*, 509 U.S. at 591-92 ("'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. . . . Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."). Possible factual developments at trial are unlikely to change this relevancy determination. *United States v. Tunkara*, 385 F. Supp. 2d 1119, 1121 (D. Kan. 2005) ("[T]he *in limine* exclusion of evidence should be reserved for those instances when the evidence plainly is 'inadmissible on all potential grounds.'") (citing *Townsend v. Benya*, 287 F. Supp. 2d 868, 872 (N.D. Ill. 2003)).

To the extent that the remaining claims (negligence, breach of fiduciary duty, and outrageous conduct) relate to the Church's conduct regarding Defendant Frank, the relevance of Mr. Isenstadt's opinion regarding "evaluation" of sexual offenders to that conduct is not apparent. Defendant Frank was not a sexual offender at the time he became a Sunday school teacher, and none of the alleged inappropriate conduct occurred in the classroom. *See Isenstadt Depo. Trans.* [#44-1] at 121:23-122:22; *Motion* [#36] at 2; *A.R. Depo.* [#36-1] at 107:22-108:2; 121:23-122:22; 123:16-19. Neither the Plaintiff nor her expert offer a link between the expert's evaluation of Defendant Frank as a sexual offender and Defendant LDS's conduct. Without such a link, the relevance of Mr. Isenstadt's opinions about Defendant Frank as a sexual offender (i.e., his alleged grooming behavior, the claim that he fits the common pattern of a pedophile, his STATIC-99R score, and whether he is at risk for recidivism) is not established, and those portions of his opinion should be excluded.

**B.    Qualifications**

Regarding qualifications, "the court must determine whether the expert is qualified

by 'knowledge, skill, experience, training, or education' to render an opinion." *Milne*, 575

F.3d at 1133 (quoting Fed. R. Evid. 702).   Further, "[t]he witness'[s] qualifications must

relate to the opinions offered in the present case, [and] the fact that the witness has given

expert testimony in other cases is not relevant unless the testimony was of the same nature

using the same methodology." *Barrientos-Sanabria v. Holte*, No. 11-cv-00838-KLM, 2012

WL 4863700, at *2 n.1 (D. Colo. Oct 15, 2012).

Mr. Isenstadt's CV indicates that he has been working in the areas of mental health

and corrections since his graduation with a Masters in Social Work in 1965, and that he has

been involved in the evaluation and treatment of sexual offenders since at least 1985.

*Isenstadt CV* [#41-2] at 1-3.   This has included experience with both adults and young

adults in the Youthful Offender System.   *Id.* at 4-5.   He has also occupied various teaching

positions, *id.* at 10, participated in over 150 "lectures and workshops in the last ten years

on Sexual Offenders Treatment, Mental Health in Corrections and other topics relevant to

the Criminal Justice System," and been certified as "an Approved Evaluator, Treatment

Provider and Phallometric Assessment Provider by the Colorado Sex Offender

Management Board."   *Id.* at 12.   He is also a member of various boards and organizations

related to the study and treatment of sexual offenders, *id.* at 13, and cites to numerous

sexual assault cases in which he has testified on "Perpetrator and Victim Dynamics," *id.* at

16.   Based on these qualifications, Plaintiff has established Mr. Isenstadt's expertise in the

field of  "evaluating sexual offenders."   *Response* [#41] ¶ 18.   In fact, Defendant LDS

admits that Mr. "Isenstadt may, in fact, be qualified to assess and treat [Defendant] Frank

as a sex offender and evaluate his risk of recidivism." *Reply* [#44] at 7.  However, as noted above, such qualification does not relate to the claims asserted in this case.

Mr. Isenstadt also offers information about his experience as an expert witness, however, his experience as an expert is not related to the issues presented in this case. Mr. Isenstadt's only reference to expert certification applicable to this case is his alleged certification from 1993 to present "as an expert in regard to sexual offending in Colorado District Courts[, where Mr. Isenstadt claims to] have testified for both the Prosecution and Defense." *Id.*  However, the Court has been unable to locate these alleged cases, and without more specific information concerning this alleged certification, the Court finds that while this ambiguous reference may refer to the evaluation of sexual offenders, it cannot support Mr. Isenstadt's claims of expertise in the field of "evaluating employees/volunteers." *Response* [#41] ¶ 18.  Mr. Isenstadt's remaining references to his services as an expert witness are vague and, based on the little information provided, appear to be unrelated to the issues presented in this case.  In addition, during his deposition, Mr. Isenstadt admitted that aside from working as an administrator, he has no specialized training in the field of human resources, *Isenstadt Depo.* [#44-1] at 13:1-15:22, is not a licensed psychiatrist, medical doctor, or psychologist, *id.* at 10:21, and has never authored or co-authored a publication in a peer reviewed publication, *id.* at 15:6-24.

Defendant LDS argues that Mr. Isenstadt is not qualified to render opinions about hiring Sunday school teachers because he has not conducted any studies about it, he has not published any peer-reviewed articles on it, and he is devoid of specialized knowledge regarding it.  *See, e.g., Motion* [#36] at 4-9; *Reply* [#44] at 3-5.  Specifically, regarding the standard of care required for Plaintiff's negligent hiring claim, Defendant LDS asserts that

16

"[n]othing in Mr. Isenstadt's vita or report suggests that he has any expertise in the standard of care for churches." *Motion* [#36] at 5.  However, absent any proof that there is a specific standard of care that applies to churches who are hiring Sunday school teachers, Mr. Isenstadt is qualified to render an opinion regarding the limited topic of the desirability of conducting a background check as part of hiring practices in general.  *See Isenstadt Report* [#36-4] at 3 ("In my capacity as an Operations Director at ComCor, Inc.[,] background checks were done on all employees to include maintenance and food service and administrative employees who had minimal or no contact with the offender population.").  Defendant LDS does not offer any support for the idea that there is a specific standard of care that would apply in this circumstance and the Court's own research has revealed no such standard of care.

The First Amendment does not require the Court to refrain from resolving legal disputes involving churches when "the inquiry does not require resolution[ ] of disputed issues of religious doctrine." *Bishop and Diocese of Colo. v. Mote ("Mote")*, 716 P.2d 85, 102 (Colo. 1986).  *Mote* held that Colorado law required application of the "neutral principles" doctrine when a court is resolving a religious property dispute. *Id.* at 96.  The "neutral principles" doctrine was first announced in *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1968), and allows a court to apply the neutral laws of the state to religious organizations.  In *Jones v. Wolf*, 443 U.S. 595 (1979), the Supreme Court explained, "[t]he neutral-principles approach cannot be said to 'inhibit' the free exercise of religion, any more than do other neutral provisions of state law governing the manner in which churches own property, hire employees, or purchase goods." *Id.* at 606.  The Colorado Supreme Court has also concluded that "[t]he First

17

Amendment to the United States Constitution does not grant religious organizations absolute immunity from tort liability.  Liability can attach for breach of a fiduciary duty, negligent hiring and supervision." *Moses v. Diocese of Colo.*, 863 P.2d 310, 319 (Colo. 1993) (citing *Destefano v. Grabrian*, 763 P.2d 275, 284, 286-87 (Colo. 1988)).  Specifically adopting the "neutral principles" approach, the Colorado Supreme Court observed that "[c]ivil actions against clergy members and their superiors that involve claims of a breach of fiduciary duty, negligent hiring and supervision, and vicarious liability are actionable if they are supported by competent evidence in the record." *Id.* at 321 (citing *Destefano*, 763 P.2d at 284, 286-87).  Application of a secular standard to secular conduct that is tortious is not prohibited by the Constitution.  *See Mote*, 716 P.2d at 98-99; *Emp't Div., Dept. of Human Res. of Or. v. Smith*, 494 U.S. 872 (1990) (stating that even religiously motivated conduct is not immune from neutral laws of general applicability).

Accordingly, the Court finds that Mr. Isenstadt may render an opinion regarding the limited topic of the desirability of conducting a background check as part of hiring practices in general.  *See Isenstadt Report* [#36-4] at 3.

**C.    Methodology/Reliability**

Once the Court has determined that the expert is qualified to give the proffered opinion, the Court must examine whether the opinion itself is reliable.  *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).  This second step of the analysis focuses on the process or means by which the witness developed the opinion, *i.e.*, the methodology or application of principles.  *Id.*

First, the Court considers whether the proponent of the opinion has shown that the witness gathered "sufficient facts and data" to formulate the challenged opinions.  *See*

18

*Lauder*, 409 F.3d at 1264 n.5 (noting that Rule 702's reference to "sufficient facts or data" calls for a quantitative rather than qualitative analysis). Mr. Isenstadt identified a number of materials and sources that he consulted in forming his initial expert report, including deposition transcripts and exhibits, filings in this lawsuit and Defendant Frank's related criminal suit, and NCIC reports regarding Defendant Frank's criminal history. *See Isenstadt Report* [#36-4] at 1-2. For the purposes of the present analysis, the Court finds that Mr. Isenstadt based his testimony on quantitatively sufficient facts and data.

Second, methodology, or the requirement that an opinion be derived from reliable principles or methods, involves two related inquiries: (1) identification of the methodology the witness used to reach the opinion; and (2) determination of whether the methodology is generally considered "reliable" in the field in which the expert works. *Crabbe*, 556 F. Supp. 2d at 1222. The inquiry authorized by Rule 702 is a flexible one; however, a scientific opinion, to have evidentiary relevance and reliability, must be based on "scientifically valid principles." *Daubert*, 509 U.S. at 597. An expert's assurances that he has utilized generally accepted scientific methodology are insufficient. *See Daubert v. Merrell-Dow Pharms., Inc. ("Daubert II")*, 43 F.3d 1311, 1316 (9th Cir. 1995) (on remand); *Bitler*, 400 F.3d at 1233. Where proffered expert testimony is not based on independent research, the party must come forward with other objective, verifiable evidence that the testimony is based on "scientifically, valid principles," *e.g.*, peer review and publication. *Daubert II*, 43 F.3d at 1318.

"The requirement that the witness 'reliably' [applied the methodology to the facts and data he obtained] is not an invitation to a court to assess the worth of the opinion itself;" instead, the Court must focus its inquiry on "whether the witness followed the dictates of

the methodology in considering the facts and data." *Crabbe*, 556 F. Supp. 2d at 1223.  Mr. Isenstadt's Report indicates that he "employs knowledge and instrumentation taken from the professional literature and research on sex offender recidivism." *Isenstadt Report* [#36-4] at 6.   In addition, Mr. Isenstadt's opinion regarding the desirability for conducting background checks as part of hiring practices in general is based on Mr. Isenstadt's work experience as explained in his Report. *Id.* at 1-3.  However, Mr. Isenstadt makes no similar indications about any other opinion offered in his report.   Although "rejection of expert testimony is the exception rather than the rule," *Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, No. 01-cv-01644-REB-CBS, 2010 WL 3522416, at *2 (D. Colo. Sept. 1, 2010) (citations omitted), Mr. Isenstadt has made *no* claims about the methodology or application of valid principles in support of his various opinions.   Even after Defendant LDS noted this deficiency in their Motion, *Motion* [#36] 5, 11, the Response argues only for the reliability of Mr. Isenstadt's use of the STATIC-R99 scale, making no reference to the reliability of his other opinions.  *See Response* [#41] at 10-11.

The proponent of expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence.  *See Tessier*, 402 F.3d at 1107 (citing *Daubert*, 509 U.S. at 592 n.10).  The burden on the proponent of the expert testimony is significant, as any inadequacy in the proof on any of Rule 702's elements may render the entire opinion inadmissible.  *See Mitchell*, 165 F.3d at 782.

Defendant LDS makes several objections to Mr. Isenstadt's methodology and the alleged unreliability of his opinions.  They are:

1.   Mr. Isenstadt's opinions are merely observations within a lay jury's ability.  *See Motion* [#36] at 5 ("most of Isenstadt's opinions are not 'expert' opinions at all, but merely observations which are within a lay

20

jury's ability."), 12 ("expert testimony is not required for such an obvious conclusion"), 13 ("the facts of this case fit within common human experience").

2.      Mr. Isenstadt's opinions are not accompanied by reasoning or a description of methodology.  *Id.* at 5 ("The opinions that can be identified are accompanied by no reasoning or description of methodology.").

3.      Mr. Isenstadt does not describe how he applied his experience to the facts of the case, how his experience leads to his conclusions, and how his conclusions can be specifically applied to this case.  *Id.* at 10; *Reply* [#44] at 2 (Mr. Isenstadt's Report "is a series of (1) unsupport assertions . . .; (2) 'questions' and 'concerns' without any analysis or conclusions . . .; (3) opinions that have no relevance to the facts of this case . . .; and (4) "opinions that have no basis in fact"), 4 (expert opinion does not lead to the conclusion reached).

4.      Mr. Isenstadt makes assumptions that are contrary to the facts. *Motion* [#36] at 8; *Reply* [#44] at 2, 5-6 ("Isenstadt's opinion regarding [Defendant Frank's] 'history of abuse' is not founded on the facts"), 9.

5.      Mr. Isenstadt's opinions are speculative.  *Motion* [#36] at 12.

6.      Mr. Isenstadt's opinions will not assist the trier of fact.  *Motion* [#36] at 12 ("expert testimony is not required for such an obvious conclusion"); *Reply* [#44] at 8-9.

As noted above, courts have routinely excluded expert testimony that was based on nothing more than speculation.  *See, e.g., Jetcraft*, 16 F.3d at 366 (expert testimony excluded as professional speculation); *Eastridge Dev. Co.*, 853 F.2d at 783 (expert testimony excluded as "tentative and speculative").  Further, Rule 702 provides that an expert witness may testify as to his expert opinions if such expert opinions "will help that trier of fact to understand evidence or to determine a fact in issue," such testimony "is based on sufficient facts and data," "is the product of reliable principles and methods," and "the expert [ ] reliably applied the principles and methods to the facts."  Fed. R. Civ. P. 702(a)-(d).  The Court agrees that statements in Mr. Isenstadt's Report which do any of the

following do not meet the requirements of Rule 702 and shall be excluded: (a) assume false facts, (b) speculate, (c) lack explanation of methodology, or (d) do not rely on specialized knowledge, training or expertise.

## D. Application of Findings to the Isenstadt Report

The Court has carefully reviewed Mr. Isenstadt's Report [#36-4] and has isolated the portions which are admissible. As an initial matter, the first two full pages and the first two paragraphs on the third page of the report do not contain any expert opinions. Instead they provide information regarding Mr. Isenstadt's background. *See Isenstadt Report* [#36-4] at 1-3. The third sentence of the third paragraph on page three of the report is admissible. The remainder of page three is **stricken**. All of page four is **stricken** with the exception of the following: "children are normally sexually abused by someone they have a relationship with either a family member or an acquaintance." The remainder of the report is **stricken**.

## E. Plaintiff's Request for a *Daubert* Hearing

In her Response, Plaintiff requests a *Daubert* hearing. *Response* [#41] at 13. While a party may request a *Daubert* hearing, it is within the Court's discretion to determine whether a hearing is necessary. *See Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000); *Charley*, 189 F.3d at 1266 (stating district court is granted great latitude in "deciding whether to hold a formal hearing"); *see also Kumho Tire,* 526 U.S. 137 ("The trial court must have [discretionary] latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability . . ."). The Court finds that a hearing is not necessary in this

case.  For this reason, the Court **denies** Plaintiff's request for a *Daubert* hearing.

### III.  Conclusion

For the reasons set forth above,

IT IS HEREBY **ORDERED** that the Motion [#36] is **GRANTED in part** and **DENIED in part**.  The Motion is **GRANTED** to the extent that it seeks to exclude all of Mr. Isenstadt's expert opinions except for the two portions of his expert report indicated above.

IT IS FURTHER **ORDERED** that portions of Mr. Isenstadt's Report [#36-4] are **STRICKEN** as indicated above.

IT IS FURTHER **ORDERED** that Plaintiff's request for a *Daubert* Hearing is **DENIED**.

Dated:  September 30, 2013                    BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge