**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Case No. 12-cv-02197-RM-KLM

ASHLEY LINDEMAN,

      Plaintiff,

v.

THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS, a Utah Corporation sole a/k/a the Mormon Church; and
DAVID SCOTT FRANK,

      Defendants.

---

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

---

      THIS MATTER is before the Court on the following motions: (1) Defendant the

Corporation of the President of the Church of Jesus Christ of Latter-Day Saints' ("Defendant

Church") Motion for Summary Judgment (ECF No. 47); (2) Plaintiff Ashley Lindeman's

("Plaintiff") Motion for Summary Judgment on Plaintiff's Claims of Negligent Hiring and

Supervision against Defendant Church (ECF No. 49); (3) Plaintiff's Motion for Summary

Judgment on Plaintiff's Claim of Battery against Defendant David Scott Frank ("Defendant

Frank") (ECF No. 50); and (4) Defendant Frank's Motion for Summary Judgment on Plaintiff's

First, Second, Fifth, and Sixth Claims for Relief (ECF No. 51) (collectively, "Motions").  On

May 1, 2014, the Court heard oral argument and subsequently received Defendant Church's

Supplement Brief (ECF No. 76).  This case was originally filed in the District Court for the

County of El Paso, Colorado and removed to this Court based on diversity jurisdiction under 28

U.S.C. § 1332.  Upon consideration of the Motions and related filings,[1] the Court file, the applicable rules and law, and the argument of counsel, the Court: (1) grants Defendant Church's Motion for Summary Judgment; (2) denies Plaintiff's Motion for Summary Judgment against Defendant Church; (3) denies Plaintiff's Motion for Summary Judgment against Defendant Frank; and (4) denies in part and grants in part Defendant Frank's Motion for Summary Judgment.

## I.  LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).  Whether there is a genuine issue of material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or, conversely, is so one-sided that one party must prevail as a matter of law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000).  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.  OVERVIEW

Plaintiff met Defendant Frank through his son ("Son"), one of Plaintiff's classmates. Plaintiff began attending the Franks' church, Defendant Church, including the Sunday School

---

[1] Plaintiff raised an issue as to the timeliness of two Responses.  The Court finds they were timely.

class which Defendant Frank taught.  Over time, and after many communications, Defendant

Frank and Plaintiff had sexual intercourse twice.  At the time, Defendant Frank was 40 and

Plaintiff was 15.  Defendant Frank subsequently pled guilty to sexual assault with a 10-year age

difference.  The issue before the Court is whether either Defendant is liable to Plaintiff civilly for

the sexual encounters.  Defendants unequivocally admit that what occurred should not have, and

Defendant Frank's actions cannot be condoned, but argue, independently, each is not liable in

whole or in part.  The Court agrees, in part.

## III.  FACTUAL BACKGROUND

<u>Defendant Church's "Calling" of Defendant Frank to be a Sunday School teacher.</u>

Defendant Church "calls" on virtually all adult members who attend church regularly to perform

unpaid, volunteer service within their local "ward" (congregation).  (ECF No. 54-5, ¶4.)  The

ecclesiastical leader of a local church ward is the bishop and he has two counselors with whom

he consults regarding most decisions, including which members to call to volunteer positions in

the ward.  (ECF No. 54-5, ¶5.)  A name may be suggested to the bishop as to whom to call.

(ECF No. 54-7, page 7.[2])  The bishop prays for inspiration and, after deciding whom to call, he

conducts an ecclesiastical interview to determine that person's moral worthiness and willingness

to serve.  (ECF No. 54-5, ¶6.)  If the member affirms his/her worthiness and accepts the calling,

the bishop or one of the counselors announces the assignment to the congregation in an open

meeting and asks if there are any objections.  If there is an objection, the bishop meets with the

objector to determine the reason for his/her objection.  A single objection may thwart the calling.

---

[2] As used in this Order, the page references are to the actual page of the brief, report, or deposition transcript, as the case may be, as opposed to the page as shown on the header of the ECF document.

Defendant Church seeks to mitigate the risk of abuse and other misconduct by drawing upon the collective knowledge of the congregation.  (ECF No. 54-5, ¶7.)

Defendant Church teaches abuse cannot be tolerated in any form.  (ECF No. 54-5, ¶3.)  It keeps a membership record where an "annotation" is placed for any member who has engaged in conduct endangering children or youth.  When a member's record is annotated, he or she is not allowed to serve with children or youth.  (ECF Nos. 48-5, page 40; 48-7.)

Defendant Church has a 24/7 "Help Line" for bishops to call whenever they become aware of child abuse, which a professional therapist answers to discuss options for assisting the victim.  An attorney may join on the call.  (ECF No. 54-5, ¶8.)

The calling of a Sunday School teacher is limited to teaching a class on religious doctrine for about 40 minutes each Sunday in a group setting.  (ECF No. 54-5, ¶4.)  Defendant Church has a "two-deep" policy for certain settings where two adults must be present, including Sunday classrooms with "children" age 11 or under. [3]  (ECF Nos. 54-5, ¶9; 48-5, page 48.)  Defendant Church does not apply the two-deep policy to teenage Sunday School classes because there are several teenagers in the classroom, the doors are not locked, the church is full of people, other adults are frequently in and out of the classroom, and the class is short.  (ECF No. 54-5, ¶10.) Across all of its churches, Defendant Church holds thousands of Sunday School classes each Sunday and is aware of only one instance of sexual misconduct on church property involving a Sunday School teacher and a member of his class.  (ECF No. 54-5, ¶11.)  That incident involved a brief grope in the hallway outside the classroom.  (ECF No. 54-5, ¶11.)

---

[3] Defendant Church refers to parishioners ages 12 to 18 as "young men and women," not "children."  (ECF No. 48-5, page 48.)

In 2008, Bishop Todd Miller was the ecclesiastical leader of the Eighth Ward of Defendant Church in which Defendant Frank and Son were members.  (ECF No. 47-2, pages 12 & 21.)  In December 2009, Bishop Miller designated Defendant Frank as a Sunday School teacher, after prayerfully considering the needs of the ward and the member.  (ECF No. 47-2, pages 15, 21 & 22.)  No one in the congregation objected to his approval as a Sunday School teacher.  (ECF No. 47-12, page 3.)  Bishop Miller first met Defendant Frank in 2003, when Bishop Miller was a member and not a bishop.  (ECF No. 47-2, pages 20-22.)

As a Sunday School teacher, Defendant Frank's duties were limited to preparing for and teaching Sunday School class.  (ECF No. 47-1, pages 126-127.)  At the time of his calling, Defendant Frank's membership record bore no annotation for abuse.  (ECF No. 48-5, page 53.)  Bishop Miller had no knowledge of any criminal history involving Defendant Frank but was aware that around the time of the end of Defendant Frank's first marriage, he had taken his children across state lines.  (ECF No. 48-5, pages 29, 35-37.)  Bishop Miller viewed this as a dispute between husband and wife; a misunderstanding.  (ECF No. 48-5, pages 37-38.)  Defendant Church does not conduct background checks, and none was conducted of Defendant Frank.  (ECF No. 47-12, page 4; ECF No. 48-5, pages 29.)  If a criminal background check had been conducted of Defendant Frank it would have revealed the following:[4]

1. March 26, 2002:  Defendant Frank was arrested for misdemeanor violation of a restraining order (ECF 47-4);

---

[4] Defendant Church contends that any information disclosed would have been limited to seven years which preceded the date of the report generated from the background check.  The evidence submitted by the parties, however, show that background checks can – and do – generate information more than seven years old.  (ECF Nos. 47-4; 48-11; 54-2, pages 5-8; 54-8, page 12.)  Indeed, Defendant Church's Brief submitted such information for the Court's consideration.  (ECF No. 47, page 6.)  Nonetheless, as Plaintiff did not dispute Defendant Church's contention, the Court will assume, for the purposes of the Motions, that the information learned would have been as set forth above.

2. April 25, 2002: In a domestic relations matter, a permanent protective order was entered by consent with no admission of the allegations (ECF No. 47-5);

3. January 13, 2003: After initially being arrested on March 19, 2002, Defendant Frank was found guilty of four counts of violation of custody (class 5 felony), fined, and sentenced to 60 days work release and three years' probation. On January 6, 2006, Defendant Frank was discharged from supervision and his sentence terminated after satisfying all court orders and probation terms and conditions. (ECF Nos. 47-4, 47-6, 47-7.) This is the matter to which the parties refer to as "kidnapping," which arose from Defendant Frank moving with his children to Tennessee (ECF No. 54-2, page 6);

4. June 5, 2003: Defendant Frank pled guilty to violating a restraining order, resulting in a fine, suspended jail sentence, and probation. On April 15, 2005, he was discharged from further supervision and his probation sentence terminated after satisfying all court orders and conditions of probation (ECF Nos. 47-8 & 47-9);

5. August 11, 2005: Defendant Frank was arrested for violating a restraining order for calling his ex-wife 38 minutes after the time permitted by the order. (ECF No. 47-10.) The arrest was made pursuant to a domestic violence complaint;

6. August 24, 2005: Defendant Frank was arrested for violating a restraining order for calling his ex-wife eight minutes prior to the time permitted by the order. (ECF No. 47-11.) The arrest was made pursuant to a domestic violence complaint; and

7. December 12, 2008: Defendant Frank was arrested for misdemeanor violation of a restraining order.[5] He had called his daughter on her birthday. (ECF No. 54-2, page 8.)

If Bishop Miller had knowledge of the information stated in the Colorado Database concerning Defendant Frank, he probably would not have extended a calling. (ECF Nos. 48-5, pages 39-40; 48-11.) The information shown to Bishop Miller and eliciting the negative response was, however, a summary which contained no explanation. (ECF No. 48-11.)

Plaintiff's Interactions with Defendant Frank. In about the fall of 2009, Plaintiff met Son at school and she was attracted to him. (ECF No. 54-6, pages 85 & 89.) Plaintiff and Son had

---

[5] Defendant Church cited to Ex. D as support, but this exhibit contains only 1 of 7 possible pages of a CBI report. (ECF No. 47-4).

frequent communications by telephone and text message on a cell phone shared by the Franks. (ECF No. 54-6, pages 86-87.)  At some point in time, Defendant Frank responded to a communication Plaintiff sent to Son on the shared cell phone.  (ECF No. 47-1, pages 133-135.) Whether there was a single communication or more is disputed, but such dispute is immaterial under the facts and circumstances of this case.  (*Compare* ECF No. 47-1, pages 133-135 *with* ECF No. 55-2, page 1.)

On January 3, 2010, because Plaintiff was interested in learning about the Mormon Church, she attended the Eighth Ward at Son's invitation.  (ECF No. 47-1, pages 88, 93, 133.) There, Plaintiff met Defendant Frank in person for the first time.  (ECF No. 47-1, pages 91 & 135.)

At Defendant Church, there were three successive church sessions which Plaintiff could attend.  The first session was an hour of church services devoted to worship with the entire congregation.  (ECF No. 47-1, pages 96-97.)  Thereafter, there was Sunday School class which, for Plaintiff's age group, was taught by Defendant Frank; and, last, a Young Women's class. (ECF Nos. 47-1, page 97; 47-12, page 3.)  Plaintiff attended all three sessions during her first visit and nothing inappropriate happened with Defendant Frank.  (ECF No. 47-1, page 135.)

Over the next few months, Plaintiff attended Defendant Church anywhere from about three to 20 times.  (ECF No. 47-1, page 96.)  She did not attend every Sunday.  (ECF No. 47-1, page 98.)  Plaintiff and Defendant Frank texted each other before they met at church services. During worship services, Plaintiff sat with the Franks, and exchanged notes with Defendant Frank, but there was nothing sexual or inappropriate in them.  (ECF Nos. 47-1, pages 97, 107-108; 55-2, page 2.)  Between worship and Sunday School class, sometimes there were

communications between Plaintiff and Defendant Frank, but Plaintiff was not sure there was any romantic or sexual content.  (ECF No. 47-1, page 108.)

In the Sunday School class Defendant Frank taught, there were anywhere between five and 12 students, boys and girls, in Plaintiff's age group.  (ECF No. 47-1, pages 120-121.)  There was no co-teacher.  There are two doors to the room, which were closed during class and, at that time, had a peephole that allowed people to look into the room but no window.  (ECF Nos. 47-1, page 123; 48-5, page 46; 48-6.)  During class, Defendant Frank had no physical contact with Plaintiff or the other students but did text her while teaching.  (ECF Nos. 47-1, page 126; 52-3, pages 171-172.)  Plaintiff was never alone with Defendant Frank during the class.  (ECF No. 48-10, page 124.)  The frequency in which the class had visitors is disputed but, in this case, such dispute is not material.  (ECF No. 47-1, page 123; 47-12, page 2.)

After Sunday School Class, Plaintiff attended the Young Women's Class.  (ECF No. 47-1, pages 97, 109.)  During the Young Women's Class, Defendant Frank would text her to skip class and hang out with him, but she did not.  (ECF No. 47-1, page 118.)  Sometimes, after the Young Women's Class, she would help Defendant Frank put up chairs in the Sunday School room.  (ECF No. 47-1, pages 109-110.)  They were alone during that time and sometimes he would hug her, but there were no wandering hands.  (ECF No. 47-1, pages 109-110, 123-124.)

At some point in time, Plaintiff began communicating with Defendant Frank outside of worship.  (ECF No. 47-1, page 136.)  Initially, it was "just regular conversation," usually by texts.  (ECF No. 47-1, page 136.)  Between January 3, 2010 and June 30, 2010, they communicated by text messages hundreds of times, and by phone "thousands and thousands of times."  (ECF No. 47-1, page 140.)  This usually occurred between 9:00 p.m. to 2:00 a.m. or 3:00

a.m., when Defendant Frank got off of work at Chili's.  (ECF No. 47-1, pages 140-141.)
Plaintiff understood Defendant Frank's communications were not part of his Sunday School
duties and he was acting as "a guy."  (ECF No. 47-1, page 141.)  Plaintiff believed Defendant
Frank was trying to manipulate her into having sex.  (ECF No. 47-1, page 141.)

At some point in time, and somewhere other than at the Eighth Ward, Defendant Frank
gave Plaintiff a gift of "Tinker Bell" panties.  (ECF No. 55-2, page 2.)[6]

In late April 2010, around 1:00 a.m., Defendant Frank came over to Plaintiff's house.  By
then, Plaintiff and Defendant Frank were sexually interested in each other.  (ECF No. 47-1,
pages 147-149.)  Plaintiff went out to Defendant Frank's car, willingly and without coercion,
and, with her consent, they kissed but did not have sexual relations.  (ECF No. 47-1, pages 149
& 152.)

In late May 2010, Plaintiff met Defendant Frank in his car outside her house again and
they had "consensual"[7] sexual relations.  (ECF No. 47-1, pages 133, 156-158.)  This was the first
time Plaintiff had sexual intercourse.  (ECF No. 47-1, page 133.)  Defendant Frank stopped
going to church or teaching Sunday School class thereafter.  (ECF No. 55-2, page 1.)

On June 25, 2010, a Friday evening, Plaintiff met Defendant Frank in his car outside her
house for a third time where she again had consensual sex.  (ECF No. 47-1, pages 160-161.)  At

---

[6] Plaintiff submitted a portion of a psychiatric evaluation by Jeffrey L. Metzner, M.D. which stated Plaintiff reported the panties had been given at Defendant Church.  (ECF No. 48, page 6; 48-10.)  During the hearing, Defendant Church argued the expert's opinions had been stricken by the Court.  The Court's records, however, show that it was Dr. Larry Shores' and Paul Isenstadt's opinions which have, in whole or in part, been stricken.  (ECF Nos. 67-68.) Regardless, the Court agrees Dr. Metzner's statement as relied upon by Plaintiff constitutes inadmissible hearsay. Even if it were not, there is nothing in Dr. Metzner's statement which would suggest the gift was given in the Sunday School class as opposed to the church parking lot or elsewhere.

[7] By this term, the Court describes the factual, not legal, nature of the sexual relationship.

the time of the sexual encounters, Plaintiff was 15 and Defendant Frank was 40.  (ECF No. 49-3, page 5.)

Defendant Frank led Plaintiff to believe he wanted to have a long-term relationship with her.  (ECF No. 47-1, page 132.)  He said he wanted to marry Plaintiff and "stuff like that," which Plaintiff believed was said to manipulate her into having sexual interactions.  (ECF No. 47-1, page 132.)  She thought about marrying him when she turned 18.  (ECF No. 47-1, pages 132-133.)

On or about July 16, 2010, Plaintiff saw on Facebook that Defendant Frank had another woman in his life.  Once Plaintiff realized she was not going to get married to Defendant Frank, she felt hurt, betrayed, manipulated and angry.  (ECF Nos. 47-1, page 164; 49-2, pages 61, 63-64.)  She called and told her mother, who reported the matter to the police.  (ECF No. 47-1, pages 164-165.)  At first, Plaintiff told her mother that she had been raped because she felt like she had – that Defendant Frank had forced her mind to thinking it was okay.  (ECF No. 47-1, page 165.)

In October 2010, after criminal charges were filed against Defendant Frank, Bishop Miller became aware of the relationship and removed Defendant Frank as a Sunday School teacher.[8]  (ECF No. 48-5, page 17; ECF No. 11, ¶22.)  On April 18, 2011, Defendant Frank pled guilty to sexual assault with a 10-year age difference, a class 1 misdemeanor.  (ECF No. 49-3, pages 2-3.)  Defendant Frank had no prior arrests or convictions for sexual misconduct.  (ECF Nos. 47-4 to 47-11; 48-11.)

---

[8] Although not raised by Plaintiff, Defendant Frank stated he was released as a Sunday School teacher before Defendant Church learned of Plaintiff's allegations.  (ECF No. 47-12, page 3.)  Under the facts and arguments of this case, any inconsistency is not material.

Plaintiff's suit seeks to recover damages for physical and psychological injury, "impairment," and medical, psychological treatment and therapy bills and related expenses for treatment.  (ECF No. 11, page 7.)

## IV.  ANALYSIS

### A.  Plaintiff's First Claim for Battery against Defendant Frank.

The parties have filed cross motions for summary judgment on Plaintiff's claim for battery.  In order to recover on this claim, the following is required: (1) the defendant's act resulted in physical contact with the plaintiff; (2) the defendant intended to make harmful or offensive physical contact; and (3) the contact was harmful or offensive.  *See* CJI-Civ. 4th 20:5 (2014); *White v. Muniz,* 999 P.2d 814, 819 (Colo. 2000).  Plaintiff argues summary judgment is appropriate because Defendant Frank admitted he had unlawful contact with her.  Defendant Frank, however, argues Plaintiff's claim fails because: (1) her testimony that she is doing better now raises genuine issues of disputed fact regarding damages; (2) her consent to the sexual relationship raises a genuine issue of material fact as to whether the battery claim is barred by such consent; and (3) it is barred by the heart balm statute, C.R.S. § 13-20-201.  The Court finds summary judgment is inappropriate for both parties, but for reasons other than those argued by the parties.

First, Plaintiff has moved for summary judgment on the issue of liability for battery, not for damages resulting therefrom.  Thus, any issues of material fact concerning damages would not preclude the granting of summary judgment for Plaintiff on the issue of liability.

Next, consent is an affirmative defense to a claim for battery.  CJI-Civ. 4th 20:11 (2014); *see Espander v. Cramer,* 903 P.2d 1171, 1172-73 (Colo.App. 1995); Restatement (Second) of

Torts § 892A (1979).  To establish this defense, the following must be shown: (1) the plaintiff, by words or conduct, consented or led the defendant reasonably to believe she consented to the contact by the defendant; (2) the contact by the defendant was the same or substantially similar to that consented to by the plaintiff; and (3) the plaintiff was capable of giving consent.  CJI-Civ. 4th 20:11 (2014).  Here, Plaintiff testified that she *factually* "consented" to the sexual intercourse but that begs the question of whether she could, at the age of 15, *legally* consent.

In *Bohrer v. DeHart,* 943 P.2d 1220 (Colo.App. 1996), *rev'd on other grounds,* 961 P.2d 472 (Colo. 1998), the Colorado Court of Appeals addressed whether a minor could consent to a sexual relationship with her adult religious counselor, as a defense to an action by the minor for claims of breach of fiduciary duty, outrageous conduct, and negligent hiring and supervision.  In rejecting the defendants' argument that an instruction on comparative fault and the defense of consent should have been given to the jury, the court stated:

> Defendants' assertion is premised on the assumption that a child is capable of giving the kind of consent the law should recognize to a sexual relationship with an adult religious counselor.  However, a child is in no position to exercise independent judgment and evaluate on an equal basis the consequences of such a relationship.  For a child induced to give such "consent," harm is not only still inflicted, it may be exacerbated.

*Id.* at 1226 (quotation in original).  The court also relied on the Colorado General Assembly's determination that consent is not a defense to a criminal charge of sexual assault on a child less than eighteen years of age by one in a position of trust, or a defense to a criminal charge of sexual assault by a psychotherapist upon a patient.  *Id.* at 1227.  The court then concluded, "[w]e likewise decline to allow the defense, at least in the circumstances presented here."  *Id.* at 1227.

Defendant Frank argues the *Bohrer* court's statement shows that whether consent should be considered is a factual issue, *i.e.,* dependent on the circumstances, and not a legal one.  The

Court finds that the issue is a legal one, but dependent on the facts.  Under the *Bohrer* court's

analysis, where the General Assembly has determined, through its criminal statutes, that consent

is not a defense to certain criminal charges of sexual assault, it also cannot serve as a defense to a

civil action in tort.  This analysis comports with the Restatement (Second) of Torts § 892C

(1979) which provides:

> (1) Except as stated in Subsection (2), consent is effective to bar recovery in a tort
> action although the conduct consented to is a crime.

> (2) If conduct is made criminal in order to protect a certain class of persons
> irrespective of their consent, the consent of members of that class to the
> conduct is not effective to bar a tort action.

The Comment on Subsection (2) states this exception is derived from the legislation's

purpose to protect a certain class of persons against a particular conduct, irrespective of their

consent.  The conclusion that consent cannot be legally given by certain classes of persons is

buttressed by Illustration 7:  "A statute makes it rape to have sexual intercourse with a girl under

the age of sixteen even with her consent.  At the solicitation of A, a girl of fourteen, B has

intercourse with her.  A's consent does not bar her action for battery."

In this case, the General Assembly has determined that, for victims at least 15 years of

age but less than 17 years of age, an actor commits a sexual assault if the actor is at least ten

years older than the victim and is not the spouse of the victim.  C.R.S. § 18-3-402(1)(e).  Here,

the facts are undisputed that Defendant Frank pled guilty to violating this criminal statute.

Accordingly, under the undisputed facts, as a matter of law, Plaintiff's consent is no bar to her

claim for battery.  That leaves the question of whether her claim is nonetheless barred by the

heart balm statute.

Under the heart balm statute, "[a]ll civil causes of actions for breach of promise to marry, alienation of affections, criminal conversation, and seduction are hereby abolished." C.R.S. § 13-20-202. The legislative declaration to the heart balm statute provides that "the remedies" for the enforcement of such actions have, among other things, "been subjected to grave abuses, caused extreme annoyance, embarrassment, humiliation, and pecuniary damage" and therefore are abolished for public policy reasons. C.R.S. § 13-20-201. The statute only precludes those causes of actions specifically listed. *Destefano v. Grabrian*, 763 P.2d 275, 282 (Colo. 1988). It should not be applied further "than to bar actions for damages suffered from loss of marriage, humiliation, and other direct consequences of" the breach, alienation, criminal conversation or seduction, and "should not affect the rights and duties determinable by common law principles." *In re Marriage of Heinzman,* 40 Colo.App. 262, 579 P.2d 638, 640 (Colo.App. 1977), *aff'd*, 198 Colo. 36, 596 P.2d 61 (Colo. 1979); *see Weiszmann v. Kirkland & Ellis,* 732 F.Supp. 1540, 1544-1545 (D.Colo. 1990).

Here, Defendant Frank argues Plaintiff's claims are in essence for seduction. "Seduction is the act of a man in enticing a woman to have unlawful intercourse with him by means of persuasion, solicitation, promise, bribes, or other means without the employment of force." *Destefano,* 763 P.2d at 282 (quotation omitted). Relying on Plaintiff's allegations and testimony that Defendant Frank allegedly "recruited" Plaintiff to have a sexual relationship; that he used her only for sexual purposes and lied to her about his engagement to another woman; that she felt "hurt," " betrayed," and "manipulated"; and that he misled her and manipulated her into having sexual relations, Defendant Frank contends that Plaintiff's claims – including the one for battery

14

– fall squarely within the abolished tort of seduction.  On the record at hand, the Court is not persuaded.

If the claim is one for seduction, as Defendant Frank contends, then the question both parties must address is whether Plaintiff's claim is for damages suffered as a result of – *i.e.*, caused by – the alleged seduction.  Both parties failed to do so.  Instead, they relied on the underlying conduct alleged, but omitted to consider what *damages* are claimed.  *See In re Marriage of Heinzman,* 596 P.2d at 63 (statute bars action for damages suffered from breach of promise to marry and other direct consequence, such as humiliation); *Goldberg v. Musim,* 162 Colo. 461, 427 P.2d 698, 700-702 (Colo. 1967) (discussing conduct resulting in loss of services and society versus the same conduct resulting in loss of plaintiff's share of property and estate accumulated during marriage).  In other words, the inquiry must include whether Plaintiff is seeking damages, *e.g.,* bills for treatment or emotional distress, occasioned by discovering that Defendant Frank allegedly lied to her about wanting to marry her in order to induce her into having sexual intercourse.  Insofar as Plaintiff seeks to recover such or similar damages, her causes of action for battery (or any other claim) are merely disguised seduction claims barred by the heart balm statute.  *See Destefano,* 763 P.2d at 288-289 (plaintiff's claims related to adulterous conduct resulting in destruction of marriage was barred, but fiduciary duty claim arising from failure to refrain from conduct which created risk of harm to marital couple stated claim).  Based on the record before the Court, however, there are insufficient undisputed material facts to determine the question.  Accordingly, the motion for summary judgment as to the claim for battery is denied as to both parties due to factual issues that must be resolved.

**B. Plaintiff's Second Claim for Negligent Infliction of Emotional Distress and Sixth Claim for Outrageous Conduct against Defendant Frank.**

Plaintiff Second Claim alleges that Defendant Frank's violation of C.R.S. § 18-3-405.3 (sexual assault on a child by one in a position of trust) constitutes negligence per se which harmed Plaintiff. (ECF No. 11, page 5.) Her Sixth Claim alleges Defendant Frank engaged in extreme and outrageous conduct and caused Plaintiff severe emotional distress. Defendant Frank argues these claims are barred by the heart balm statute.[9] On the state of the record before the Court, and for the reasons stated above, it cannot fairly yet be determined whether or not these are disguised heart balm claims. Accordingly, summary judgment is inappropriate on these claims as well.

**C. Plaintiff's Claims against Defendant Church and the Heart Balm Statute.**

Defendant Church also argues Plaintiff's claims fall squarely within the abolished tort of seduction barred by the heart balm statute. For the reasons stated in Section A above, that issue cannot be resolved on the factual record before the Court. Accordingly, Defendant Church's request for summary judgment for all claims on this basis is denied.

**D. Plaintiff's Third Claim for Negligent Hiring and Fourth Claim for Negligent Supervision against Defendant Church.**

**i.   Negligence.**

The Colorado courts apply the Restatement (Second) of Agency § 213 (1958) ("Restatement") in determining liability for negligent hiring and supervision. "Liability exists only if all the requirements of an action of tort for negligence exist." Restatement § 213 cmt. a.

---

[9] Although not entirely clear, to the extent Defendant Frank is relying on the argument that he was not a fiduciary and owed Plaintiff no fiduciary duty, such argument is not relevant to determining whether the heart balm statute applies.

To establish a claim based on negligence, the plaintiff must show: (1) a legal duty owed to the plaintiff; (2) a breach of that duty by defendant; and (3) harm resulting in damage to the plaintiff caused by such breach. *Keller v. Koca*, 111 P.3d 445, 447 (Colo. 2005). Whether the defendant employer owes a legal duty to the plaintiff is a question of law for the court. *Keller,* 111 P.3d at 448.

In negligent hiring or supervision, "[l]iability of the employer is predicated on the employer's antecedent ability to recognize a potential employee's attributes of character or prior conduct which would create an undue risk of harm to those with whom the employee came in contact in executing his employment responsibilities." *Moses v. Diocese of Colo.*, 863 P.2d 310, 327 (Colo. 1993) (quotation and brackets omitted); *see Keller,* 111 P.3d at 448.

> The employer is subject to liability only for such harm as is within the risk. If, therefore, the risk exists because of the quality of the employee, there is liability only to the extent that the harm is caused by the quality of the employee which the employer had reason to suppose would be likely to cause harm.

*Destefano,* 763 P.2d at 287 (quoting Restatement § 213 cmt. d).

## ii.    Negligent Hiring.

Negligent hiring involves an "employer's responsibility for the dangerous propensities of the employee, which were known or should have been known by the employer at the time of hiring, gauged in relation to the employee's job duties." *Raleigh v. Performance Plumbing & Heating*, 130 P.3d 1011, 1016 (Colo. 2006). "An employer has a duty to exercise reasonable care in making his decision to hire." *Moses,* 863 P.2d at 327. "The requisite degree of care increases, and may require expanded inquiry into the employee's background, when the employer expects the employee to have frequent contact with the public or when the nature of

the employment fosters close contact and a special relationship between particular persons and the employee." *Moses,* 863 P.2d at 328.

In this case, Plaintiff argues Defendant Church was negligent in appointing Defendant Frank as a Sunday School teacher. In essence, she asserts Defendant Church owed her a duty to protect her from the sexual assault which occurred off church premises, and at times other than when Sunday School class was held. Neither the facts nor the law, however, support such a legal duty.

Plaintiff argues this duty existed because Defendant Church was aware of Defendant Frank's history of domestic violence and crimes involving his own children, but failed to discover his character to cause harm to women and children. The undisputed facts, however, are to the contrary. Instead, the evidence establishes that, at the time of his calling, Defendant Frank had been a church member for several years; Defendant Church's membership record bore no annotation for abuse; and Bishop Miller was only aware that around the time of the end of Defendant Frank's first marriage he had taken his children across state lines, which Bishop Miller viewed as domestic issues between a husband and wife. Such facts show no propensity or characteristic that put Defendant Church on notice that Defendant Frank posed a risk of harm to minors as implicated in this case.

Plaintiff also contends Defendant Church had a heightened duty to investigate due to Defendant Frank's regular contact with the public. In a church setting, the Colorado Supreme Courts has recognized that a church's duty is increased when placing a clergy with duties that not only required frequent contact with others (close association with parishioners) but also included counseling which induced reliance and trust by the parishioner. *Moses,* 863 P.2d at 328. But, no

such facts exist here.  Nonetheless, even assuming, *arguendo*, teaching a weekly 40-minute Sunday School class to a limited number of students in a group setting constitutes sufficient "regular contact" requiring an independent inquiry, that inquiry would have shown the "domestic violence" and other violations Plaintiff relies on arose from domestic disputes with Defendant Frank's ex-wife, such as calling her eight minutes earlier than allowed under a court order.  Such facts would not have put Defendant Church on notice of any character or propensity on the part of Defendant Frank to engage in sexual misconduct involving a minor at church or, for that matter, anywhere else.[10]

Plaintiff also relies on Bishop Miller's testimony that if he had knowledge of the information in the Colorado Database concerning Defendant Frank, Bishop Miller probably would not have extended the calling to Defendant Frank.  The reliance, however, is misplaced because the information which Defendant Church would have received would not have been so limited.  As discussed, a background check would have disclosed the bases for the various domestic related charges.[11]  Such violations would not have been sufficient to put Defendant Church on notice of any predisposition that would subject Plaintiff to a serious risk of harm.   In other words, the harm complained of was not foreseeable.  As such, Defendant Church owed no legal duty to protect Plaintiff as claimed.

---

[10] Plaintiff's testimony of a hug, passing notes, text messages or the like while at the Eighth Ward, of which there is no evidence of any sexual or otherwise inappropriate content, without more, do not support a finding of "grooming." Moreover, even assuming, *arguendo*, such an inference could be made, there is no evidence that such risk was foreseeable, even if Defendant Church had all the information about Defendant Frank's domestic relations related issues.
[11] By this statement, the Court is neither trivializing nor rendering any opinion or judgment concerning the seriousness of such violations.

### iii.      Negligent Supervision.

"[I]n a claim for negligent supervision against an employer the plaintiff must prove that the defendant knew his employee posed a risk of harm to the plaintiff and that the harm that occurred was a foreseeable manifestation of that risk." *Keller,* 111 P.3d at 446.  In other words, "the plaintiff must prove that the employer has a duty to prevent an unreasonable risk of harm to third persons to whom the employer knows or should have known that the employee would cause harm." *Keller,* 111 P.3d at 448; *Moses*, 863 F.2d at 329; *Destefano,* 763 P.2d at 288. "While the tort of negligent supervision applies to instances where the employee is acting outside his scope of employment, it does not extend to *all* acts undertaken by an employee that are actionable in tort." *Keller,* 111 P.3d at 448 (emphasis in original).  As with negligent hiring, liability is "predicated on the employer's *antecedent ability* to recognize a potential employee's attributes of character or prior conduct which would create an undue risk of harm to those with whom the employee came in contact in executing his employment responsibilities." *Keller,* 111 P.3d at 448 (quotation and brackets omitted; emphasis added).  Accordingly:

> the question of whether the employer owes a duty of care to the injured third party boils down to issues of *knowledge* and *causation*—whether the employee's acts are so connected with the employment in time and place such that the employer knows that harm may result from the employee's conduct and that the employer is given the opportunity to control such conduct.

*Keller,* 111 P.3d at 448-449 (emphasis added).

In this case, Plaintiff argues Bishop Miller's knowledge of Defendant Frank's "history of domestic violence and taking his children across state lines" created a special duty to supervise Defendant Frank's performance as a Sunday School teacher.  As previously discussed, Bishop Miller had no such knowledge.  Moreover, even if Defendant Church had conducted a criminal

background check, it would have shown the "domestic violence" consisted of, for example,

Defendant Frank calling his ex-wife earlier or later than otherwise allowed by court order.  The

"known risk" of "harm" disclosed, if any, would be toward Defendant Frank's family.  Such

knowledge would not have disclosed a known risk of "grooming" or sexual assault on an

unrelated minor – or on any member of the public in general – by Defendant Frank, at church or

anywhere else.  *Cf. Keller*, 111 P.3d at 450 (employer's knowledge of employee's proclivities to

engage in lewd and sexual behavior with female employees on premises during business hours

imposed duty on employer "to take reasonable steps to prevent *that* harm from occurring"

(emphasis in original)).

There is an obvious and significant disconnect between the conduct causing or

constituting harm – the sexual intercourse – and the duty to supervise which Plaintiff seeks to

recognize in this case.  The conduct occurred off of church property at a time and place wholly

disconnected from the church and, more importantly, from the Sunday School class which

Plaintiff alleges was negligently supervised.  In the language of *Keller*, what is lacking is an

"opportunity to control such conduct" by Defendant Church.  *Keller*, 111 P.3d at 449.  In an

effort to bridge the gap between the conduct and Defendant Church's ability to supervise,

Plaintiff focuses on two matters – first, a lack of training and other physical attributes of the

Sunday School class and, second, "grooming" of Plaintiff by Defendant Frank.

Plaintiff relies on the "lack" of the following: training of Defendant Frank before

assigning him the role as a Sunday School teacher; a co-teacher in the Sunday School class; a

window in the closed Sunday School classroom door; and supervision in general.  Before a duty

of care may exist, however, "there must be a connection between the employer's knowledge of

the employee's dangerous propensities and the harm caused." *Keller*, 111 P.3d at 450.  In this

case, there is insufficient evidence that any alleged supervision deficiencies caused the harm.

Here, there is no evidence that Defendant Frank's lack of training on religious education

was the cause of the sexual intercourse, and it should go without saying that an employer need

not have to "train" a 40-year old adult male that he is prohibited from engaging in sexual

intercourse with a 15-year old.  There is also no evidence that the lack of a co-teacher or a

window in the classroom door caused the harm – the sexual interactions occurred at night,

outside of Plaintiff's house.

Undoubtedly aware of this difficulty, Plaintiff turns to her argument of "grooming."

Here, Plaintiff alleges that Defendant Frank "groomed" Plaintiff during Sunday School class,

that the grooming occurred due to a lack of supervision and that the intercourse would not have

occurred without the grooming.  In constructing the argument, however, Plaintiff consistently

fails to identify specific conduct constituting grooming; to tie that conduct to the Sunday School

class; and to explain how that conduct would have been deterred by some specific form of

supervision.  The only conduct directed toward Plaintiff during Sunday School class was the

sending of text messages from Defendant Frank while he was teaching, but there is no evidence

this had any sexual content or was "grooming."  In short, Plaintiff constructs a series of

precarious lily pads and invites the Court to hop from one to another to connect harmful conduct

on one shore with a supervision deficiency on the other.  The law does not allow the Court to do

so.

Moreover, even assuming, *arguendo*, that the referenced conduct could be deemed

grooming, it would be dwarfed by the non-controllable instances of identical conduct.  Plaintiff

testified that she and Defendant Frank exchanged hundreds of text messages and thousands of calls outside of church – all between about 9:00 p.m. to 2:00 a.m. or 3:00 a.m. – when Defendant Frank got off of work from Chili's.  If any grooming occurred, it was far from a time and place connected with Defendant Frank's "employment" at Defendant Church.[12]

In summary, there is simply no evidence the conduct complained was reasonably foreseeable by Defendant Church thus triggering a duty to impose specific forms of supervision to prevent it.  Under Plaintiff's theory, due to Defendant Frank's violation of court orders in disputes with his ex-wife, Defendant Church owed Plaintiff a duty to supervise Defendant Frank to prevent sexual intercourse with minors, something the law does not require.  Moreover, even if the operative conduct is the grooming, as opposed to the sexual intercourse, there is simply no conduct constituting grooming supported by, or which may be inferred from, the evidence which would or could have been prevented by a window, co-teacher or other forms of supervision of the Sunday School class.  On this record, Plaintiff's claim for negligent supervision cannot be sustained.

**E.  Plaintiff's Fifth Claim for Breach of Fiduciary Duty against Defendants.**

Defendants contend there was neither a fiduciary duty nor the breach of any such duty.  First, according to Defendants, no court has recognized a fiduciary duty based on a "*basic clergy-congregant relationship*"[13] much less a Sunday School teacher-student relationship.  In other words, attending church or its Sunday School does not create a fiduciary relationship

---

[12] The Court is not unmindful of the fact that a gift of Tinker Bell panties by a 40-year old man to a 15-year old girl could reasonably be construed as some form of grooming.  Nonetheless, the evidence does not suggest this gift was given at, during, or in connection with Sunday School class.  The Court further notes that it would be required to take a sizable leap to infer that an adult male would give such a gift to a 15-year old girl in a public setting.  In other words, the presence of other students in the class would have as much deterrent effect as the presence of a co-teacher.

[13] ECF No. 47, page 11 (emphasis supplied).

between the church/school/teacher and the parishioner/student.  Second, according to

Defendants, even if Defendant Frank was a fiduciary, Defendant Church is not vicariously liable

for any breach.[14]

Under Colorado law, in order to state a claim for breach of fiduciary duty, a plaintiff must

prove the defendant was acting as a fiduciary of the plaintiff, the defendant breached his

fiduciary duty, and such breach caused the plaintiff's damages.  CJI-Civ. 4th 26:1 (April 2014).

"A fiduciary is a person having a duty, created by his undertaking, to act primarily for the benefit

of another in matters connected with the undertaking."  *Destefano,* 763 P.2d at 284; *Accident &*

*Injury Med. Specialists, P.C. v. Mintz*, 279 P.3d 658, 663 (Colo. 2012).  "The existence of a

fiduciary relationship is a prerequisite to a finding of a fiduciary duty."  *Winkler v. Rocky Mtn.*

*Conf. of United Methodist Church*, 923 P.2d 152, 157 (Colo.App. 1995).

Certain types of relationships constitute a fiduciary relationship as a matter of law, such

as the attorney and client relationship or principal and agent relationship.  *See Accident & Injury*

*Med. Specialists, P.C.,* 279 P.3d at 663.  Other fiduciary relationships are based on the particular

circumstances of the relationship between the parties.  *Id.*  A fiduciary relationship *may* arise

when one person occupies a superior position relative to another.  *Winkler,* 923 P.2d at 157; *see*

*Moses*, 863 P.2d at 321.  "An unequal relationship does not automatically create a fiduciary duty.

In order to be liable the superior party must assume a duty to act in the dependent party's best

interest."  *Moses,* 863 P.2d at 322.  Thus, it requires not only a repose of trust, confidence and

reliance, but also an assumption of a duty.  *See Moses*, 863 P.2d at 322; *Winkler,* 923 P.2d at

---

[14] Defendant Frank joined in Defendant Church's arguments; however, this latter argument could only apply to Defendant Church.

157.  Whether one party owes fiduciary duties to another is a mixed question of law and fact. *Accident & Injury Med. Specialists, P.C.,* 279 P.3d at 662.[15]

The clergy-parishioner relationship is not necessarily a fiduciary relationship.  *Moses,* 863 P.2d at 322.  The Colorado courts have recognized that a fiduciary relationship may arise in limited instances between a parishioner and the church and/or its ministers, such as where the clergy/church accepted the parishioner's trust and accepted the role of counselor, *see Moses*; or where the priest acted as a marriage counselor to parishioners, *see Destefano*; or where the pastor counseled the parishioner and the church conference assumed control of the investigation of the complaints of the parishioner and others against the pastor, *see Winkler*.  In contrast, no fiduciary duty was found where there was no evidence that defendant church conference ever assumed a duty to act solely or primary in the interests of parishioner in investigating and resolving her complaint of sexual misconduct by the minster at her church.  *Bohrer,* 945 P.2d at 1229.  These cases demonstrate there are instances where a fiduciary duty may arise between a church/clergy-parishioner; however, the mere fact that there *is* a church/clergy-parishioner relationship, without more, in insufficient to create such a duty.  *See Houston v. Mile High Adventist Academy*, 872 F.Supp. 829, 834-835 (D.Colo. 1994).[16]

Here, in the Complaint, Plaintiff *alleges* that Defendants Church and Frank were acting as fiduciaries in providing religious instruction and creating a setting for interaction which created trust and reliance.  (ECF No. 11, page 6.)  In her Response, Plaintiff *argues* Defendants placed themselves in a position of superiority, trust and influence and she, then age 15, was

---

[15] In earlier cases, the Colorado courts have stated that the existence of a fiduciary relationship is a question of fact for the jury. *E.g., Moses,* 863 P.2d at 322.

[16] The Court recognizes that since *Houston* was decided, there have been some decisions by courts in other jurisdictions which have found an educational institution may act as a fiduciary in relation to its students.  The parties cited to no controlling Colorado law on the issue.

vulnerable and dependent.  As Defendants have argued, what is notably absent is any *evidence* that Defendants assumed any duty to act in Plaintiff's best interest or that Plaintiff reposed any trust or confidence in and relied on Defendants to protect her interest.  Instead, Plaintiff was a visiting parishioner, present at church services like all other parishioners and at Sunday School like other young men and women.  She was free to attend or not attend, as demonstrated by her testimony that she attended anywhere from three to 20 occasions.  Such undisputed facts do not support the existence of a fiduciary relationship between Defendants and Plaintiff.  Similarly, Plaintiff's bare allegations and arguments that a fiduciary duty existed, without any evidentiary basis to show such a duty in fact existed, are insufficient.  Further, as discussed above, the legal authorities upon which Plaintiff relies do not support her theory that a fiduciary duty existed under the undisputed facts.  Accordingly, dismissal of this claim is appropriate for both Defendants.

### F.  Plaintiff's Sixth Claim for Outrageous Conduct against Defendants.

Defendants argue dismissal of this claim is proper, relying on different theories.  In order to establish a claim for outrageous conduct, the plaintiff must show: "(1) the defendant engaged in extreme and outrageous conduct; (2) recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) [caused] the plaintiff severe emotional distress."  *Reigel v. Savaseniorcare L.L.C.*, 292 P.3d 977, 990 (Colo.App. 2011).

> The level of outrageousness required to constitute extreme and outrageous conduct is extremely high.  The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities are insufficient.

However, conduct, otherwise permissible, may become extreme and outrageous if it is an abuse by the actor of a position in which he has actual or apparent authority over the other, or the power to affect the other's interests. Conduct may also become outrageous where the defendant proceeds though he knows that the plaintiff is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity.

*Id.* at 990-991 (quotations and citations omitted).  The claim may be submitted to a jury only if reasonable persons could differ on whether the defendant's conduct was sufficiently outrageous. *Id.* at 991.  Whether reasonable persons could differ on the issue is a question of law for the court in the first instance. *Id.* at 991.

Plaintiff bases her outrageous conduct claim on the following: (1) the sexual intercourse; (2) Defendant Church "exposing" Plaintiff to Defendant Frank; (3) Bishop Miller's calling for legal assistance for Defendant Church instead of calling for assistance for Plaintiff; and (4) Defendant Church's alleged blaming and attacking of Plaintiff, including designating Plaintiff's parents and stepparents as parties at fault.

Defendant Frank only argues this claim is barred by the heart balm statute.  As previously discussed, there are insufficient facts in the record to establish the statute applies to Plaintiff's claims.  Accordingly, dismissal is inappropriate on this basis.

As for Defendant Church, it contends it did nothing outrageous because: (1) Plaintiff's argument presumes it knew Defendant Frank posed a risk to her, but the evidence is to the contrary; (2) Bishop Miller did not learn of Defendant Frank's conduct until after assistance had already been sought on behalf of Plaintiff and after Defendant Frank had been arrested; (3) and Plaintiff alleged no "outrageous" conduct directed at her by the Church.  The Court agrees with each contention.  In addition, Plaintiff may not, under the facts and circumstances here, rely on actions taken as part of Defendant Church's litigation defense to support a claim for outrageous

27

conduct, *e.g.,* the designation of parties at fault.  Further, even assuming, *arguendo*, Plaintiff may do so, the Court finds that all the conduct complained of, taken singularly or as a whole, would not lead a reasonable person to conclude that such conduct was "atrocious and utterly intolerable in a civilized community."  *Reigel,* 292 P.3d at 992 (quotation and brackets omitted).  Therefore, summary judgment on this claim is warranted as to Defendant Church.

### G. Constitutional Issues.

In addition to the various defenses discussed above, Defendant Church has also asserted a variety of First Amendment defenses to Plaintiff's claims.   The Court need not reach the constitutional challenges raised in the matter in light of its rulings on the various matters.  Accordingly, it declines to do so.  *See United States v. Hardman*, 297 F.3d 1116, 1135-1136 (10th Cir. 2002)

## V.  CONCLUSION

For the reasons stated, (1) Defendant Church's motion for summary judgment on all claims is granted and it is dismissed from this case entirely; (2) Plaintiff's motion for summary judgment on the claims for negligent hiring and supervision is denied; (3) Plaintiff's motion for summary judgment on the claim for battery is denied; and (4) Defendant Frank's motion for summary judgment, through his joinder in Defendant Church's motion for summary judgment, is granted as to the claim for breach of fiduciary duty but denied as to all other claims.  It is therefore,

ORDERED that Defendant Church's Motion for Summary Judgment (ECF No. 47) is GRANTED and all claims against Defendant Church are hereby DISMISSED with prejudice;

FURTHER ORDERED that Plaintiff's Motion for Summary Judgment on her Claims for Negligent Hiring and Negligent Supervision against Defendant Church (ECF No. 49) is DENIED;

FURTHER ORDERED that Plaintiff's Motion for Summary Judgment on her Claim for Battery against Defendant Frank (ECF No. 50) is DENIED; and

FURTHER ORDERED that Defendant Frank's Motion for Summary Judgment on Plaintiff's First, Second, Fifth and Sixth Claims for Relief (ECF No. 51) is GRANTED as to the Fifth Claim for Breach of Fiduciary Duty and this claim is DISMISSED with prejudice but DENIED as to the remaining claims against Defendant Frank.

DATED this 22nd day of May, 2014.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge